## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

TAMMY J. BOYD,

On behalf of herself and on behalf of
all others similarly situated,

                                                    10-cv-426

                   Plaintiff,

    v.

MERITER HEALTH SERVICES
EMPLOYEE RETIREMENT PLAN, and
MERITER HEALTH SERVICES, INC.


                   Defendants.

---

## CLASS ACTION COMPLAINT

---

### NATURE OF ACTION

1.     This is a proposed class action under the Employee Retirement Income

Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*

### SUBJECT MATTER JURISDICTION

2.     This Court has subject matter jurisdiction over this action by virtue of 28

U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

Specifically, this action is brought under ERISA § 502, 29 U.S.C. § 1132.

### PERSONAL JURISDICTION AND VENUE

3.     This Court has personal jurisdiction over Defendants (defined below) because

they transact business in, and have significant contacts with, this District, and because ERISA

provides for nationwide service of process.  *See* ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

4.     Under ERISA § 502(e), 29 U.S.C. § 1132(e), an action "may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found."  Venue here is proper for Defendants on three of the four bases provided by the statute.

5.     First, this is the District where, among other places, the alleged breaches occurred.  Where a participant claims that a violation of ERISA resulted in a failure to pay a benefit due under an ERISA plan, either under the express terms of the plan or terms implied by law, the alleged breach is deemed to have occurred in the place where the participant received or should have received his or her plan benefits.  It was in this District, where Plaintiff currently resides and resided at the relevant time, that the Plan benefits at issue here should have been paid to her.

6.     Second, the Plan and the Company "may be found" in this District in either a general or specific personal jurisdiction sense.

7.     There is general personal jurisdiction over the Plan because many hundreds of residents of this District, as employees of the Company, are currently being credited benefits under the Plan in this District, or, as former employees of the Company, are currently receiving benefits from the Plan in the District.  In addition, the Plan comes into this District on a continuous basis to communicate with these District residents regarding their benefits, including through a highly-interactive Plan internet website.

8.     There is general personal jurisdiction over the Company because it has continuous and systematic contacts with this District through its employment of thousands of

District residents, ownership of property in the District and operation of hospitals, clinics, and other facilities in this District.

9.     There is specific personal jurisdiction over both Defendants insofar as this action arises out of the failures to pay or credit Plaintiff and/or other proposed Class members residing in this District pension benefits that should have been paid or credited in this District.

10.     Third, each Defendant "resides" here within the meaning of ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

**THE PARTIES**

11.     Plaintiff Tammy J. Boyd is a former employee of Meriter Health Services, Inc. ("Meriter" or the "Company") who resides in Wonewoc, Wisconsin.  Plaintiff Boyd participated in the Plan during her period of employment with the Company and remains a Plan participant, as defined in ERISA § 3(7), because although she received benefits from the Plan, it owes her additional benefits that it has not yet paid her, as set forth herein.

12.     Defendant Meriter Health Services Employee Retirement Plan (the "Meriter Plan" or the "Plan") (EIN 39-1412318, Plan No. 002) is and was at all relevant times an "employee pension benefit plan," and more specifically a "defined benefit plan," within the meaning of ERISA §§ 3(2)(A) and 3(35).

13.     The Plan's administrator and named fiduciary within the meaning of ERISA §§ 3(16)(A), 3(21), and 402(a), 29 U.S.C. § 1002(16)(B), is the "Pension Committee," which is also known as the Executive Compensation and Pension Committee.  The Pension Committee consists of persons appointed by the Company who serve at the pleasure of the Company, which may remove them at any time for any reason.

14.     The document (sometimes referred to the "plan document" or "master plan document") reflecting the terms of the Plan as of October 1, 1987 through January 1, 1997, inclusive of intervening amendments, is referred to herein as the "1987 Plan document."[1]

15.     The Plan was amended and restated effective January 1, 1997.  The document reflecting the terms of the Plan as of January 1, 1997 through January 1, 2003, inclusive of intervening amendments, is referred to herein as the "1997 Plan document." [2]

16.     The Plan was amended and restated effective January 1, 2003.  The document reflecting the terms of the Plan as of January 1, 2003 through the present, inclusive of intervening amendments, is referred to herein as the "2003 Plan document." [3]

17.     Defendant Meriter Health Services, Inc. ("Meriter" or "the Company") is and has been the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B) since October 1, 1987.

18.     Meriter Health Services, Inc. was formed in 1987 when the parent companies of Madison General Hospital and Methodist Hospital merged.

19.     Prior to the 1987 merger, employees of the Madison General Hospital and its affiliates included participants in three traditional defined benefit pension plans:  the Madison

---

[1] This document is distinct from Defendant Meriter Plan.  *See Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755, 757 (7th Cir. 2003) ("The plan (in the sense of the pension contract, as distinct from the entity that provides the pensions required by the contract--we use the word in both senses and trust to context to disambiguate) is what is called a 'cash balance' plan . . . .").

[2] Citations to "Plan § __" are, except as otherwise stated, generally citations to the 1997 Plan document, although they may also be taken as references to the identically or similarly numbered provisions of the 1987 Plan.

