# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

TAMMY J. BOYD,
On behalf of herself and on behalf of
all others similarly situated,

                    Plaintiff,

    v.

MERITER HEALTH SERVICES
EMPLOYEE RETIREMENT PLAN and
MERITER HEALTH SERVICES, INC.,

                    Defendants.

Case No. 10-cv-426

## DEFENDANTS' SUR-REPLY REGARDING THE SUITABILITY OF THE TEN NEWLY PROPOSED PLAINTIFFS TO ACT AS CLASS REPRESENTATIVES IN FURTHER SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Charles C. Jackson (pro hac vice)
Jeffrey J. Kmoch (pro hac vice)
Morgan, Lewis & Bockius LLP
77 West Wacker Drive, Fifth Floor
Chicago, Illinois 60601
(312) 324-1000
(312) 324-1001 (fax)
charles.jackson@morganlewis.com
jkmoch@morganlewis.com

Jeremy P. Blumenfeld (pro hac vice)
Jeffrey A. Sturgeon (pro hac vice)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000
(215) 963-5001 (fax)
jblumenfeld@morganlewis.com
jsturgeon@morganlewis.com

Todd G. Smith
Godfrey & Kahn S.C.
One East Main Street
Madison, WI 53703
(608) 257-3911
(608) 257-0609 (fax)
Tsmith@gklaw.com

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND BACKGROUND ..................................................... 1

II.  ARGUMENT ............................................................................................ 5

A.  Plaintiff And The Proposed Class Representatives Are Not Adequate Representatives Because Conflicts Of Interests Between And Among Them and Within Their Respective Subclasses Prevent Them From Representing Numerous Class Members. ............................................... 5

    1.  The Interest Crediting Rate Conflict ......................................... 6

    2.  2003 Plan Amendment Conflicts ............................................... 9

B.  The Proposed Class Representatives Are Inadequate Due to their Lack of Knowledge about Basic Aspects of this Case and Their Inability to Adequately Fulfill Their Roles as Class Representatives. ................................... 14

C.  The Newly-Proposed Class Representatives Also Are Not Suitable Representatives For Repeated Plan Amendment Claims And These Claims Raise Individualized Issues .................................................................. 24

    1.  The Timing Of Each Participant's Participation In The Plan Determines Any Alleged Pattern Of Repeated Amendments. ................. 24

    2.  Determining the "Reasonable Expectations" of Each Participant Regarding Alleged Repeated Plan Amendments Is Also An Individualized Inquiry ........................................................... 27

D.  When Plaintiffs' Claims Accrued For Purposes Of The ERISA Statute Of Limitations Requires Individualized Inquiries Rendering This Case Unsuitable For Class Certification. ................................................... 32

III.  CONCLUSION ...................................................................................... 35

## TABLE OF AUTHORITIES

**Page**

CASES

*Berger v. Compaq Computer Corp.*,
   257 F.3d 475 (5th Cir. 2001) ...................................................................................21

*Culver v. City of Milwaukee*,
   277 F.3d 908 (7th Cir. 2002) ...................................................................................14

*Eslava v. Gulf Tel. Co.*,
   No. 04-00297, 2007 WL 2298222 (S.D. Ala. Aug. 7, 2007).....................................21

*Forrest v. Shenandoah Valley Nat'l Bank*,
   No. 06-C-11, 2007 WL 1029503 (E.D. Wis. Mar. 28, 2007) ....................................15

*Gilpin v. AFSCME*,
   875 F.2d 1310 (7th Cir. 1989) .........................................................................5, 8, 11

*In re AEP ERISA Litig.*,
   No. 03-67, 2008 WL 4210352 (S.D. Ohio Sept. 8, 2008) .................................14, 21

*Langbecker v. Electronic Data Sys. Corp.*,
   476 F. 3d 299 (5th Cir. 2007) .....................................................................................5

*Lumenite Control Technology, Inc. v. Jarvis*,
   252 F. Supp. 2d 700 (N.D. Ill. 2003) ........................................................................13

*Massengill v. Bd. of Educ., Antioch Cmty. High Sch.*,
   88 F.R.D. 181 (N.D. Ill. 1980)...................................................................................20

*Maywalt v. Parker & Parsley Petroleum Co.*,
   67 F.3d 1072 (2d Cir. 1995).......................................................................................22

*Nafar v. Hollywood Tanning Sys., Inc.*,
   No. 08-3994, 2009 WL 2386666 (3d Cir. Aug. 5, 2009) .........................................30

*Ogden v. AmeriCredit Corp.*,
   225 F.R.D. 529 (N.D. Tex. 2005) ..............................................................................21

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999).................................................................................................4, 9

*Ostrof v. State Farm Mut. Auto. Ins. Co.*,
   200 F.R.D. 521 (D. Md. 2001)...................................................................................15

# TABLE OF AUTHORITIES
(continued)

**Page**

*Piazza v. EBSCO Industries, Inc.*,
  273 F.3d 1341 (11th Cir. 2001) ................................................5

*Rand v. Monsanto Co.*,
  926 F.2d 596 (7th Cir. 1991) ................................................14

*Retired Chicago Police Ass'n v. City of Chicago*,
  7 F.3d 584 (7th Cir. 1993) ................................................5, 11

*Riordan v. Smith Barney*,
  113 F.R.D. 60 (N.D. Ill. 1986) ................................................14

*Ruppert v. Alliant Energy Cash Balance Pension Plan*,
  255 F.R.D. 628 (W.D. Wis. 2009) ................................................33

*Ruppert v. Alliant Energy Cash Balance Pension Plan*,
  No. 08-127-BBC, 2010 WL 5464196 (W.D. Wis. Dec. 29, 2010) ................................6, 7, 33

*Sec'y of Labor v. Fitzsimmons*,
  805 F.2d 682 (7th Cir. 1986) ................................................5, 9

*Spano v. The Boeing Co.*,
  633 F.3d 574 (7th Cir. 2011) ................................................5, 9, 13

*Teumer v. General Motors Corp.*,
  34 F.3d 542 (7th Cir. 1994) ................................................32

*Thompson v. Ret. Plan for Employees of S.C. Johnson & Sons, Inc.*,
  265 F.R.D. 405 (E.D. Wis. 2010) ................................................9

*Thompson v. Ret. Plan for Employees of S.C. Johnson & Sons, Inc.*,
  651 F.3d 600, 2011 WL 2463550 (7th Cir. June 22, 2011) ................................................ passim

*Thompson v. S.C. Johnson & Sons, Inc.*,
  No. 07-1047, 2010 WL 4723410 (E.D. Wis. Nov. 18, 2010), *rev'd in part by* 651 F.3d
  600, 2011 WL 2463550 (7th Cir. 2011) ................................................6

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
  445 F.3d 311 (4th Cir. 2006) ................................................32

*Thornton v. Graphic Commcs. Conf. of the Int'l Bhd. of Teamsters Supp. Ret. &
  Disability Fund*,
  566 F.3d 597 (6th Cir. 2009) ................................................25

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
  309 F.3d 978 (7th Cir. 2002) ....................................................................................5

*Wachtel v. Guardian Life Ins. Co.*,
  453 F.3d 179 (3d Cir. 2006)......................................................................................5

*Weiner v. Quaker Oats Co.*,
  No. 98-3123, 1999 WL 1011381 (N.D. Ill. Sept. 30, 1999) ...................................15

**STATUTES**

29 U.S.C. § 1055(g) ......................................................................................................20

**REGULATIONS**

26 C.F.R. § 1.411(d)-4, Q&A-1(c)(1).........................................................................2, 24

**RULES**

Fed. R. Civ. P. 23(a)(4)..................................................................................................14

Fed. R. Civ. P. 23(g)(1)(A) .............................................................................................9

## I.  <u>INTRODUCTION AND BACKGROUND</u>

Plaintiff's 62 page Reply Brief (Dkt. 115) does not salvage the core deficiencies of the proposed subclasses nor of the class representatives seeking to represent them.  Informal and formal discovery conducted since Defendants' 9/12/11 Opposition (Dkt. 106) – including depositions of 10 proposed representatives – confirms that the proposed class (spanning 23 years and asserting numerous alternative claims) is not suitable for class action treatment.  These deficiencies (in addition to those set forth by Defendants in their 9/12/11 Opposition Brief)[1] can be summarized in five general categories:

*First*, Plaintiff's central allegation of improper interest crediting rates for calculating the future value of Plan participants' accrued benefits places the ten proposed class representatives at odds with one another and putative class members within their own subclasses (and others).  Though the Amended Complaint is silent on what rate should have been applied, courts in the Seventh Circuit apply two methods for calculating future interest credits.  And Plaintiff's Reply Brief *concedes* that some putative class members would achieve a greater recovery under one method as compared to the other.  (Reply Br. at pp. 31-32).  For the first time, Plaintiff now advocates for one of these methods, but this only underscores the conflict.  As Defendants' expert analysis of the newly-proposed class representatives shows, choosing a projection rate

---

[1] Pursuant to the Court's Order, this sur-reply is limited to arguments relating to the suitability of the ten-newly proposed class representatives.  (Dkt. 102 at p. 3).  The deficiencies of these individuals are intertwined with points raised by Defendants in their 9/12/11 Opposition.  These include class conflicts and individualized issues that affect this Court's Rule 23 analysis under all of the sub-sections invoked by Plaintiff.  These same arguments also go to the suitability of the 10 newly-proposed class representatives.