[3] All versions of the Plan document (including all amendments and appendices thereto), the Plan's Summary Plan Descriptions, and Statements of Material Modifications (if any) and any other documents to which this complaint refers are incorporated as if attached hereto.  *See* Fed. R. Civ. P. 10(c).

General Hospital Association Pension Plan; the General Medical Laboratories Pension Plan; and the General Health Management Company Pension Plan.

20.     The other hospital system involved in the 1987 merger, Methodist Hospital, participated in a multi-employer defined contribution plan sponsored by the Wisconsin Hospital Association.

21.     In or about 1987, Meriter converted the Madison General Hospital Association Pension Plan to a cash balance formula, and renamed it the Meriter Health Services Employee Retirement Plan, and consolidated the participants of the other Madison General defined benefit plans (namely, the General Medical Laboratories Pension Plan and the General Health Management Company Pension Plan) and the Methodist Hospital defined contribution plan into the Meriter Plan.

22.     Reference to "Defendants," "Meriter," or the "Meriter Plan," should be read, as applicable, to include Meriter, the Meriter Plan, the Meriter Board of Directors, the Pension Committee and/or one or more of its Members, and/or other Plan fiduciaries or service providers whether or not such entities or persons are or may become named defendants in this action.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings suit on behalf of herself and on behalf of all other participants and beneficiaries similarly situated under the provisions of Rule 23 of the Federal Rules of Civil Procedure with respect to violations alleged herein.  Plaintiff proposes a Class as follows:

> All persons who accrued a vested benefit under the Meriter Health Services Employee Retirement Plan between October 1, 1987 and December 31, 2002, and the beneficiaries and estates of such persons.

24.    The requirements for maintaining this action as a class action under Fed. R. Civ. P. 23(a)(1) are satisfied in that there are too many Class members for joinder of all of them to be practicable.  There are at least hundreds of members of the proposed Class dispersed among many states.

25.    The claims of the Class members raise numerous common questions of fact and law, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(2).  There are several issues of fact and law concerning liability and/or relief common to all Class members.

26.    Plaintiff's claims are typical of the claims of Class members, and therefore satisfy the requirements of Fed. R. Civ. P. 23(a)(3).  She does not assert any claims relating to the Plan in addition to or different than those of the Class.

27.    Plaintiff is an adequate representative of the proposed Class, and therefore satisfies the requirements of Fed. R. Civ. P. 23(a)(4).  Plaintiff's interests are identical to those of the proposed Class.  Defendants have no unique defenses against Plaintiff that would interfere with her representation of the Class.  Plaintiff has engaged competent counsel with both ERISA and class action litigation experience.

28.    Additionally, all of the requirements of Fed. R. Civ. P. 23(b)(1) are satisfied in that the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for defendants and individual adjudications present a risk of adjudications which, as a practical matter, would be dispositive of the interests of other members who are not parties.

29.     All of the requirements of Fed. R. Civ. P. 23(b)(2) also are satisfied in that the Plan's actions affected all members in the Class in the same manner, making appropriate final declaratory and injunctive relief with respect to the Class as a whole.

## ADDITIONAL ALLEGATIONS

**A.     Defendants' Annuity-Based Cash Balance Plan.**

30.     A cash balance plan is, by law, a defined benefit plan and not a defined contribution plan and as a result, the "accrued benefit" under a cash balance plan, like any defined benefit plan, must be expressed in terms of an annual benefit commencing at normal retirement age, which is typically age 65 (often referred to as the "normal retirement benefit"). *See* IRS Notice 96-8, 1996-1 C.B. 359, 1996 WL 17901, Sec. II.A (Feb. 5, 1996); *see also Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755, 762 (7th Cir. 2003) (Notice 96-8 is "authoritative").

31.     The accrued benefit under a cash balance plan cannot be, no matter how creative the plan sponsor, its consultants or its actuaries, the same as the accrued benefit in a defined contribution plan – *i.e.,* the "balance of the individual's account," ERISA § 3(23)(B), 29 U.S.C. § 1002(23)(B).

32.     There are basically two types of "cash balance" plans.  The typical cash balance plan is designed to look like a defined contribution plan.  In such plans, benefits are defined by reference to notional account balances.  The employer periodically credits the accounts with "pay credits" typically equal to a percentage of each participant's salary or wages, and the account balance then grows via "interest credits" typically pegged to the a fixed or variable outside index.  The Alliant Energy Cash Balance Pension Plan, designed by

Towers Perrin in the mid to late 1990's, resembles this model. *See generally Ruppert v. Alliant Energy Cash Balance Pension Plan*, 08-cv-127-bbc, 2010 WL 2264954 (W.D. Wis. June 3, 2010). Under this style of cash balance plan, the accrued benefit is the current account balance *plus* future interest credits promised under the plan, converted to an annual benefit at normal retirement age. *Id.* at *1.