There are certain arguments in Plaintiff's Reply Brief, however, that this brief does not address given limitations imposed by the Court's Order.  These include Plaintiff's attempt to rebut Defendants' arguments relating to the propriety of certifying these subclasses under Rule 23(b) (aside from arguments relating to individual-plaintiff conflicts and other individualized issues).  Class Counsel's adequacy issues relating to prior representations to this Court are also not addressed herein.  (*See* Reply Br. at pp. 40-48).

that purportedly seeks to maximize the recovery for the class as a whole is not in the best interest of numerous putative class members. *See infra* Section A.1.

*Second*, Plaintiff's alternative allegations regarding whether the Plan was amended in 2003 militate against certifying any class. When these alternative allegations are applied to the varying circumstances of the 10 proposed class representatives, and to the contingent ERISA claims being asserted over a 23-year time period by each, their unsuitability for class treatment is apparent. Further, Plaintiff's argument that "everyone" would prefer that the Plan be amended at the latest date possible, (Reply Br. at p. 17), is not only incorrect; it is an attempt to streamline her allegations solely to meet the requirements of Rule 23. Despite the Amended Complaint's alternative allegations and the individualized circumstances of the proposed class representatives and their subclasses, Plaintiff is asking the Court to shoe horn all class members into a one-size-fits-all approach. This is directly contrary to the interests of many in the proposed class. *See infra* Section A.2.

*Third*, most proposed class representatives are figurehead placeholders, solicited by counsel, who lack a basic understanding of the allegations in this case and their role as class representatives. And others merely repeated words provided by their attorneys, but admitted *they did not understand the words they were using*. *See infra* Section B. Their lack of understanding is important, given that they are trying to join the case late because they think Plaintiff Boyd is not adequate to represent the interests of the class. (Dkt. 82 at p. 2).

*Fourth*, Plaintiff also asserts an anti-cutback claim based on the so-called repeated plan amendment rule. *See* 26 C.F.R. § 1.411(d)-4, Q&A-1(c)(1). Plaintiff argues that a "pattern" of amendments existed such that participants developed a protected right to continued indexing based on a Plan returns-based interest crediting rate. (Amend. Compl., Dkt. 39, ¶¶ 109, 169-176;

Reply Br. at 27-28).  This claim is not class worthy.  The nature and extent of any "pattern" depends on the specific amendments and other information extant *during the specific years* each class member or proposed representative participated in the Plan.  Class members who took lump sums in 1988, for example, cannot rely on amendments that occurred after 1988 to prove a pattern, and class members who did not join the plan until 2000 cannot rely on amendments that occurred from 1987-1999.  As illustrated by the 10 newly-proposed class representatives, evidence and arguments apply to different class members depending on the specific years they participated in the Plan, and the alleged "pattern" of amendments and other information in those specific years.  In addition, Plaintiff must show that each participant had an actual and reasonable expectation that the Plan's alleged returns-based interest crediting rate was an ongoing feature of the Plan.  Yet all ten class representatives testified that that they had *no expectation* about what the interest crediting rate would be, necessarily making them unsuitable class representatives on this claim.[2]  *See infra* Section C.

Fifth, claims accrual for statute of limitations purposes requires individualized determinations, showing that individual issues with predominate and that these 11 proposed representatives are not adequate.  Like Boyd, the testimony of the newly proposed class representatives shows that their claims are untimely because they accrued outside the six-year statute of limitations.  Each testified that he/she would receive his/her respective account balances, nothing more.  Plaintiff's Reply Brief responds that actual knowledge cannot cause

---

[2] In Reply, Plaintiff abandons or adjusts her repeated plan amendment theory (while never doing so explicitly) in favor of a "secret plan amendment" theory she claims is established by a document she recently found that purportedly guaranteed a Plan returns-based interest crediting rate for a longer duration of time.  (Reply Br. at pp. 30-31).  As explained *infra* at Section C, this is another example of the variable nature of Plaintiff's class claims, and further highlights the danger of Class Counsel sacrificing claims, arguments and evidence on behalf of approximately 4490 individuals in an effort to achieve class certification.

ERISA claims to accrue and Defendants' argument that written communications of the Plan or a participant's actual knowledge could cause claims to accrue is somehow "internally inconsistent" and an improper "micro-inquiry."  (Reply at p. 38).  But, what a participant knew *or* should have known is precisely the test for accrual that has been adopted by this Circuit.  *See Thompson v. Ret. Plan for Employees of S.C. Johnson & Sons, Inc.*, 651 F.3d 600, 2011 WL 2463550, at *8 (7th Cir. 2011) ("We have held that '[t]he general federal common law rule is that an ERISA claim accrues when the plaintiff *knows* or should know of conduct that interferes with the plaintiff's ERISA rights.'") (citation omitted) (emphasis added).

If this case just involved a single plaintiff, Defendants would no doubt be able to take discovery to demonstrate that this individual actually understood years before she filed suit that she would only receive a lump sum equal to her account balance in order to establish a statute of limitations defense.  Plaintiff cannot use Rule 23 to alter or eliminate Defendants' substantive rights to prove that the claims of each and every class member and proposed representative are time-barred based on that individual's actual knowledge.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999) ("No reading of [Rule 23] can ignore the [Rules Enabling] Act's mandate that 'rules of procedure shall not abridge, enlarge or modify any substantive right.'") (citation omitted).  *See infra* Section D.

*Lastly*, an overriding theme of Plaintiff's Reply is that the class should be certified because putative class members are, or were, in the same Plan at various points in time, and that adopting Defendants' arguments would preclude ERISA class actions from ever being certified. These arguments are contrary to controlling authority.  They also are a transparent attempt to shift the focus from problems that are of Plaintiff's own making.  The conflicts, individualized issues, and inherent failings of these subclasses are the result of Plaintiff's attempt to certify

eleven subclasses spanning a twenty-three year time-period, all of which assert various ERISA claims that having moving target, alternative proofs.  *See, e.g.*, *Spano v. The Boeing Co.*, 633 F.3d 574, 586-87 (7th Cir. 2011) (vacating class certification of challenge to design and operation of pension plan because of potential for differing or conflicting interests based on time periods of different plan investment options; also holding that the fact "that the class was complaining about the structure of the plan as a whole" was insufficient to justify class certification); *Langbecker v. Electronic Data Sys. Corp.*, 476 F. 3d 299, 315-16 (5th Cir. 2007) (same); *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179,188-89 (3d Cir. 2006) (holding that class certification order must identify the parameters defining the classes to be certified and the "complete list of the claims, issues or defenses to be treated on a class basis").

## II.    ARGUMENT

### A.    Plaintiff And The Proposed Class Representatives Are Not Adequate Representatives Because Conflicts Of Interests Between And Among Them and Within Their Respective Subclasses Prevent Them From Representing Numerous Class Members.

A class should not be certified when the legal theories alleged and the relief sought by class representatives are at odds with the interests of other class members.  *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002); *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598-99 (7th Cir. 1993).[3]  As explained in *Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*, an ERISA cash balance whipsaw case, a court "cannot expect [plaintiff] to assert with forthrightness and vigor those interests of other class members that he does not share and in which he has no stake.  Indifference as well as antagonism can

---

[3]  *See also Gilpin v. AFSCME*, 875 F.2d 1310, 1313 (7th Cir. 1989); *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986); *Langbecker*, 476 F.3d at 315-16; *Piazza v. EBSCO Indus., Inc.*, 273 F.3d 1341, 1353 (11th Cir. 2001).

undermine the adequacy of representation."  221 F.3d 1235, 1253 (11th Cir. 2000) (internal

quotations and footnote omitted).  Further discovery and analysis regarding the 10 newly-

proposed class representatives and their subclasses show that members within the same subclass,

class members in different subclasses, and the class representatives seeking to represent them,

have competing interests with respect to (1) the interest crediting rate their proposed counsel

seeks to assert, and (2) when the Plan was effectively amended.

### 1.    The Interest Crediting Rate Conflict.

One of Plaintiff's central claims is that the Plan did not properly apply interest crediting

rates when calculating the future value of Plan participants' accrued benefits.  Prior to filing her

Reply Brief, Plaintiff did not specify what interest crediting rate she contends should have been

used by the Plan.  Nonetheless, as explained in Defendants' Opposition, it is in the economic

interest of different class representatives and members to advocate for different methods of

calculating future interest credits under the controlling Plan documents.  (Defs.' Opp. at pp. 5-7,

15-17).  Plaintiff's Reply Brief does not dispute this conclusion, nor that two courts – in cases

involving Plaintiff's counsel – adopted different methods for calculating future interest credits

with respect to much shorter class periods (eleven years (1998-2009) and twelve years (1998-

2010), respectively) and more limited claims.  *See Ruppert v. Alliant Energy Cash Balance*

*Pension Plan*, No. 08-127-BBC, 2010 WL 5464196 (W.D. Wis. Dec. 29, 2010) (adopting fixed

8.2% projection rate) and *Thompson v. S.C. Johnson & Sons, Inc.*, No. 07-1047, 2010 WL

4723410 (E.D. Wis. Nov. 18, 2010) (adopting rolling five-year average projection rate), *rev'd in*

*part by* 651 F.3d 600, 2011 WL 2463550 (7th Cir. 2011).