33. There is another, much less typical, type of "cash balance" plan that dates from an earlier era. This is a cash balance plan that is written in a fashion that lets the sponsor portray it to regulators as something it decidedly is not – namely, a traditional defined benefit. These "annuity-based" cash balance plans borrow the nomenclature of traditional defined benefit plans but attempt to be functionally equivalent to account-based cash balance plans. In the words of one prominent employer-side cash balance expert, Paul V. Strella:

> Although most cash balance plans are designed to look like an account based defined contribution plan, they can also be designed to look like a traditional career average pay defined benefit plan with an indexed annuity benefit. Some of the earlier cash balance plans were designed using the indexed annuity approach to look more like a traditional defined benefit plan to facilitate IRS approval. . . . Under the indexed annuity approach, a cash balance formula would look like a traditional defined benefit career pay formula. An employee would accrue a benefit for each year of service based on that year's pay. Each year's benefit accrual would then be indexed, using an index rate specified by the plan.

*See* Paul Strella, *Specialized Qualified Plan – Cash Balance, Target, Age-Weighted and Hybrids*, Tax Management Portfolio No. 352-3rd (BNA 2005) ("Strella Treatise").[4]

---

[4] Mr. Strella is an attorney and enrolled actuary with the Washington Resource Group of Mercer Human Resource Consulting, a global consulting firm that advises Fortune 500 companies with regard to cash balance and other plans. *See* http://wrg.wmmercer.com/about.asp?a=wrg.

8

34.     The "yearly accruals" under annuity-based cash balance plans are the functional equivalent of "pay credits" under account-based cash balance plans, while the "indexing" is a stand-in for the more typical "interest credits."

35.     The Meriter Plan, designed by Towers Perrin in the mid-1980's, is precisely the type of indexed, annuity-based, career average pay formula cash balance plan that Mr. Strella describes in his treatise.

36.     Under the terms of the 1987 and 1997 Meriter Plan documents, during October 1, 1987 through January 1, 2003, benefits are expressed in terms of a monthly annuity commencing at normal retirement age (age 65) for the life of the participant and his or her spouse, if applicable.

37.     Thus, Plan § 1.1 defines the "'Accrued Benefit'" as meaning "as of any date of reference . . . an annual amount equal to the sum of (a) the Prior Plan Benefit (if any) plus (b) the Transition Benefit (if any) plus (c) *the sum of **all Yearly Accruals*** where (a), (b) and (c) are expressed in the Normal Form commencing at Normal Retirement Date and are adjusted to such date of reference in accordance with the procedures outlined in Section 3.14." (emphasis added).  In turn, Plan § 3.8 defines the "Yearly Accrual" as "an amount of pension . . . payable under the Normal Form" – which is a Qualified Joint & Survivor Annuity for married participants or a straight life annuity for single participants.[5]

---

[5] For former participants in Madison General's defined benefit plans, the "Prior Plan Accrued Benefit" is the "accrued benefit calculated in accordance with the terms and conditions of the respective Prior Defined Benefit Plan."  Plan § 1.46.  For former participants in Methodist Hospital's defined contribution plan, the account balance is simply that participant's account balance in the defined contribution plan.  Plan § 1.45.  The Transition Credit is an additional amount accrued by those participants who were employed by Meriter on October 1, 1987 that is calculated based on the participants' Prior Plan Accrued Benefit.  Plan § 3.7.

38.     Each year, participants who contribute 1% of their pay for the year ("Annual Earnings"), *see* Plan § 2.2, with less than 10 years of vesting service accrue an age 65 monthly annuity equal to 0.75% of the participant's pay for the year whereas participants with more than 10 years of vesting service accrue an age 65 monthly annuity equal to 0.9375% (*i.e.* .75% + .1875%) of the participant's pay.

39.     The accrued age 65 annuity is then "adjusted . . . in accordance with Plan § 3.14" – *i.e.,* it is indexed or automatically increased each year by the Plan's "Indexing Rate."

40.     The Indexing Rate is defined in Plan § 3.14(A) which provides that each year prior to the commencement of benefits, starting on January 1, 1989, the Accrued Benefit as of the prior January 1, shall be increased by 4% – which according to the 1987 and 1997 Plan documents is the "Indexing Rate" – unless that rate is "amend[ed]" by the Pension Committee.  (However, during the Plan Year in which a lump sum distribution is made, the Indexing Rate is 1% for each completed calendar quarter prior to distribution.).

41.     The Indexing Rate thus applies annually to the accumulation of yearly accruals to date  – the Accrued Benefit, payable in the Normal Form – prior to the participant's receipt of the benefit in lump sum form or the commencement of annuity payments if benefits are paid in that form.