The divergent economic interests of class members here are illustrated by applying the

interest calculation methods utilized in *Ruppert* and *S.C. Johnson*.  As explained in Defendants'

9/12/11 Opposition, proposed representative Johnson (Subclass A) is indifferent as to which

interest crediting rate method is chosen because she commenced her benefit after age 65.  (Defs'
Opp. at pp. 6-7).  Putative class members in her subclass, however, would prefer to advocate for
conflicting methods.  (*See* Ex. A to Sturgeon Decl.; L. Sher Report at p. 4, ¶10) (providing detail
about putative class members who would prefer a five-year average or a fixed 8.2% rate).[4]

Proposed representative English (Subclass B) would prefer a five-year rolling average,
while certain members of her subclass would prefer a fixed 8.2% interest crediting rate,
including, by way of example, putative class member # 2786.[5]  (*See* Ex. A to Sturgeon Decl.; L.
Sher Report at p. 4, ¶11).  Greco (Subclass C), Hansen (Subclass E1), Muller (Subclass F), and
Wages (Subclass H) would prefer a fixed 8.2% interest crediting rate, while numerous other
putative class members would prefer a rolling five-year average, including # 3843, 2774, 3695,
3600, 2442  (*See* Ex. A to Sturgeon Decl.; L. Sher Report at p. 6, ¶13).  This is not a conflict that
is relegated to a few atypical class members.  Indeed, there are at least hundreds of putative class
members who would prefer to advocate for a fixed 8.2% interest crediting rate, and hundreds of
others who would prefer a rolling five-year average.  (*See* Ex. A to Sturgeon Decl.; L. Sher
Report at p. 6, ¶14).

In her Reply Brief, for the first time in this litigation, Plaintiff alleges that a fixed rate of
return, similar to the 8.2% interest crediting rate adopted in *Ruppert*, should be adopted by this
Court.  In other words, Plaintiff already is abandoning – and, indeed, arguing *against* – a

---

[4] An analysis of the alternative methods for projecting interest crediting rates and the effect of
Plaintiff's alternative allegations as to when the Plan was amended are reflected in the
Declaration and Expert Report of Lawrence Sher, attached hereto as Exhibit "A."

[5] Plaintiff's Reply Brief has re-defined Subclasses A and B based on an "inadvertent drafting
error" so that Class B now purports to include "all members of Class A who received a lump sum
distribution from the Plan prior to attaining age 65," (Reply Br. at p. 10, n. 6), changing the
contours of this class yet again.

methodology that is contrary to the economic interests of hundreds of class members at least.[6]
Indeed, Plaintiff's Reply Brief does not attempt to explain why proposed representative English
class members # 3843, 2774, 3695, 3600, 2442, or any other putative class member who would
achieve a greater recovery using a five-year rolling average would want to abandon such a claim.

Regardless of whether proposed Class Counsel disagrees with *S.C. Johnson*'s use of a
rolling five-year average, a district court in this Circuit adopted this method, and the Seventh
Circuit did not "perceive any problem" with the district court doing so in light of the Treasury
regulations and "several precedents" that support the use of such a method.  *See S.C. Johnson*,
2011 WL 2463550, at *9, n.17 ("This is not to say that we perceive any problem with the five-
year average methodology the district court adopted . . . Although we do not decide the question,
we note that the Treasury 'safe harbor' regulations and several precedents support the use of
such an average." (citing *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 760
(7th Cir. 2003); *Esden v. Bank of Boston*, 229 F.3d 154, 170 (2d Cir. 2000)).

The economic conflicts of the proposed class are thus real, and not "hypothetical," as
Plaintiff contends.  (Reply Br. at p. 36).  These conflicts among the class representatives and the
putative class members preclude class certification.  *See, e.g., E. Tex. Motor Freight Sys., Inc.*,
431 U.S. 395, 403 (1977) (holding that proposed class representatives must at a minimum
"possess the same interest and suffer the same injury as the class members" (citation and internal
quotations omitted)); *Gilpin*, 875 F.2d at 1313 (affirming district court's refusal to certify a class

---

[6] Plaintiff also claims that Defendants' 9/12/11 Opposition advocates for the five-year rolling
average or against a fixed rate methodology.  (Reply Br. at p. 35).  This is not accurate.
Defendants are not "advocating" for or against any particular methodology at this stage of the
litigation.  Both parties agree that the Court should not decide at this stage what interest crediting
rate, if any, should have been applied when calculating future interest credits.  (*See* Defs.' Opp.
at p. 6; Pl.'s Reply Br. at p. 36).  But the conflicting interests among proposed class
representatives, and between them and hundreds of the class members they and their counsel are
trying to represent, is relevant.

action because of class conflicts); *Fitzsimmons*, 805 F.2d at 697 (reversing decision to certify class because district court failed to properly consider the "clear conflicts" that existed among the named plaintiffs and members of the certified settlement class). Moreover, because Class Counsel intends to advocate for a fixed interest crediting rate on behalf of *all* class members, even the ones who should demand a different course of action, Class Counsel is also inadequate.[7] *See Ortiz*, 527 U.S. at 856 (each subclass requires separate class representatives and counsel in order to eliminate conflicts of interest where they exist); *Spano*, 633 F.3d at 586-87 (vacating class certification ruling in ERISA class action because of potential conflicts of interest) (citations omitted); Fed. R. Civ. P. 23(g)(1)(A), Advisory Committee Note of 2003 ("Class counsel must be appointed for all classes, including each subclass that the court certifies to represent divergent interests.").

### 2.   2003 Plan Amendment Conflicts.

Plaintiff's alternative allegations as to when the Plan was amended compound conflicts between and within the subclasses. Defendants' Opposition explained that if the Court found that the Plan's administration prior to 2003 was lawful, Boyd would actually be better off if the Plan changes took effect in 2003, (Defendants' Opp. at p. 7), something that the Amended Complaint and Plaintiff's Motion affirmatively allege did not occur. (Dkt. 83 at p. 2). Certain

---

[7] Plaintiff's Reply Brief contends that Judge Stadtmueller's class certification ruling in *S.C. Johnson* rejected the "virtually identical argument that Defendants make here." (Reply Br. at p. 37). That misstates the posture of *S.C. Johnson*. Judge Stadtmueller's opinion begins by noting that "[t]he Plans do not make arguments directly opposing the merits of the motion for class certification under Federal Rule of Civil Procedure 23," which Defendants affirmatively do here. *See Thompson v. Ret. Plan for Employees of S.C. Johnson & Sons, Inc.*, 265 F.R.D. 405, 410 (E.D. Wis. 2010). Second, the class certified in *S.C. Johnson* was much shorter in duration (twelve years) than the 23 years at issue here and a more uniform, economic and interest rate environment was at issue. Third, the evidence of the conflict here is undisputed, and Plaintiff and her counsel already are advancing the interests of some class members to the detriment of others. (*See* Reply Br. at p. 32) (arguing against the rolling five-year average methodology that hundreds of class members here would prefer).

putative class members in her own subclass and in other subclasses would prefer the opposite

result, i.e., that the Plan changes took effect at a later date.  (Defendants' Opp. at pp. 7-8).

An analysis of the claims brought by other proposed class representatives and their

respective subclasses, also exposes these conflicts.  By way of example, proposed representative

Wages (Subclass H) would prefer that the New Plan became effective as of January 1, 2003.

(*See* Ex. A to Sturgeon Decl.; L. Sher Report at pp. 7-9, ¶¶15-21).[8]  However, certain class

members in her subclass would prefer that the Old Plan continued in effect until a much later

date, including # 2228.  (*Id*.).

Plaintiff's Reply Brief attempts to explain away the Boyd conflict by claiming that "[t]he

alleged [2003] conversion amendment is ***not*** the ***source*** of the 4% indexing that was applied to

Boyd's benefit (to increase its value as of 12/31/02 from $45,030.34 to $65,508.31) and

Defendants are conclusively on record admitting that it was not."  (Reply Br. at p. 19) (emphasis

in original).  Based on a misreading the New Plan, (*see id.* at pp. 22-23), Plaintiff concludes that

it was a "change in Plan *administration*, and not a change in Plan terms," that accounted for this

increase in benefits.  (*Id*. at p. 23) (emphasis in original).

Plaintiff's claim that the New Plan was not the source of this benefit is simply wrong.

The parties do not dispute that Boyd enjoyed an increase in her 12/31/02 accrued benefit from

---

[8] Defendants use the term "New Plan" and "Old Plan" in a manner similar to Plaintiff's Reply
Brief.  However, Plaintiff's Reply Brief devotes numerous pages to dissecting and improperly
characterizing numerous provisions of both Plans.  Defendants dispute those characterizations.
Plaintiff even claims that the Defendants "explicitly and misleadingly told participants that the
Old Plan was a cash balance plan."  (Reply Br. at p. 3).  It is Defendants' position that cash
balance plans in existence more than twenty years ago, close in time to when they were first
created, differed in certain respects from those that exist today, and those differences did not
make them any less of a cash balance plan.

$45,030.34 to $65,508.31.[9]  And Plaintiff's misreading of the New Plan can be readily demystified.  Numerous putative class members enjoyed an increase in benefits that was informally referred to as a 12/31/02 "frozen benefit."  This increase was based on the New Plan document, Section 1.43.  (*See* Dkt. 40-1 § 1.43, at MER00000122).  While Plaintiff strains to argue that the New Plan was not the basis for this change, she does not point to any sections of the Old Plan that would have entitled her to this increase.  She simply says (without support) that the increase was a result of a change in Plan administration.  Faced with unambiguous Plan terms, Plaintiff's argument should be rejected.  Again, the Court need not definitively decide this issue, but Plaintiff's willingness to disregard Plan provisions that clearly benefited Boyd and others raises a heightened potential that alternate theories of recovery advocated by Plaintiff will operate to the detriment of putative class members  *See Retired Chicago Police Ass'n*, 7 F.3d at 598-99 (affirming district court's denial of class certification where there were potential conflicting interests that may exist among the putative class members); *Gilpin*, 875 F.2d at 1310 (same).