42.     Because the indexing is automatic and applies each year regardless of a participant's employment status, the right to future indexing rates is part of the participant's accrued benefit (as defined in IRC 411(a)(7)), just as the right to future interest credits are part of the accrued benefit in a "frontloaded" account-based cash balance plan.  *See* IRS Notice 96-8, Sec. III.A.  In other words, the normal retirement benefit is the *nominal annuity* amount

accrued to date, *plus future indexing* through normal retirement age.  This is the case because the indexing is functionally indistinguishable from both interest credits under a frontloaded account-based cash balance plan and the kind of automatic post-retirement cost-of-living adjustment ("COLA") that the Seventh Circuit held in *Hickey v. Chicago Truck Drivers, Helpers & Warehouse Workers Union*, 980 F.2d 465 (7th Cir. 1992), to be part of participants' accrued benefits.  *See* Strella Treatise, *supra* at 93 (the rate of benefit indexing "is merely a substitute for" the rate of interest credits; moreover, "[t]he guaranteed interest credits in the cash balance plan are analogous to the COLAs in *Hickey*, particularly if the cash balance plan is considered from the indexed career average plan perspective").

**B.     Defendants' Violations of ERISA's Accrued Benefits Standards.**

43.     The problem is, notwithstanding decisions like *Hickey* and *Berger* and the IRS's clear admonitions in Notice 96-8 and elsewhere, Defendants did not see it this way. Thus, the value of the guaranteed future indexing – which was, as shown below, as a matter of law, not the mere 4% rate referenced in the Plan document but ***the greater of*** 4% **or *75% of the Plan's asset returns for the plan year* (or similar formula)** – was and is not taken into account in computing participants' benefits.

44.     IRS Notice 96-8, Section III. B.1 states that "in determining the amount of an employee's accrued benefit, a forfeiture, within the meaning of § 1.411(a)-4T, will result if the value of future interest credits is projected using a rate that understates the value of those credits or if the plan by its terms reduces the interest rate or rate of return used for projecting future interest credits.  A forfeiture in violation of section 411(a) also will occur if, in determining the amount of an employee's accrued benefit, future interest credits are not taken

into account (*i.e.,* there is no projection of future interest credits) and this has the same effect as using a rate that understates the value of future interest credits."

45.     In violation of these standards and the IRS's clear admonition in Notice 96-8, Defendants failed to "prescribe the method for reflecting future interest credits" – aka Indexing Rates – "in the calculation of an employee's accrued benefit . . . [in a way that] preclude[s] employer discretion . . . [and ensures that] the value of future interest credits is projected using a rate that [does not] understate[] the value of those credits."  Notice 96-8, Section III. A.

46.     Instead, Defendants simply calculated and paid benefits to participants such as Plaintiff and members of the proposed Class based on the nominal accrued benefit to date, indexed only at the 4% rate.  Therein lies the violation of *Hickey*, *Berger*, and Notice 96-8.

47.     When the projected indexing (aka "interest credits") is taken into account in determining the accrued benefit under the Plan as the law requires, the result is far different than the accrued benefits Defendants calculated for Plaintiff and members of the Class.  The right to receive through age 65 the greater of:  (1) a guaranteed positive 4% minimum, applied annually, or (2) 75% of the calendar year returns generated by the investment of the Plan's assets also applied annually, with no ceiling on the return that could be earned under the portfolio-based variable return component, is obviously an extremely valuable right and obviously far more valuable than a mere 4%.

48.     As a result of Defendants' exclusion of the true value of the Plan's Indexing Rate, all benefit payments prior to age 65 (lump sum or annuity) were miscalculated and,

where applicable, underpaid, and are continuing to be miscalculated and underpaid to this day.

**C.      Defendants' "*Ad Hoc* Amendment" Attempt to Evade Their Responsibility for Complying with ERISA's Accrued Benefit Standards Was and Is Unavailing.**

49.      Defendants also attempted to avoid paying participants their due by pretending that the only portion of the Indexing Rate that was guaranteed through normal retirement age was 4% when in fact Meriter committed to indexing benefits at the greater of 4% or 75% of the Plan's asset returns (or similar formula) for each plan year.

50.      ERISA and the Code provide that, subject to exceptions that are not relevant here, a retirement plan may not be amended to reduce the accrued benefit of any participant, *see* ERISA § 204(g), 29 U.S.C. § 1054(g); IRC § 411(d)(6), and must "provide systematically for the payment of definitely determinable benefits."  Treas. Reg. § 1.401(a)-1(b)(1)(i); *accord* Rev. Rul. 79-90, 1979-1 CB 155; IRC § 401(a)(25) ("actuarial assumptions . . . [must be] specified in the plan in a way which precludes employer discretion"); ERISA § 402(b)(4), 29 U.S.C. § 1102(b)(4) (plan must "specify the basis upon which payments are made . . . from the plan").

51.      Under Treas. Reg. § 1.411(d)-4, Q&A-1(c), if an employer establishes a pattern of repeated plan amendments providing for similar benefits in similar situations for substantively consecutive, limited periods of time, such benefits are treated as provided for under the terms of such plan.[6]  This is necessary to prevent employers from evading the anti-cutback and/or definitely determinable safeguards through the simple means of breaking

---

[6] Treasury regulations provide the authoritative interpretation of the parallel statutory provision of ERISA by virtue of ERISA § 3002(c), 29 U.S.C. § 1202(c).

down an otherwise permanent benefit feature into a series of substantively continuous temporary enactments.  *See* Treas. Reg. § 1.411(d)-4, Q&A-1(c); Rev. Rul. 92-66, 1992-2 C.B. 93.