Plaintiff also argues that Defendants are "trying to trick the Court" by contending that there are conflicts if Boyd's (and numerous others') benefits were actually calculated under the New Plan (which they were):

> [A]ccepting for the moment that it was the amendment that bestowed upon participants the one-time 4% indexing right to the 12/31/02 frozen accrued benefit, the posited conflict is a non-existent one because no participant recovers anything more than he or she has already received by arguing that Defendants were **not** required to index the old formula at 4%.  Defendants are simply trying

---

[9] Defendants continue to use Boyd as an example in this section of the brief, not with the intent to re-argue her suitability, which was done in Defendants' Opposition, but to keep constant the example that has been used by the parties in both briefs to exemplify the effect of the New Plan changes.  As explained, most of the ten new class representatives and putative class members within their subclasses, suffer from this same conflict.

to trick the Court:  they have posited a lawsuit consisting entirely of a *defense*, not a *claim* – ***there is no lawsuit*** *if the old plan formula was properly administered*."

(Reply Br. at p. 19) (emphasis in original).

Plaintiff suggests that her second argument "accept[s]" that the New Plan was the source of the 4% indexing, but Plaintiff does not carry this assumption to its logical end.  Again, using Boyd as an example, as of December, 2002, Boyd's accrued benefit under the Old Plan was approximately $45,000.00.  Assuming the Old Plan stayed in effect until she left Meriter and elected to receive a lump sum, she would simply have continued to earn additional pay credits and interest credits pursuant to the terms of the Old Plan.  These indisputably would have resulted in a lump-sum benefit less than the $65,508.31 she actually received pursuant to the terms of the New Plan.  Her interests (and those of proposed representative Wages, among others), therefore conflict with putative class member # 2228, and any other putative class member who would benefit by having the Old Plan continue in effect until a much later, post-2003 date.  (*See* Ex. A to Sturgeon Decl.; L. Sher Report at pp. 7-9, ¶¶15-21).

By making this argument, Plaintiff is also suggesting that because no putative class member could receive less than what he or she already received if the Old Plan was found to be lawful and it continued to be the operative Plan until the latest date alleged in her Amended Complaint, then every participant's interest in alleging that the Old Plan continued past 2003 is aligned.  Plaintiff overlooks that the proposed subclasses include people who have not commenced their benefits.  If those putative class members benefited from the New Plan becoming effective January 1, 2003 (including, for example, because the New Plan provides for the 4% projection or the higher pay credit rates for participants with more than 20 years of

service, like # 2281 whose 20 year service increase is detailed in Larry Sher's Expert Report),[10] then Plaintiff's claims in this lawsuit – if she prevails – would reduce the benefits ultimately paid to those individuals.  Likewise, subclasses D and G include putative class members who elected annuities.  (Dkt. 115).  Plaintiff offers no argument that these individuals are entitled to a projection of their account balances at 4% under the terms of the Old Plan.  Again, for these putative class members, if the New Plan did not become effective January 1, 2003, their monthly benefits will be reduced if Plaintiff prevails.[11]

These conflicts are not present because of defenses, as Plaintiff contends.  They are present solely because of the alternative style allegations in the Amended Complaint and the expansive nature of this class.[12]  Plaintiff protests that this Court should not analyze the various ways this litigation could proceed – though her allegations "in the alternative" are what is forcing this Court to vet the alternatives.  *Spano*, 633 F.3d at 583 ("'[A] judge should make whatever factual and legal inquiries are necessary under Rule 23.'  If some of the determinations required by Rule 23 cannot be made without a look at the facts, then the judge must undertake that investigation.") (citations omitted).

---

[10] (*See* Ex. A to Sturgeon Decl.; L. Sher Report at p. 8, ¶16).

[11] Implicit in this argument is that the Plan has no ability to recover over-payments to Plan participants, which is incorrect.  *Lumenite Control Technology, Inc. v. Jarvis*, 252 F. Supp. 2d 700, 705 (N.D. Ill. 2003) (employer may seek restitution from participant for overpaid pension benefits under ERISA § 1132(a)(3)).

[12] *See* Amended Complaint, Dkt. 39, at ¶143 ("Plaintiffs dispute but assume here solely for sake of argument (or pleading in the alternative) that the purported conversion amendment, embodied in the 2009 Plan document, was duly adopted.  If so, Plaintiffs allege that it was not so adopted prior to January 2009; alternatively, it was not so adopted prior to December 2008; alternatively, it was not adopted prior to November 2007; alternatively, it was adopted sometime in 2002 or some other time.").

**B.     The Proposed Class Representatives Are Inadequate Due to their Lack of Knowledge about Basic Aspects of this Case and Their Inability to Adequately Fulfill Their Roles as Class Representatives.**

In class actions, courts display flexibility regarding the knowledge proposed class representatives need possess.  As demonstrated below, however, the level of knowledge the 10 proposed plaintiffs possess is so wanting that they do not pass even the most minimal standards courts use to assess adequacy.  Though their lack of knowledge is consistent with their being late comers who were solicited by Plaintiff's counsel earlier this year, (Defs.' Opp. at pp. 1,10), class representatives must be more than figurehead placeholders to fill out the myriad legal theories counsel wishes to prosecute.  They must be individuals who genuinely possess claims that they wish to prosecute on behalf of themselves and understand the claims sufficiently to prosecute on behalf of others.

The lack of understanding of the 10 proposed class representatives about this case and their willingness to allow their lawyers to drive these proceedings render them unsuitable class representatives.  A "class action is an awkward device, requiring careful judicial supervision, because the fate of the class members is to a considerable extent in the hands of a single plaintiff (or handful of plaintiffs, when . . . there is more than one class representative) whom the other members of the class may not know and who may not be able or willing to be an adequate fiduciary of their interests."  *Culver v. City of Milwaukee*, 277 F.3d 908, 910 (7th Cir. 2002).  Thus, a class must have a "conscientious representative plaintiff," *Rand v. Monsanto Co.*, 926 F.2d 596, 599 (7th Cir. 1991), and a class representative must have "a sufficient interest in the outcome to ensure vigorous advocacy."  *Riordan v. Smith Barney*, 113 F.R.D. 60, 64 (N.D. Ill. 1986).  To that end, Plaintiff bears the burden of proving that the proposed class representatives "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

To satisfy the adequacy-of-representation standard under Rule 23(a)(4), class representatives must demonstrate "a basic understanding of the facts and legal claims comprising their case." *In re AEP ERISA Litig.*, No. 03-67, 2008 WL 4210352, at *2-4 (S.D. Ohio Sept. 8, 2008) (holding that class representative was not adequate where his deposition testimony demonstrated "his lack of overall involvement in the case and call[ed] into question his understanding of the nature of the claims asserted" because he had not previously reviewed the complaint or amended complaint, was not aware of what investigation into his claims his lawyers had conducted, and was ill-informed about the nature of the allegations asserted). *See also Forrest v. Shenandoah Valley Nat'l Bank*, No. 06-C-11, 2007 WL 1029503, at *4 (E.D. Wis. Mar. 28, 2007).

In *Forrest*, the court found that the proposed class representative was not adequate based in part on the fact that she "appear[ed] too much like a shadow plaintiff; disinterested or unconcerned." *Id.* The proposed class representative's deposition transcript in *Forrest* showed that she could not identify or recall a loan solicitation letter that was attached as an exhibit to the complaint and that she did not know the status of the lawsuit. *Id.* Thus, the court concluded that she "lack[ed] adequate knowledge and understanding of the case . . . to adequately represent the class." *Id.*; *see also Ostrof v. State Farm Mut. Auto. Ins. Co.*, 200 F.R.D. 521, 530 (D. Md. 2001) (doubting the adequacy of plaintiffs' representation of class interests because they had "displayed limited knowledge and understanding of the lawsuit" where one plaintiff could not remember reading the complaint and the other did not know how much money she was claiming for lost wages); *Weiner v. Quaker Oats Co.*, No. 98-3123, 1999 WL 1011381, at *10 (N.D. Ill. Sept. 30, 1999) (finding class representative inadequate in securities fraud case because he

"appear[ed] to lack even a minimal grasp of the facts and legal basis of the case" where he "fail[ed] to not only understand, but even recognize" key legal terms and facts).