52.      Here, beginning in 1989, and continuing through 2002 when Meriter converted the Plan to an account-based cash balance format and purported to permanently alter the Indexing Rate, Meriter established a pattern of repeated Plan amendments providing for similar benefits in similar situations for substantively consecutive, limited periods of time at the rate of the greater of 4% or 75% of the Plan's asset returns for the plan year, or a similar formula.

53.      More specifically, in 1989, 1990, 1992, 1994, 1996, 1997, 1998, 1999, and 2000, Meriter amended Plan § 3.14(A), pursuant to Plan § 3.14(B), to provide for an Indexing Rate greater than the minimum 4% rate.  The only years excluded from this series of amendments were years in which 75% of Plan asset returns for the year did not exceed 4% and thus did not require an amendment.

54.      Meriter's enactment of repeated, supposedly *ad hoc* Indexing Rates consistently above 4% whenever the Pension Committee determined that 75% of Plan asset returns were in excess of 4% caused the greater of 4% or 75% of Plan asset returns or similar formula "based in part on how well the retirement plan investment fund does," *see* 1987-1988 Plan Participant Brochure, to become a permanent, nonforfeitable feature of the Plan.

55.      Each amendment of the Indexing Rate that increased the Indexing Rate above 4% according to the greater of 4% or 75% of Plan asset return (or similar) formula discussed above, was made under similar situations and in substantively consecutive periods, only

14

excluding periods in which 75% of Plan asset returns for the year did not exceed 4% and thus did not require an amendment.

56.     Participants thus had a protected right to the Indexing Rate at a higher rate than the basic guaranteed minimum at least through normal retirement age.  This pattern of repeated plan amendments increasing the Indexing Rate above 4% to a rate equal to the greater of 4% or 75% of the Plan's asset returns for the year (or similar formula), caused the formula underlying the determination of when and by how much the Indexing Rate was increased to become a guaranteed term of the plan under which Plaintiff and the proposed Class had an accrued right to future increases to the Indexing Rate under the formula that had been previously used to determine both when and by how much the Indexing Rate would be increased.

57.     Defendants themselves recognized this was the effect of their repeated plan amendments.  Defendants repeatedly authorized and/or approved statements in the Plan's auditor's Notes to the Plan's Financial Statements  contained in the Plan's IRS Form 5500 filings in 1997 which asserted that the Plan's Indexing Rate was equal to "the greater of 75 percent of the actual return on trust assets for the year or 4 percent."

58.     The resulting Indexing Rate was thus equivalent, in law and fact, to a variable interest crediting rate in an account-based cash balance plan equal to the greater of 4% or 75% of the Plan's asset returns for the year (or similar formula).

**D.      Defendants Concealed the True Nature of the Plan from Participants and Provided Them with False and Misleading Descriptions of the Plan's Terms and Their Plan Benefits.**

59.     While the Meriter indexed career average annuity-based cash balance plan functioned just like an account-based cash balance plan, Defendants did not in fact create or maintain bookkeeping accounts for participants during the 1989 to 2002 period. **Defendants nevertheless told participants that they had –** keeping them in the dark about the true nature of their Plan benefits and causing them to believe that their "accounts" were real accounts as in a defined contribution plan (and thus the full extent of their Plan benefit) rather than, as in a typical cash balance plan, mere steps in a formula used to compute their age 65 defined benefit annuity.  Defendants failed to disclose or failed to adequately disclose that the Plan was an indexed annuity defined benefit plan, that participants in fact had no accounts (either actual or notional), and that the Plan's terms were quite different than Defendants actually described them to participants.

60.     For example, in a 1987-1988 brochure sent to participants immediately following the effective date of the Plan, Defendants systematically concealed the true nature of the Plan as an indexed annuity plan and, using the word "account" over 60 times, represents to participants that their benefit was equal to an account maintained in their name – an assertion which would have been false even if the Plan had been written as an account-based cash balance plan instead of as an indexed annuity plan, a fact that Defendants assiduously concealed from participants.

61.     Defendants' misrepresentations or omissions do not end there.  For example, Defendants' construction of the Plan's "cash balance" benefit is accomplished via subsidizing lump sums (*i.e.,* there is no reduction on early retirement), and that caused violations of Treas. Reg. § 1.401(a)-20 Q&A 16, which requires the qualified and joint survivor annuity (the

"QJSA") to be most valuable benefit form.  This improperly induced some participants during the relevant time to consent to receive their benefit in the form of a lump sum and to waive their right to receive their full, ERISA-protected accrued benefit in the form of a QJSA based on the false premise that the two were of equal value.  Spousal consents were not valid because the wrong benefit was disclosed, the relative value regulations were violated, the Plan document's own requirements on disclosure were violated; and participants' protected benefit through the 2003 conversion to an account-based cash balance plan would have been understated and participants underpaid on that basis as well.