In this case, the testimony of the proposed class representatives demonstrates a fundamental lack of understanding of the basic facts and legal claims at issue.  Some proposed class representatives had virtually no recollection of rudimentary facts underlying allegations in the Amended Complaint.  (*See, e.g.,* Excerpts from Deposition of Phyllis Johnson, Ex. G to Sturgeon Decl. at 10:24-11:4 ("I am aware of the new Meriter retirement plan [introduced in 1987], but I remember very little about it") *and* 9:24-21:6 (answering some variation of "I don't remember" to nearly twenty questions about basic plan operations, including items integral to her purported claims such as whether or not an investment credit was ever attributed to her account)).  Others, such as Jill Anthony (Subclass J) testified inaccurately about such basic facts as how the Plan was funded, when she began participating,[13] and how the investment credits were determined:

> Q. As you sit here today, can you tell me how you understand the pension plan works?
> A. A certain part of my paycheck is taken, a percentage, and Meriter matches it and invests it in hopefully profitable ways.  And the money grows, and it gets put towards my retirement.
> Q. Do you participate in the Meriter 401(k) plan?
> A. Yes.
> Q. And do you understand that that's a separate plan from the Meriter pension plan?
> A. Yes.
> Q. And you believe that Meriter takes money out of your paycheck to this day to contribute towards your pension in the pension plan?
> A. Yes.
> …

---

[13] Indeed, if Anthony's testimony that she participated in the Plan prior to 2003 were correct, she would not fit within Plaintiff's proposed definition for her own Class J given that she is the representative for participants that entered the Plan after 2003.  (*See* Dkt. 83-1, p. 5 ("Class J is defined as follows:  All persons who entered the Plan for the first time on or after January 1, 2003…")).  Moreover, contrary to her testimony, no participant contributed to the Plan after January 1, 2003.

| | |
|---|---|
| Q. | Okay. Do you think you participated in a plan prior to January 1 of 2003? |
| A. | Yes. |
| Q. | And that you're confident about? |
| A. | Yes. |
| … | |
| Q. | Did you understand that the rate would be based on the US Treasury 10-Year Constant Maturity Rate? |
| A. | No. |
| Q. | Okay. You just thought it was whatever the market would bring? |
| A. | Yes. I thought it was based on the stock market. |

(Ex. B to the Sturgeon Decl., at 14:3-18; 21:14-18; 30:10-22).

In addition to not knowing basic facts underlying their claims, some proposed class representatives clearly did not understand the nature of their legal claims at a basic level.  Some proposed representatives admitted that they simply did not understand the claims.  (*See, e.g.,* Excerpts from Deposition of Madge English, Ex. D to the Sturgeon Decl., at 75:14-19 ("I heard [the theories that my attorneys are advocating], but I don't necessarily understand them all."); Excerpts from Deposition of Michele McCabe, Ex. H to the Sturgeon Decl., at 47:9-12 (McCabe alleged incorrect calculation of her benefit was based on "[s]ome IRS law…"); Excerpts from Deposition of Ann Marie Stephens, Ex. J to the Sturgeon Decl., at 46:11-47:22 (Stephens testified that her only understanding of the claims is that "there's a miscalculation with the pension fund[,]" that she does "not really" know what she is contending was miscalculated, and that "I understand if there's a miscalculation in the plan, that's all I need to know.")).

Others offered explanations that were incomprehensible:

| | |
|---|---|
| Q. | Can you tell me what you understand this lawsuit is about? |
| … | |
| A. | It was miscalculated for the payouts to the employees. That's how I understand it. |
| Q. | Okay. Can you be any more specific than that? |
| A. | No. |
| Q. | Okay. You said it was miscalculated for the payouts to employees. Do you have an understanding as to the basis for how the payouts were miscalculated? |
| A. | I know that there is a quotient, a way that it's calculated that was presented in documents to the IRS. |

…
Q.     Do you think that Meriter had -- when you say quotient, what are you referring to?
A.     Their calculation. That's what I'm referring to.
Q.     Okay. So Meriter had a calculation for the account balances, and they didn't do it correctly?
A.     Yes.
Q.     Can you be any more specific than that?
A.     No.
Q.     Okay.  Do you know what it is about the calculations that was done incorrectly?
A.     No.
…
Q.     Okay. And so what is it that you're hoping to gain out of this lawsuit?
A.     What was promised to me in the paperwork Meriter submitted as the way they were going to calculate the retirement fund.  It ended up being different than what they said they were going to calculate it as.
Q.     When you say as promised in the paperwork, are you talking about paperwork that was submitted to the IRS?
A.     Yes.
…
Q.     Have you seen the paperwork that was submitted to the IRS?
A.     No.
Q.     Have you read the paperwork that was submitted to the IRS?
A.     No.
…
Q.     As you sit here today, do you have any understanding about what the paperwork that was submitted to the IRS said?
A.     No, I have not seen the paperwork.
Q.     I know you haven't seen it. Do you have any understanding about what it said?
A.     No.

(Excerpts from Deposition of Claudia Greco, Ex. E to the Sturgeon Decl., at 50:1-55:22).

Q.     Ms. Greco, what is your understanding of the claims in connection with the Boyd lawsuit?
A.     Basically that the plan was not followed as it was stated.
Q.     And do you know how the plan was not followed as stated?
A.     That the minimum 4 percent existed but was not paid in terms of the variable and in terms of time frames.

(*Id.* at 49:25-50:8).

Some proposed class representatives testified that they have not even seen the Complaint.

(*See* Ex. B to Sturgeon Decl., at 68:19-22; Ex. H to Sturgeon Decl., at 55:17-25).  Others could

do no more than parrot back terms used by their attorneys to describe the claims, revealing that

they had virtually no understanding of what those terms meant.  For example, English (Subclass

B) testified:

> Q.    Ms. English, I think you said that you understood that you and your lawyers at
> least were claiming that something should be indexed to age 65 at 4 percent,
> correct?
> A.    Yes.
> Q.    Do you understand what indexing at 4 percent to age 65 means?
> A.    No.
> Q.    Okay. Do you have any idea what it means?
> A.    No.
> **Q.    Okay. So where did those words come from?**
> **A.    The meetings we had with the lawyer.**
> Q.    Okay. And the factor of eight that you also mentioned, do you know what that
> means?
> A.    No.
> Q.    Do you know what it's about?
> A.    No.
> **Q.    All you know is that your lawyers said something about a factor of eight?**
> **A.    Yes.**

(Ex. D to Sturgeon Decl., at 84:14-23 (emphasis added)).

Similarly, McCabe (Class G) was able to repeat certain keywords that she had heard,

such as "indexing" and "wear-away," but had no idea what those terms meant or referred to:

> Q.    What's your understanding of the claims that you're -- that are being asserted in
> the lawsuit?
> A.    I understand that there was a change in the plans partly because the previous plan
> wasn't maybe set up right, and so they had to change it, which would give me
> some wear-away, and that the indexing was not correct.  And the old plan should
> have continued for me at the rates and things that it was set up for.  They did not
> figure out our retirement to our proper retirement age, so our pension plans were
> diminished.
> Q.    And do you know what was calculated incorrectly or applied incorrectly?
> **A.    I have no idea.**
> Q.    Do you know any of the details of how the calculations were performed,
> incorrectly or correctly?
> A.    Some IRS law, and it should have been 8 percent.
> Q.    Do you know what should have been 8 percent?
> A.    No.
> Q.    And when you say that there was wear-away, what do you mean by that?

> A.     For a while when they switched my pension plan, I would get less than I had.
> Q.     And what's your understanding of why that was? Do you know the details of that?
> **A.     No, I have no idea.**

(Ex. H to Sturgeon Decl., at 46:20-47:21 (emphasis added)).

Likewise, Emerson (Subclass D) repeated that the suit involved "indexing" but could only offer nothing more than a circular explanation of what that actually meant:

> Q.     And what is your understanding of the claims that you're asserting in the lawsuit?
> A.     That the numbers were wrong.
> Q.     Do you know which numbers were wrong?
> A.     There should have been indexing from the time I retired through 65.
> Q.     Can you explain that to me, though, in any more detail?
> A.     It wasn't projected from when I retired through the end of -- through the age of 65.
> Q.     And what was it that wasn't projected?
> A.     A percentage should have been put on my retirement benefit.

(Ex. C to the Sturgeon Decl., at 71:8-72:20).

A class representative is also inadequate where she does not know the contours of the class she seeks to represent.  *See Massengill v. Bd. of Educ., Antioch Cmty. High Sch.*, 88 F.R.D. 181, 186 (N.D. Ill. 1980) (finding that proposed class representative was inadequate where, among other things, she was unaware of the composition of the class).  Here, the deposition testimony of some of the proposed class representatives revealed that they do not understand the basic composition of the subclasses they are seeking to represent.  Johnson (Subclass A), for example, testified:

> Q.     Do you know which class you're representing?
> A.     Yes, I do.
> Q.     What class are you --
> A.     65 --
> Q.     -- attempting to represent?
> A.     It's 65 and over.
> Q.     Anything beyond that?
> A.     What's beyond that?
> Q.     Do you know of any other parameters of the class that you're purporting to represent beyond that?

A.    No.

(Ex. G to the Sturgeon Decl., at 29:19-30:4).[14]  Class A, however, is not at all defined in terms

of the participants' ages.  Instead, it is defined as "[a]ll persons who received a lump sum

distribution … between October 1987 and December 31, 2002 whose lump sum … was less than

the lump sum they would have received had the lump sum been calculated using the applicable

ERISA § 205(g), 29 U.S.C. § 1055(g); 26 U.S.C. ("IRC") § 417(e) factors ...." (Dkt. 83-1 at p.

3).  With such a fundamental misunderstanding of why she is being grouped with the other

members of her proposed subclass, she cannot possibly look out for those other members' best

interests.  Johnson is not alone in having no understanding about the contours of the subclass she

purports to represent.  The deposition transcripts of English (Subclass B) and Anthony (Subclass

J) also demonstrated a lack of basic knowledge about their subclasses.[15]  These plaintiffs cannot

possibly look out for the other members' best interests.

Additionally, class representatives should have sufficient involvement in the case and

independence from their counsel to protect the interests of the class.  *See In re AEP ERISA Litig.*,

2008 WL 4210352, at *2.  "Plaintiffs should understand the actions in which they are involved,

---

[14] Johnson further testified that she knew of no other parameters beyond age "65 and over." (*Id.*
at 29:21-30:4).  Specifically, she testified that did not even know what form of benefit the other
members of Class A received.  (*Id.* at 32:25-33:2).  This is significant because Class A only
includes participants who elected a particular form of distribution of their benefits – a lump sum
payout.  (*See* Dkt. 83-1 at p. 3).