62.     Defendants also violated IRC § 417(a); ERISA § 205, 29 U.S.C. § 1055 in that there is a bigger subsidy to the lump sum than the QJSA for payment prior to age 55.  In effect, the Plan provides a full early retirement subsidy below age 55 but only for the lump sum.  By not also providing the subsidy to the QJSA, Defendants violated ERISA § 205, 29 U.S.C. § 1055; IRC § 417(a).

**E.     Defendants Acknowledge Their Unlawful Benefit Calculation Methodology But Fail to Disclose the Problem to Participants.**

63.     By 2001, Defendants clearly recognized that the Plan as written and administered was illegal, as they effectively admitted recently when served with a subpoena in the related *Ruppert* action.  *See Ruppert* docket, Doc. 313, Declaration of Joan Pahl, 5/26/2010.

64.     In fact, in 2002, Defendants disclosed in the Plan's audited financial statement that in 2002 Meriter "became aware that additional amounts" – "approximately $800,000" including interest – "may be due to some former participants of the Plan that were paid [lump sums] in prior years."  *See* 2002 IRS Form 5500, Notes to Financial Statements at 11.

17

Defendants said that Meriter "intends to make any required payouts" but claimed that whether that would occur depended on the receipt of "further clarification . . . from the Internal Revenue Service." Meriter claimed that there was "uncertainty associated with the measurement of lump-sum distributions in a defined benefit plan."

65.     There was no such uncertainty:  since well before Meriter adopted its plan, the law has insisted that when projecting future interest credits, plans must select a projection rate that does not understate the value of those credits.  The only "uncertainty" that existed, as far as Meriter or the law was concerned, was whether the IRS would *force* Meriter to make good on its implied-by-law promises.

66.     Notwithstanding Meriter's quasi-candid disclosures in the Plan's 2002 audited financial statement to the handful of government regulators or specialized professionals who might have occasion to read them, Defendants failed to make disclosure to the people who really mattered, *i.e.,* the persons to whom they owed the strictest fiduciary duties:  the participants whom they had underpaid and whom Defendants knew or had every reason to know were completely unsuspecting of that fact (as a result of Defendants' own prior misleading or incomplete disclosures).  Despite the fact that Defendants had in hand an actual list of the actual specific individuals who were collectively owed or possibly owed, in Defendants' estimation, $800,000 in unpaid pension benefits, Defendants failed to lift a finger to inform them directly of that fact.  This was in reckless disregard of their duties to these participants, especially given how quickly and inexpensively such notification could have been made.

67.     Moreover, Defendants' estimate of $800,000 grossly understates their true liability.  First and foremost, that figure is evidently based on a continued undervaluing of projected indexing at the greater of 4% or 75% of Plan asset return (or similar) rate.  Second, that figure ignores that annuitants as well as lump recipients were underpaid.  Third, it ignores the significant additional value owed to participants by virtue of the Plan's annuity conversion factors:  Plan § 4.3 provides that the Accrued Benefit is converted to a lump sum by multiplying by the greater of 8 or (under the 1997 Plan document) a deferred-to-age 65 life annuity based upon the Applicable Interest Rate, the Applicable Mortality Table and the Participant's age at determination.  Failure to lawfully apply these factors alone would cost Plaintiff and members of the proposed Class millions of dollars.[7]

68.     Also in disregard of their fiduciary duties, in addition to failing to acknowledge their parallel violations of annuitants' right to their ERISA-defined accrued benefit, Defendants also failed to inform annuitants that they have claims to additional payments on the identical basis as lump sum recipients.

69.     Thus, in communicating with participants regarding the Plan and their Plan benefits, both Defendants made repeated material misstatements and omissions regarding the nature and manner in which they interpreted and applied the account balance and accrued benefit calculation provisions of the Plan.  These material misstatements and omissions not only violated Defendants' fiduciary duties, but other applicable disclosure standards including

---

[7] Finally, Defendants have made the identical statement estimating potential underpayments at $800,000 since 2002, including most recently in their 2008 IRS Form 5500 filing.  Surely, with continued interest accruing on these amounts, Defendants' liability easily exceeds $1 million, based on their own calculations.

Defendants' obligation to provide participants with accurate, non-misleading and comprehensive summary plan descriptions ("SPD's").

70.     Defendants thus failed to furnish participants with SPD's that complied with ERISA § 102(a), which requires that participants be furnished with an SPD "written in a manner calculated to be understood by the average plan participant," ERISA § 102(a), that is "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan," *id.,* and that includes the plan's eligibility requirements, as well as the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."  ERISA § 102(a)-(b); *see also* 29 C.F.R. § 2520.102-3(1).

71.     Defendants also improperly failed to inform current or then-current participants that their pre-2003 benefit calculations (as well as their post-2003 benefit calculations at a minimum, as explained further below) had been improperly performed and that they too would or might have claims to payments in addition to those that Defendants would voluntarily make (whether those payments were made in lump sum or annuity form).

72.     Finally, Defendants concealed other facts and circumstances and made material misstatements and omissions in their communications with participants about the Plan designed to conceal the underlying 417(e) and related violations alleged herein.