[15] *Compare* Ex. D to Sturgeon Decl., at 75:2-8 ("Q. Okay. Do you understand who it is you're
trying to represent? … A.  People who took their pension out in a lump sum before they changed
the pension plan to the 401(k) and called the plan I was in the old plan.") *with* Dkt. 83-1 at p. 3
("Class B is … All persons who prior to attaining age 65 received a lump sum distribution from
the Plan between October 1987 and December 31, 2002 who are not members of Class A ….");
*and compare* Ex. B to Sturgeon Decl., at 56:18-57:54 ("Q. Do you know how the class that
you're trying to represent is defined?  Do you know who it includes?  A. I'm **assuming** people
such as myself … People who have been employed ten years under the same retirement plan."
(emphasis added)) *with* Dkt. 83-1 at p. 5 ("Class J is … All persons who entered the Plan for the
first time on or after January 1, 2003 ….").

and that understanding should not be limited to derivative knowledge acquired solely from counsel." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 (5th Cir. 2001); *see also Eslava v. Gulf Tel. Co.*, No. 04-00297, 2007 WL 2298222, at *3 (S.D. Ala. Aug. 7, 2007) (finding that proposed class representatives were inadequate because they had virtually abdicated the representative role to their counsel and "failed to demonstrate a basic understanding of the various violations that the multiple Defendants are alleged to have committed." (citation and internal quotations omitted)); *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 532-36 (N.D. Tex. 2005) (finding putative class representative inadequate because her knowledge was limited to that provided by counsel; class representatives must have "commendable familiarity" with the complaint and the concept of the class action). Thus, class certification "may properly be denied 'where the class representatives ha[ve] so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'" *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995) (citation omitted).

Here, some of the proposed class representatives' knowledge of their claims is limited almost entirely to that provided by counsel. For example, proposed representative English testified that she knows basically nothing about her claims beyond her attorney telling her that her benefit was miscalculated for reasons she does not understand:

> Q.    And what's your basis for thinking that it's not accurate?
> A.    Well, my lawyer tells me that it was not done correctly. It was not figured correctly according to the Meriter pension plan and the state and federal laws.
> Q.    Is that it?
> A.    Yes.
> Q.    Okay. Is that the first time you thought it was not accurate?
> A.    Yes.
> …

> Q.      And do you understand the theories that your lawyers are advocating about why you didn't get as much as he thinks you should have gotten and you think you should have gotten?
>
> A.      I -- I heard them, but I don't necessarily understand them all.
>
> …
>
> Q.      Ms. English, I think you said that you understood that you and your lawyers at least were claiming that something should be indexed to age 65 at 4 percent, correct?
>
> A.      Yes.
>
> Q.      Do you understand what indexing at 4 percent to age 65 means?
>
> A.      No.
>
> Q.      Okay. Do you have any idea what it means?
>
> A.      No.
>
> Q.      Okay. So where did those words come from?
>
> A.      The meetings we had with the lawyer.
>
> Q.      Okay. And the factor of eight that you also mentioned, do you know what that means?
>
> A.      No.
>
> Q.      Do you know what it's about?
>
> A.      No.
>
> Q.      All you know is that your lawyers said something about a factor of eight?
>
> A.      Yes.

(Ex. D to Sturgeon Decl., at 60:10-20; 75:14-19; 84:4-23).  English is just one example – many of the other proposed class representatives knew nothing of their claims beyond what was told to them by their attorney.  (*See also* Ex. F to Sturgeon Decl., at 68:3-69:1 (Hansen testified that he does not know anything more about the alleged miscalculation of his benefits besides "the information that I received from my attorneys." );  Ex. B  to Sturgeon Decl., at  52:13-16 ("Q. So what's your basis for saying that Meriter didn't do what it told you it was going to do?  A. My attorney."); Ex. I to the Sturgeon Decl., at 66:3-13 ("I don't believe there's a difference [between the circumstances of the classes] according to my counsel[,]" and admitting she did no further assessment)).  In addition, some of the proposed representatives explained that they would abdicate their role as class representatives to counsel if class conflicts or issues with other proposed representatives arose.  (*See* Ex. D to Sturgeon Decl., at 77:5-13 ("I would leave that up to the lawyer to come up with the correct way to [resolve a conflict.]"); Ex. B  to Sturgeon Decl.,

at 60:25-61:2 ("I'm leaving [ensuring that the other proposed representatives are adequate] in my lawyer's hands.")).

The level of knowledge the 10 new proposed class representatives possess is so wanting that they do not pass even the most minimal standards courts use to assess adequacy. They were rounded up by Plaintiff's counsel through client solicitations earlier this year and are largely figurehead placeholders (conflicted ones, as demonstrated in Section A above) to fill out the myriad legal theories counsel wishes to prosecute. Defendants submit that their lack of minimal knowledge, involvement and willingness to abdicate their responsibilities as a class representative to their attorneys militates against this class being certified.

**C.    The Newly-Proposed Class Representatives Also Are Not Suitable Representatives For Repeated Plan Amendment Claims And These Claims Raise Individualized Issues.**

Plaintiff's anti-cutback claim is based on the so-called repeated plan amendment rule. *See* 26 C.F.R. § 1.411(d)-4, Q&A-1(c)(1). In her First Amended Class Action Complaint, Plaintiff alleges that a series of purported amendments were made to the Plan between 1988 and 2002, which Plaintiff says set the Plan's interest crediting rate annually to 75% of the prior year's investment returns on the Plan's assets, subject to a 4% minimum. (Dkt. 39, ¶¶ 66-67). Through these purported Plan amendments, Plan participants allegedly developed a protected right to continued indexing based on a Plan returns-based interest crediting rate. (Dkt. 39, ¶¶ 109, 169-176). None of the 10 proposed class representatives are suitable or adequate for this claim.

**1.    The Timing Of Each Participant's Participation In The Plan Determines Any Alleged Pattern Of Repeated Amendments.**

As explained in Defendants' Opposition, any analysis of whether a "pattern" of amendments exists depends on a participant's unique circumstances. These include the year in

which someone commenced, and ceased, their participation in the Plan and their employment at

Meriter, and the information provided in those time frames.  (Defs.' Opp. at pp. 34-35).  Class

members who took lump sums in 1988, for example, cannot rely on amendments that occurred

after 1988 to prove a pattern, and class members who did not join the Plan until 2000 cannot rely

on amendments that occurred from 1987-1999.[16]

New proposed class representative Johnson (Subclass A), for example, participated in the

Plan from its inception in 1987 to 1996.  (*See* Ex. G to Sturgeon Decl., at 6:20-9:20; Johnson

Dep. Ex. 97).  She received a lump sum distribution from the Plan in February 1996.  (*See* Ex. G

to Sturgeon Decl., at 24:21-25:13; Johnson Dep. Ex. 100).  Because amendments occurring after

a participant has separated from employment are immaterial to determining the existence of a

"pattern," *see Thornton v. Graphic Commcs. Conf. of the Int'l Bhd. of Teamsters Supp. Ret. &*

*Disability Fund*, 566 F.3d 597, 614 (6th Cir. 2009), any purported indexing rate amendment after

1995, the year Johnson retired, cannot establish a "pattern" for her under the regulation.  (*See,*

*e.g.*, Ex. G to Sturgeon Decl., at Johnson Dep. Ex. 98; Ex. I to Sturgeon Decl., at Muller Dep.

Ex. 177).

Johnson therefore is not a suitable representative for class members who participated in

the Plan for different years than she, because they necessarily would be subject to different

pattern evidence.  For example, a putative class member who received a lump sum in 1988 could

---

[16] Even assuming that the "test" to determine whether a pattern exists is "purely objective" under
Rev. Rul. 92-66, (Reply Br. at p. 29), it contemplates "facts and circumstances" such as the
individualized considerations discussed above.  These facts and circumstances, including the
investment credit rate history for a participant based on the participant's dates of employment,
may vary both within and between subclasses.  By definition, certain putative class members in
the subclass Johnson seeks to represent (Subclass A) did not take distributions from the Plan
until December 31, 2002, and therefore may have participated in the Plan until the end of 2002.
Thus, whether Johnson or the various putative class members in Subclass A can establish a
"pattern" of amendments require individualized determinations.

not rely on most of the evidence upon which Johnson would rely (1988-1995 amendments) to demonstrate a pattern. The same is true for a putative class member who commenced participation in the Plan after Johnson left, or whose participation only partially overlapped with Johnson.

Proposed representative Anthony (Subclass J) entered the Plan on or after January 1, 2003, when the indexing rate was changed. (*See* Ex. B to Sturgeon Decl., at 47:25-48:4; Anthony Dep. Ex. 67). Because Anthony was not a Plan participant prior to January 1, 2003, a pattern cannot be established based on interest crediting rates that were no longer in effect when she entered the Plan. Stated differently, unlike Johnson, she did not participate in the Plan when a supposed Plan-returns based interest crediting rate was used by the Plan. Rather, her benefits were calculated using the 10-year U.S. Treasury Constant Maturities rate with a minimum of 4%. (*See* Ex. B to Sturgeon Decl., at 47:25-48:4; Anthony Dep. Exs. 67 and 74).