**F.      The Unlawful 2003 Amendment, Calculations and Communications.**

73.     Instead of resolving to pay what they owed and making proper disclosure to participants, in 2002, Defendants decided to amend the Plan effective January 1, 2003 to convert it to an account-based cash balance plan.  Their objectives via the 2003 amendment

were two-fold.   Neither, however was, or could be, lawfully achieved under the amendment as written and/or implemented.

74.     *First,* Defendants sought to use the putative plan changes as a cover for "wearing-away" and/or "cutting-back" to the greatest extent possible the benefits that Defendants recognized participants had accrued but that Defendants did not want to pay them. However, the 2003 amendment, as written and/or as implemented, violated and violates ERISA and the Code's prohibition against cutbacks of accrued benefits.

75.     The 2003 amendment purported, among other things, to amend the Indexing Rate, effective on and after January 1, 2003, to equal the annual yield on 10-year Treasury Constant Maturities in effect for the November 30 preceding the Plan Year but in no event less than 4%.  *See* 2003 Plan § 3.4(b).  The problem with this purported amendment from the point of view of benefits already accrued was that it failed, as written and/or as implemented, to account for the fact that Plaintiff and members of the proposed Class had the pre-2003 ERISA 204(g) protected right to continued indexing of their December 31, 2002 accrued benefit at the rate of the greater of 4% or 75% of the Plan's asset returns for the plan year, or similar formula, and not merely 4% (or the greater of 4% or the yield on 10-year Treasuries).[8]

76.     The 2003 amendment also, as written and/or as implemented, violated ERISA 204(g), by failing to protect the accrued benefit of Plaintiff and members of the proposed Class by entitling them to the highest benefit calculated under the actuarial factors under 1987 and 1997 Plan § 1.2.   ERISA § 204(g) not only protects the accrued benefit, but the value of the optional forms of the accrued benefit (such as the amount of the immediate lump sum).

---

[8] To the extent the 2003 amendment is given effect, Defendants' failure to protect the pre-2003 ERISA 204(g) protected right to continued indexing of the December 31, 2002 impermissibly caused the opening balance under the 2003 Plan formula to be understated.

Thus, when a plan changes the basis on which an optional benefit form is determined, it must protect (*e.g.,* not pay less at some future point) the amount of benefit that would be payable in that optional form, based upon the accrued benefit on the date of the amendment.

77.     The various amendments failed to do this.  For example, in the 1997 Plan, the immediate lump sum is not less than the actuarial equivalent of the accrued benefit, determined using 5% interest, but in the 2003 Plan, the immediate lump sum is not less than the actuarial equivalent of the accrued benefit, determined using 6% interest.  The 2003 amendment thus failed to protect the value of the 5% interest rate on the benefit accrued as of the amendment effective date.

78.     Additionally, the ERISA § 204(g) protection of the December 31, 2002 accrued benefit leads to a violation of the anti-excessive "backloading" rules.  Even ignoring that the protected benefit, as articulated in the 2003 Plan, is understated, the provision of ERISA § 204(g) protection causes the actual increase in the accrued benefit to fall to zero for many participants for some number of years.  Indeed, Plaintiff did not receive any increase in accrued benefit as of 12/31/2005, and most likely would not have for several more years.

79.     In Revenue Ruling 2008-7, a plan which converted from a final average pay plan to a cash balance plan avoids violating the anti-excessive backloading rules by testing affected participants under the fractional rule.  But that option was only available because the prior accrued benefit was determined under a final average pay formula.  In this Plan, the prior accrued benefit was determined under a formula in which the benefit was based upon an average of compensation for over 10 years, and therefore, it must use the 133 and 1/3 rule to

test for compliance with the anti-excessive backloading rules.  However, the Plan fails that rule.

80.     During the wear-away period, the increase in the accrued benefit is zero.  After the wear-away period, when the participant recommences accruing a benefit, the increase in the accrued benefit is greater than zero.  Since anything greater than zero is more than 133 and 1/3of zero, any plan that relies on the 133 and 1/3 rule cannot have a wear-away.  In essence, a plan that relies on the 133 and 1/3 rule must use an A+B approach when amending the benefit accrual formula, where A is the accrued benefit on the amendment date, and B is the accrued benefit under the new formula, applied for years after the amendment date.  The plan is then allowed to test only the B part of the formula for anti-excessive backloading, by treating the plan as if the amendment had been in effect for all plan years (*i.e.*, ignoring that the formula prior to the amendment was lower than the new formula).  If the 2003 amendment is to be given effect and assuming no violation of ERISA § 204(h), the Court should order benefits calculated (as elsewhere explained according to the correct methodology) under an A+B approach.