Moreover, whether such a "pattern" exists for a participant who was employed by Meriter before January 2003, such as Muller, depends on a different investment credit rate history than existed for Johnson or Anthony. Muller was employed by Meriter from 1975 through 2007 and took her lump sum distribution in November 2007. (*See* Ex. I to Sturgeon Decl., at Muller Dep. Ex. 200). The purported amendments that could be used to establish a "pattern" for Muller range from 1988 through 2007 (*See id.* at Muller Dep. Ex. 188). This alleged "pattern" is different from the amendments considered for Johnson, who retired in 1995, (*see id.*), or Anthony who only became a participant beginning in 2003. (*See* Ex. B to Sturgeon Decl., at Anthony Dep. Ex. 67).

Plaintiff's response to these individualized pattern issues is confined to a footnote. Plaintiff essentially claims that once a pattern of amendments is established, all participants are

be subject to them regardless of when the pattern is established or whether they even participated in the Plan when those amendments were adopted.  (Reply Br. at pp. 29-30, n.23).  This reasoning begs the question to be decided.  Individualized considerations will determine *whether and when* each putative class member will be able to establish a plan amendment through repeated activity.

### 2. Determining the "Reasonable Expectations" of Each Participant Regarding Alleged Repeated Plan Amendments Is Also An Individualized Inquiry.

The I.R.S. explains that "plan amendments that make benefits available for a limited period of time do not automatically result in the elimination of a participant's valuable right once that period of time has ended."  Rev. Rul. 92-66, issued August 20, 1992.  Rather, "the regulations preclude a pattern of plan amendments that would make benefits available only for a limited period of time if the plan amendments give rise to a *reasonable expectation* that the benefit is an ongoing feature of the plan, and therefore a valuable right."  *Id*. (emphasis added).  This is necessarily an individualized inquiry and Plaintiff's Reply Brief does not cite a single case supporting her proposition that a participant's "reasonable expectations" can somehow be presumed on a class-wide basis.

Like Boyd, the testimony of all 10 newly proposed class representatives shows that *none* had an expectation that a Plan returns-based interest crediting rate was an ongoing feature of the Plan.  Emerson (Subclass D), for example, stated that she would take notice of the actual designations of the yearly investment credits because she "would get a yearly printout of what [the investment credit] would be."  (Ex. C to Sturgeon Decl., at 20:23-21:2; Emerson Dep. Exs. 110-120; *see also id.*, at 29:20-22; 30:3-23 (testifying that she would review, and understood, the investment credit history on her annual account statements)).  Emerson also testified that she knew the investment credit rate was set each year and "[t]hat it wouldn't be any less than 4

percent, but it would vary otherwise."  (Ex. C to Sturgeon Decl., at 20:20-21:10; 38:8-9; 30:24-31:6).  Emerson did not, however, have any expectation as to what the investment credit rate would be in the future.  (Ex. C. to Sturgeon Decl., at 20:7-11; 21:1-3).

Likewise, Wages (Subclass H) testified that it was her "practice" to review the annual account statements, including the "rate of interest that [she] was earning under [the] investment credit" and the historical rates.  (Ex. K to Sturgeon Decl., at 23:20-22; 19:24-25; 20:6-12; Wages Dep. Exs. 132-154).  She also testified as to her understanding that interest rates went up and down each year:

> Q.   And each -- in each given year like, for example, in 1989 here, did you have any expectation as to what the rate would be on a going-forward basis?
> A.   No.
> Q.   You understand or you understood that the rate could go up or down?
> A.   Yes.
> . . .
> Q.   And so in a given year, you didn't know what the rate was going to be on a going-forward basis, correct?
> A.   Correct.
> Q.   And that was the same throughout your employment with --
> A.   Yes.
> Q.   -- Meriter?  . . . .

(Ex. K to Sturgeon Decl., at 20:20-21:1; 21:8-15).

Likewise, Muller's (Subclass F) testimony, based on her knowledge of the Plan and reliance on her individual account statements and purported indexing rate amendments, was that she had no expectation that a given interest crediting rate was a permanent feature of the Plan:

> Q.   What was your understanding as to -- in 1988 as to how that percentage credit rate was arrived at?
> A.   That there was a board at Meriter that determined the rate according to how well the investment assets did that year.
> Q.   And do you remember in your experience each year that that rate varying?
> A.   Yes.
> Q.   And each year did you have any expectation as to what the rate would be in the future?

A.      No.

Q.      Because it varied each year?

A.      Yes -- oh. It would not go below 4 percent.

Q.      Okay. So you knew -- you knew at a minimum it would be 4 percent, but it could be some number higher than that?

A.      Yes.

Q.      But what that number would be, you didn't know each year?

A.      Correct.

Q.      When you would receive your account statements, was the investment credit rate something that you would review?

A.      Yes.

(Ex. I to Sturgeon Decl., at 22:20-23-18; *see also* Muller Dep. Exs. 171-199).

The testimony of the other proposed new class representatives is the same.[17] This makes all of them inadequate and unsuitable class representatives with respect to the repeated Plan amendment claim.

---

[17] *See* Ex. G to Sturgeon Decl., at 20:7-11; 21:1-3 (Johnson testified that she knew she received annual account statements, but did not have any expectation as to what the investment rate would be in the following years because there was no way of her "anticipating what it would be"); Ex. D to Sturgeon Decl., at 28:2-28:14 ("Q. Okay. Until you received that statement telling you what the rate was for that past year, did you have an expectation about what the rate was going to be for that year? . . . A. I believe the minimum was 4 percent . . . Q. But aside from that 4 percent minimum, did you have any expectation about what the rate was going to be? A. No."); Ex. E to Sturgeon Decl., at 27:22-28:7 ("Q. . . .[D]id you have any, any concrete expectation of what [the investment credit] would be in the future other than a minimum of 4 percent? . . . A. Not concrete . . . Q. Well, did you have any expectation as to what it would be beyond 4 percent each year? . . . A. I assumed if the hospital did well, it would be more . . . Q. And did you assume that if the hospital didn't do well it would be the minimum of 4 percent? . . . A. Yes."); Ex. F to Sturgeon Decl., at 23:14-24:21 (Hansen testified that it was his practice to review his annual account statements and the investment credit rate history; he understood the investment credit rate varied depending on how well the "fund" had performed; and he did not have any expectation as to what the investment credit rate would be going forward throughout the course of his employment at Meriter); Ex. H to Sturgeon Decl., at 12:17-13-7 (McCabe testified that she knew the investment credit would vary and "that the rate was 4 percent some years"; she had no expectation as to what the investment credit rate would be going forward); Ex. J to Sturgeon Decl., at 17:21-18:25 (Stephens explained that "if [Meriter] do[es] good with whatever investment they do with the pension, we will get an interest rate[,]" but stating that she did not have an expectation as to what the interest rate would be in the future; "it varies and no lower than 4 percent"); Ex. B to Sturgeon Decl., at 30:10-14 (Anthony stated that she did not have any expectation about what the future investment credit rate would be beyond the 4 percent minimum).

Plaintiff's Reply Brief makes a nonsensical, lawyers-only argument that what a participant "expected" is irrelevant in determining his or her "reasonable expectations." (Reply Br. at p. 29). She cites Revenue Ruling 92-66, but that Revenue Ruling does not say what Plaintiff claims. Further, as a matter of logic, determining a participant's "<u>reasonable expectations</u>" requires an analysis of the participant's "<u>expectations</u>" and whether those expectations are <u>reasonable</u>. Plaintiff cites no contrary legal authority, and all eleven class representatives testified that they had no expectation about what the interest crediting rate would be, which necessarily shows this is an individualized issue and makes them unsuitable class representatives. (*See* Defs.' Opp. at pp. 9, 34-35).

Finally, Plaintiff claims that a "newly discovered" "secret plan amendment" serves to "moot" the need for Plaintiff to pursue a repeated plan amendment theory.[18] (Reply Br. at pp. 26-31). This document, she claims, alleviates her from having to prove repeated plan amendment allegations that, until now, were the cornerstone of her claim that Plan participants are entitled to future interest credits equal to the greater of 75% of the Plan's trust returns or 4%. (Dkt. 39., ¶¶ 54-67). But Plaintiff equivocates between calling the newly found third-page of a "secret" document an actual "plan amendment" or alternatively, as "extrinsic evidence" that proves "the words of the Plan document were intentionally written to say one thing but mean another." (Reply Br. at pp. 29-30).

---

[18] It is not clear if Plaintiff and the proposed class representatives are now abandoning any repeated plan amendment allegations in order to justify the class motion. If they are, that only underscores that none of them is adequate or suitable, as they are waiving arguments that might benefit some class members simply to get a class certified. *See Nafar v. Hollywood Tanning Sys., Inc.*, No. 08-3994, 2009 WL 2386666, at *8-9 (3d Cir. Aug. 5, 2009) (vacating district court's order to certify a class and remanding for a determination as to whether the proposed class representative's abandonment of her personal injury claims would prejudice putative class members who might want to pursue such claims).