81.     *Second,* Defendants separately sought to use the putative plan changes to discontinue participants' rights to the valuable pre-2003 index annuity benefit formula, namely, the greater-of 4% or 75% of Plan asset return (or similar formula) Indexing Rate. However, Defendants' failure to disclose or adequately disclose to Plaintiff and members of the Class the significant reductions in the rate of future benefit accrual under the proposed 2003 version of the Plan means that under ERISA § 204(h)(4), 29 U.S.C. § 1054(h)(4), that participants are entitled to the greater of the accrued benefit determined reflecting such

change, and the accrued benefit determined not reflecting such change.  *See* ERISA §

204(h)(4)(A), 29 U.S.C. § 1054(h)(4)(A).

82.     There are at least three ways in which Defendants failed to provide Plaintiff

and members of the proposed Class with a proper notice under ERISA § 204(h) (*i.e.*, a

"204(h) notice") regarding the change in the Indexing Rate that was effective on January 1,

2003.

83.     First, even assuming that timely 204(h) notices were distributed, they failed to

provide Plaintiff and members of the proposed Class adequate notice of significant reductions

in the rate of future benefit accrual that would be caused by the amendment of the Indexing

Rate from the greater-of 4% or 75% of Plan asset return (or similar formula) to the greater of

4% or the yield on 10 year Treasury securities.  Such notices as were timely issued were

mistakenly premised on the notion that the Indexing Rate was merely 4% when, by virtue of

the pattern of repeat amendments, the Indexing Rate was equal to the greater of 4% or 75% of

the Plan's asset returns for the year (or similar formula).

84.     Second, such 204(h) notices as were timely issued also failed to disclose or

adequately disclose the wear-away caused by the 2003 amendment, under which the effective

rate of future benefit accrual for Plaintiff and members of the proposed Class would not

merely be significantly reduced, but would in fact drop to zero*,* perhaps for a considerable

period of time.

85.     Third, such 204(h) notices as were timely issued also failed to disclose or adequately disclose that the 2003 amendment lowered the benefit formula causing a significant reduction in the rate of future benefit accrual.[9]

**Claims**

86.     Plaintiff repeats and re-allege the allegations contained in all paragraphs of this Complaint as if fully set forth herein.

87.     As a result of Defendants' exclusion of the true value of the Plan's Indexing Rate, all benefit payments prior to age 65 (both in the form of a lump sum or annuity) were miscalculated and, where applicable, underpaid, and are continuing to be miscalculated and underpaid to this day.

88.     Defendants' failed to protect participants' accrued benefits (including, for various reasons,  the benefit payable as an annuity at retirement, early retirement type subsidies, and optional benefit forms) in violation of ERISA § 204(g).  Because of the Plan's failure to recognize the true accrued benefit as of the 2003 amendment effective date, the Plan improperly established both the initial cash balance account as of the amendment effective date, and the Prior Plan benefit causing the underpayment of benefits after the 2003 Plan was effective.

89.     The Plan, as written and/or as implemented, failed and fails to comply with ERISA §§ 204(b)(1)(A), (B) or (C), 29 U.S.C. §§ 1054(b)(1)(A), (B) and (C).  Due to how the Plan attempted to implement the protection of the prior accrued benefit, the Plan failed to comply with anti-excessive backloading rules.

---

[9] This is true notwithstanding the fact that by dropping the mandatory employee contribution requirement it created a net increase in the employer purchased benefit.

90.     Because of the Plan's failure to recognize the true benefit being accrued, the Plan failed to properly comply with the ERISA § 204(h) requirements when reducing the benefits being accrued in future plan years. Defendants' violations of ERISA § 204(h) means that that participants are entitled to the greater of the accrued benefit determined reflecting such change, and the accrued benefit determined not reflecting such change. *See* ERISA § 204(h)(4)(A), 29 U.S.C. § 1054(h)(4)(A).

91.     Accordingly, Plaintiff and members of the proposed Class seek and are entitled to all available relief for and as a result of these violations under ERISA § 502(a), 29 U.S.C. § 1132(a).

### Prayer for Relief

WHEREFORE, Plaintiff prays that judgment be entered against Defendants and that the Court award the following relief:

A.     Certification of this action as a class action for all purposes of liability and relief and appointment of undersigned counsel as class counsel pursuant to Fed. R. Civ. P. 23.

B.     Judgment for Plaintiff and the Class against Defendants on all claims expressly asserted and/or within the ambit of this Complaint.

C.     An order awarding, declaring or otherwise providing Plaintiff and the Class all other such relief to which Plaintiff and the Class are or may be entitled whether or not specified herein.

D.     An order awarding pre- and post-judgment interest.

E.      An order awarding attorney's fees on the basis of the common fund doctrine (and/or other applicable law, at Plaintiff's election), along with the reimbursement of the expenses incurred in connection with this action.

F.      An order awarding, declaring or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that Plaintiff and the Class may subsequently specify and/or that the Court may deem appropriate.

Dated:  July 30, 2010                    By

       /s *Eli Gottesdiener*
Eli Gottesdiener (#4045464)
Gottesdiener Law Firm, PLLC
498 7th Street
Brooklyn, New York 11215
Email:  eli@gottesdienerlaw.com
Telephone:  (718) 788-1500
Telecopier:  (718) 788-1650

*Counsel for Plaintiff and the proposed Class*