There is good reason for Plaintiff's equivocation.  Plaintiff does not actually argue that this document constitutes a Plan amendment – presumably because she does not want to compromise her allegation in the Amended Complaint that the Plan could only be amended in one specific way.[19]  In addition, this internal document repeatedly characterizes the guidelines set forth therein as an "operating rule."  (*See* Ex. 12 to Pl.'s Reply Br.).  Also, Plaintiff fails to present evidence showing that the interest crediting rate formulaically mirrored 75% of the trust returns when that amount was greater than 4%.  The interest crediting rate used by the Plan varied, substantially in certain years, from the 75% figure even when that percentage exceeded 4%.  (Ex. A to Sturgeon Decl.; L. Sher Report at p. 2, n.4).  The Old Plan authorized the Pension Committee to amend the Plan, "in its sole discretion," to increase the interest crediting rate from 4% for "any calendar year," but did not mandate that they follow a specific formula when doing so.  (Ex. L to Sturgeon Decl., Section 3.14 at MER00000495).

The "secret" document does not overcome the individualized issues inherent to Plaintiff's repeated plan amendment theory.  In addition, the Court should take into account Plaintiff's apparent decision to back away from her repeated plan amendment allegations to cure obstacles for her class motion.  If Plaintiff and her proposed class representatives will so readily abandon arguments that could benefit certain members of the putative class to smooth the path to class certification, they are not adequate or suitable representatives.

---

[19] *See* Dkt. 39 at ¶ 14 ("Between October 1, 1987 and today, by virtue of Plan § 10.1, with one limited exception referenced later in this paragraph, only Meriter's Board of Directors has had the authority to amend or modify the terms of the Plan. No such amendment is effective under Plan § 10.1, unless the Board has duly enacted a resolution authorizing the amendment in question; the amendment's terms must first be formalized in a written instrument executed in Meriter's name by a duly authorized officer; and that instrument of amendment must then be delivered to the Pension Committee along with a duly certified copy of the Board resolution authorizing the amendment.").

**D.    When Plaintiffs' Claims Accrued For Purposes Of The ERISA Statute Of Limitations Requires Individualized Inquiries Rendering This Case Unsuitable For Class Certification.**

Class certification should also be denied because when the claims asserted here accrued also requires individualized determinations not proper under Rule 23(b).  As explained in Defendants' Opposition, (Defs.' Opp. at pp. 37-38), "[e]xamination of whether a particular plaintiff possessed sufficient information such that he knew or should have known about his cause of action will generally require individual examination of testimony from each particular plaintiff to determine what he knew and when he knew it."  *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 320 (4th Cir. 2006).

The parties agree that the Seventh Circuit's opinion in *S.C. Johnson* will guide this Court's statute of limitations analysis.  However, Plaintiff argues that Defendants' attempt to establish that a participant's claims are time-barred based on Plan communications *or* a participant's knowledge is "internally inconsistent."  Plaintiff also says that Defendants' approach is an irrelevant "micro-inquiry into how each individual participant internally processed the words on the page."  (Reply Br. at p. 38).  Plaintiff is wrong.

Generally, "[a] claim to recover benefits under § 502(a) accrues upon a clear and unequivocal repudiation of rights under the pension plan which has been made known to the beneficiary."  *S.C. Johnson*, 2011 WL 2463550, at *4 (citations and internal quotations omitted).  As explained in *S.C. Johnson*, the "clear and unequivocal" repudiation test stems from the "general federal common law rule [] that an ERISA claim accrues when the plaintiff *knows* or should know of conduct that interferes with the plaintiff's ERISA rights.'"  *Id*. at *8 (citation omitted) (emphasis added); *see also Teumer v. General Motors Corp.*, 34 F.3d 542, 550 (7th Cir. 1994) ("Once an unlawful action is taken, a claim accrues when the putative plaintiff discovers the *injury* that results.") (emphasis in original).  Thus, Defendants' argument that "actual

knowledge" *or* Plan communications can cause a claim to accrue comes straight from *S.C. Johnson*, and the precedents upon which it relied.  Plaintiff's attempt to argue that a "benefits-paid-but-miscalculated case" is somehow excepted from the federal common law rule is directly contrary to the law in this Circuit.  (Reply Br. at p. 35).

Further, Plaintiff's claim that Judge Crabb rejected this "identical" argument in *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 255 F.R.D. 628 (W.D. Wis. 2009) is also wrong. (Reply Br. at p. 38-39).  *Ruppert* rejected Alliant's contention that a lead plaintiff was an inadequate or atypical class representative because she did not to have a "fraudulent concealment or tolling" claim, which the class was asserting to prove that their claims were not untimely. *Ruppert*, 255 F.R.D. at 634.  This is not the issue presented here.  Plaintiff also omits a crucial part of *Ruppert*'s holding.  Specifically, Judge Crabb held:

> *If this were a case in which varying factual circumstances among class members had been identified* and could reasonably be expected to lead to varying degrees of success in responding to defendant's particular defenses, *I might have reservations* as to typicality. *In this case, however, defendant has offered nothing more than speculation that some class members might have such defenses . . .*

*Id*. at 634 (emphasis added).

"Varying factual circumstances" that "could reasonably be expected to lead to varying degrees of success" were identified in Defendants' Opposition and are further substantiated below as to several of the 10 proposed class representatives.  Boyd's claim accrued no later than her June, 2006 lump sum distribution, so she personally can only sue for events going back six years based on the six-year statute of limitations.  *See S.C. Johnson*, 2011 WL 2463550, at *4. Defendants' point is that accrual of the statute of limitations actually occurred in her case much earlier based on her individual understanding of the Plan communications.  (Defs.' Opp. at pp. 38-39).

Plaintiff's Reply Brief does not even address Boyd's testimony on this issue.  Moreover, discovery has confirmed that claims by other newly-proposed class representatives are also untimely.  (*See* Ex. B to Sturgeon Decl., at 21:19-22:10, 22:24-23-7 (Anthony testified she understood that she was entitled to a benefit equal to her account balance if she took a distribution from the Plan); Anthony Dep. Ex. 67); (Ex. C to Sturgeon Decl., at 28:16-29:1, 32:4-13 (Emerson testified she understood that her account balance was the amount she was entitled to in the event she took a lump sum distribution); Emerson Dep. Ex. 109); (Ex. D to Sturgeon Decl., at 34:21-36:2, 43:23-44:6, 47:4-10 (English testified she understood that if she took a lump sum distribution from the Plan she would receive her account balance); English Dep. Exs. 52, 54-56); (Ex. F to Sturgeon Decl., at 34:17-36-19 (Hansen testified he knew that he would receive his account balance if he took a lump sum distribution from the Plan), Hansen Dep. Exs. 83-88; Ex. 217 to McCabe Dep.); (Ex. I to Sturgeon Decl., at 11:14-12:12, 21:25-22:9 (Muller testified she knew that she would receive her account balance upon taking a lump sum distribution from plan), Muller Dep. Ex. 170); (Ex. G to Sturgeon Decl., at 17:6-18:8, 25:19-26:2 (Johnson testified that she understood that her lump sum payout to be her account balance); Johnson Dep. Exs. 98, 100); (Ex. E to Sturgeon Decl., at 43:9-44:15 (Greco testified she understood that the total account for distribution to be her lump sum distribution from the plan), Ex. 230 to Greco Dep.); (Ex. K to Sturgeon Decl., at 28:19-29:6 (Wages testified she understood that her lump sum distribution from the plan would be her account balance), Wages Dep. Ex. 140); (Ex. J to Sturgeon Decl., at 15:7-16:2, 27:22-28:6, 39:23-40:13 (Stephens testified she understood that her lump sum distribution from the plan would be her account balance), Stephens Dep. Ex. 235).

Plaintiff has failed to carry her burden to show that resolution of Defendants' statute of limitations defense can occur on a class-wide basis.  Accordingly, class certification is improper under Rule 23(b).

## III.   <u>CONCLUSION</u>

For the foregoing reasons and for those set forth in Defendants' Opposition to Plaintiff's Motion for Class Certification, Defendants respectfully request that the Court deny Plaintiff's Motion for Class Certification.

October 12, 2011                                             Respectfully submitted,


                                                            By: /s Jeffrey A. Sturgeon
                                                                Jeffrey A. Sturgeon

Todd G. Smith                           Charles C. Jackson (pro hac vice)
Godfrey & Kahn S.C.                     Jeffrey J. Kmoch (pro hac vice)
One East Main Street                    Morgan, Lewis & Bockius LLP
Madison, WI 53703                       77 West Wacker Drive, Fifth Floor
(608) 257-3911                          Chicago, Illinois 60601
(608) 257-0609 (fax)                    (312) 324-1000
Tsmith@gklaw.com                        (312) 324-1001 (fax)
                                        charles.jackson@morganlewis.com
                                        jkmoch@morganlewis.com

                                        Jeremy P. Blumenfeld (pro hac vice)
                                        Jeffrey A. Sturgeon (pro hac vice)
                                        Morgan, Lewis & Bockius LLP
                                        1701 Market Street
                                        Philadelphia, PA 19103
                                        (215) 963-5000
                                        (215) 963-5001 (fax)
                                        jblumenfeld@morganlewis.com
                                        jsturgeon@morganlewis.com

                                        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of October, 2011, a true and correct copy of the foregoing Defendants' Sur-Reply Regarding the Suitability of the Ten Newly Proposed Plaintiffs To Act As Class Representatives in Further Support of Defendants' Opposition to Plaintiff's Motion for Class Certification was electronically filed with the Clerk of the Court using the Court's CM/ECF, which will send notification to the following:

> Eli Gottesdiener
> Steven D. Cohen
> Gottesdiener Law Firm, PLLC
> 498 7th Street
> Brooklyn, NY 11215
> (718) 788-1500
> (718) 788-1650 (fax)
> eli@gottesdienerlaw.com

<u>/s Jeffrey A. Sturgeon</u>
*Attorney for Defendants*