# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Tammy J. Boyd, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Meriter Health Services Employee Retirement Plan and Meriter Health Services, Inc.<br><br>Defendants. | Case No  3-10-cv-00426-wmc<br><br>**DECLARATION AND REPORT OF LAWRENCE SHER** |

I, Lawrence Sher, depose and state pursuant to 28 U.S.C. § 1746 as follows:

1.　I am the founder and President of Sher Actuarial Consulting LLC.[1] I am a Fellow of the Society of Actuaries, an Enrolled Actuary, a Fellow in the Conference of Consulting Actuaries, and a member of the American Academy of Actuaries. I am the Immediate Past President of the Conference of Consulting Actuaries and continue to serve on its Board. I was a member of the Actuarial Standards Board, I have served on the Board of Directors of the American Academy of Actuaries, and have served on both the Council of U.S. Presidents and the North American Actuarial Council. I have practiced as an actuary since 1973, primarily in the area of pension benefits. I have extensive experience designing and consulting with respect to defined benefit pension plans, including the types of plans involved in this case. Exhibit A includes more information on my professional background, publications and involvement in other cases.

2.　The documents that I received from defendants' counsel that I considered in preparing this declaration are listed at Exhibit B. My firm is being compensated for my time at an hourly rate of $600.

3.　Counsel for the defendants asked me to make observations regarding the impact on Class members of (1) alternative approaches used by courts in this Circuit

---

[1] I have accepted an offer to join the firm of October Three LLC as a partner, effective October 17, 2011.

for projecting interest, and (2) the effect of changes in benefit provisions reflected in the 2003 version of the Plan, which is referred to as the "New Plan" in plaintiff's reply brief.

    4.    My observations in the report should not be construed as commentary on the merits of the plaintiff's claims and theories in this case.

**A. Impact on Class Members of the Different Methods For Projecting Index Rates**

    5.    One of plaintiff's claims is that lump sums under the Plan should be redetermined under a "whipsaw" approach, whereby the employee's Accrued Benefit (i.e., the account balance divided by "8") would be projected at an assumed annual rate to age 65, and then converted to a lump sum present value at a (generally different) assumed discount rate to the employee's age at the date of distribution.

    6.    Defendants' counsel asked me to evaluate whether Class members would prefer that the assumed projection rate in whipsaw calculations be a constant 8.2% or vary based on year of distribution using a moving 5-year average rate.[2] The 5-year average rate for a given year of distribution would be equal to the average over the preceding 5-years of the Plan's actual index rates.[3] For years after 2002, I estimated what the actual index rates would have been had the pre-2003 Plan terms continued under the plaintiff's theory that the index rate in a given year was determined as the greater of 4% and 75% of the Plan trust actual investment return for the year.[4] In all cases, I determined the conversion from the resulting age 65 life annuity to a lump sum on the date of distribution using the applicable interest rate under Section 417(e) of the

---

[2] My calculations do not reflect another of the plaintiff's claims that the 417(e) lump sum factor should be subject to a minimum of "8."

[3] Because indexing rates did not exist for periods before October 1, 1987, the average reflects fewer than 5-years for distribution years before 1993 (for example, 1.25 years for 1989 distributions – the 1988 rate and the rate in the last quarter of 1987). The averaging period does not include the rate in the year of distribution because that rate will not have been known until after the year is over and therefore after the lump sum is distributed. Another approach would have been to impute hypothetical rates for pre-1987 years based on plaintiff's theory as to how rates were determined under the Plan. The results for those early years would have been somewhat different under such an approach.

[4] I made these estimates using the asset information on the Form 5500s provided to me, using the formula: $2I/[(A+B)-I]$, where $I$ = is the total market value return (interest, dividends, realized and unrealized gains) net of plan expenses, A is the assets at the beginning of the year and B is the assets at the end of the year. I also developed rates of return for the years before 2003 for which Forms 5500 were provided, and note that 75% of the actual return (minimum 4%) differed materially from the index rate actually used in some of those years.

2

Internal Revenue Code.[5]

7. The actual index rate for the years 1987 through 2002, as well as the rates I calculated from Forms 5500 for the years 2003 through 2008 (in italics), together with the corresponding 5-year average rates, all described in paragraph 6 above, are set forth in the following table:[6]

|  | Index Rate in Year | 5-Year Average Rate |  |  | Index Rate in Year | 5-Year Average Rate |
|---|---|---|---|---|---|---|
| 1987 | 1.00% | 4.00% |  | 1998 | 12.00% | 12.10% |
| 1988 | 8.50% | 4.00% |  | 1999 | 11.50% | 12.60% |
| 1989 | 15.00% | 7.60% |  | 2000 | 4.00% | 14.10% |
| 1990 | 4.00% | 10.89% |  | 2001 | 4.00% | 10.90% |
| 1991 | 15.00% | 8.77% |  | 2002 | 4.00% | 9.30% |
| 1992 | 4.00% | 10.24% |  | 2003 | *14.92%* | *7.10%* |
| 1993 | 9.50% | 9.30% |  | 2004 | *6.95%* | *7.68%* |
| 1994 | 4.00% | 9.50% |  | 2005 | *4.89%* | *6.78%* |
| 1995 | 20.00% | 7.30% |  | 2006 | *8.43%* | *6.95%* |
| 1996 | 12.00% | 10.50% |  | 2007 | *4.00%* | *7.84%* |
| 1997 | 15.00% | 9.90% |  | 2008 | *4.00%* | *7.84%* |

8. From the table, we can see that the 5-year average approach would produce whipsaw projection rates higher than a constant 8.2% rate in distribution years 1990 through 2002 except 1995. The 8.2% rate would be higher in 1987, 1988, 1989, 1995, and all years in 2003 and after. A majority of the members of Classes C, E1, E2

---

[5] The applicable interest rate for distribution years before 1997 was based on the rates used by the PBGC for terminations of single employer plans in the month of November preceding the calendar year of distribution. From 1997 through 2007, the applicable interest rate was the rate on 30-year US Treasury bonds for the November of the year preceding the calendar year of distribution. Mortality rates after age 65 were determined under the unisex version of the 1983 GAM Table (1994 GAR Table for distributions in 2003-2007) published by the Internal Revenue Service. For distributions after 2007, I reflected the applicable interest rates and mortality tables under the Pension Protection Act of 2006 published by the Internal Revenue Service.

[6] For example, the 5-year average rate for 1997, shown in the table as 9.90%, is determined by averaging the Index Rates in the 5-years 1992-1996 (i.e., 4.00% + 9.50% + 4.00% + 20.00% + 12.00%, divided by 5).

and F would prefer a constant 8.2% rate. On the other hand, a majority of the Class A and B members would prefer the 5-year average approach. The extent of a member's preference depends primarily on the differential between the two rates and the member's age in the year of distribution.

9. Members of Classes H, I and J who elect lump sums distributions in the future will prefer one approach or the other depending on the actual investment returns of the Plan's trust in future years.

10. The above observations can be illustrated by considering the impact on example Class representatives and members. For example, Phyllis Johnson, the named representative of Class A, would be indifferent as to the 8.2% versus 5-year average approach because she was over age 65 when she took her benefit. An example of a member of Class A who would prefer the 5-year average approach is ID 2750 who received a distribution in 1999. An example of a Class A member who would prefer the 8.2% approach is ID 3916 who received a distribution in 1995. Here are my estimates of the whipsaw amounts under the two approaches for these three members:

|  | **Phyllis Johnson** | **ID 2750** | **ID 3916** |
|---|---|---|---|
|  |  |  |  |
| Distribution Year | 1996 | 1999 | 1995 |
| Age at Distribution | 65 | 60 | 63 |
| Account at Distribution | $ 66,079 | $119,655 | $117,641 |
|  |  |  |  |
| Whipsaw Lump Sum |  |  |  |
| Project at 8.2% | $ 83,330 | $188,928 | $138,933 |
| Project at 5-Yr. Avge. | $ 83,330 | $221,830 | $137,327 |

11. Madge English, the named representative of Class B, who received her distribution in 2000 would prefer the 5-year average approach. An example of a member of Class B who would prefer the 8.2% approach is ID 2876 who received a

distribution in 1995.[7] Here are my estimates of the whipsaw amounts under the two approaches for these two members:

|  | Madge English | ID 2876 |
|---|---|---|
|  |  |  |
| Distribution Year | 2000 | 1995 |
| Age at Distribution | 51 | 41 |
| Account at Distribution | $ 57,298 | $ 32,341 |
|  |  |  |
| Whipsaw Lump Sum |  |  |
| Project at 8.2% | $ 97,951 | $ 70,420 |
| Project at 5-Yr. Avge. | $202,486 | $ 58,092 |

As can be seen by reviewing the application of these two rates to Made English's lump sum, the differences can be substantial (in her case $97,951 vs. $202,486).

12. Other examples of the hundreds of Class A and B members who would prefer the 5-year average projection approach are as follows:

|  | ID 3843 | ID 2774 | ID 3695 | ID 3600 | ID 2442 |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| Distribution Year | 1990 | 1992 | 1996 | 1998 | 1999 |
| Age at Distribution | 31 | 43 | 62 | 41 | 54 |
| Account at Distribution | $ 8,256 | $ 21,608 | $ 60,802 | $ 31,837 | $122,600 |
|  |  |  |  |  |  |
| Whipsaw Lump Sum |  |  |  |  |  |
| Project at 8.2% | $ 19,740 | $ 38,342 | $81,192 | $ 66,435 | $232,261 |
| Project at 5-Yr. Avge. | $ 45,202 | $ 57,535 | $85,008 | $152,546 | $354,502 |

---

[7] Nobody who is a member of Class B would be totally indifferent since by definition Class B excludes members who received a distribution at or after age 65.

5

13.     As discussed above, the majority of members of Class C, E1, E2 and F would prefer the 8.2% whipsaw projection rate over the 5-year average approach. Here are the results of my calculations for the named representatives of each of these Classes:

|  | C. Greco | S. Hansen | T. Boyd | L. Muller |
|---|---|---|---|---|
| Class | C | E1 | E2 | F |
| Distribution Year | 2003 | 2004 | 2006 | 2007 |
| Age at Distribution | 52 | 59 | 41 | 60 |
| Est. Acct. at Dist. Date | $109,136 | $ 68,224 | $ 58,108 | $228,480 |
| Distribution Amount | $145,057 | $ 90,071 | $ 65,508 | $289,242 |
| Whipsaw Lump Sum |  |  |  |  |
| Project at 8.2% | $241,808 | $119,370 | $192,865 | $428,180 |
| Project at 5-Yr. Avge. | $211,728 | $115,449 | $140,646 | $414,488 |

14.     The above analysis reveals that hundreds of Class members would prefer that lump sums be determined using a constant 8.2% to index benefits to age 65, and hundreds of others would prefer that the 5-year average approach be used. And other Class members would have little or no preference between the two approaches.

## B. Impact of Benefit Changes in 2003 Plan Document

15. The plaintiff asserts that the 2003 version of the Plan did not become effective on January 1, 2003 and either became effective on some later date or never became effective. Defendants' counsel asked me to compare the benefits that would have accrued under the terms of the 1987 version of the Plan assuming it had continued beyond 2002 without change with the actual benefits reflecting the terms of the 2003 Plan document.

16. The following table illustrates for selected members of Class H the estimated lump sum benefits they would have been entitled to under several variations of these two scenarios, assuming that the members terminated and received distributions on December 31, 2008.

**1987 Plan Continuing.** The 1987 Plan amounts (expressed as account balances) are shown on two bases regarding the indexing of benefits in 2003 through 2008:

- At the 4% annual rate specified in the 1987 Plan
- At 75% of the Plan's investment return each year (but not less than 4%)[8]

**2003 Plan Effective 1/1/03.** The 2003 Plan amounts are shown on three bases all of which reflect indexing of benefits in 2003 through 2008 at the 10-year Treasury Bond rate for each year (but not less than 4%):

- Before reflecting either of the special minimum benefits introduced in the 2003 Plan document (i.e., the account balance only)
- Reflecting the special minimum in the 2003 Plan based on the 12/31/02 accrued benefit under the 1987 Plan
- Reflecting both the 12/31/02 related minimum and the special minimum for those who had attained age 60 and 10 years of service as of 12/31/02.

---

[8] This is the basis that I understand the plaintiff is asserting was used in determining pre-2003 index rates and, according to the plaintiff, should continue to be used under the 1987 Plan while it remains in effect.

7

|  | K. Wages | ID 2119 | ID 2281 | ID 2228 |
|---|---|---|---|---|
| Age at 12/31/08 | 57 | 56 | 68 | 38 |
| Vesting Service 12/31/08 | 36 | 22 | 17 | 10 |
| 12/31/02 Acct. Bal. (8 x Accrued Benefit) | $156,860 | $47,289 | $29,499 | $7,406 |
| 1987 Plan Continuing | | | | |
|   Acct. Bal. 12/31/08: 4% Index 2003-2008 | $222,559 | $76,932 | $51,664 | $29,162 |
|   Acct. Bal. 12/31/08: 75% Return Index 2003-2008 | $261,889 | $89,129 | $59,365 | $31,524 |
| 2003 Plan Effective 1/1/03 (Plan Index 2003-2008) | | | | |
|   Acct. Bal. 12/31/08 | $230,042 | $78,677 | $51,331 | $27,569 |
|   Reflecting Min. based on 12/31/02 Accd. Ben. | $287,158 | $85,864 | $51,331 | $27,569 |
|   Further reflecting special age 60/ 10 yrs svc. Min. | $287,158 | $85,864 | $64,027 | $27,569 |

17. From the table above, we see that Krystal Wages, who is the Class H named representative, would have had an account balance under the 2003 Plan that is about $7,500 higher than it would have been had the 1987 Plan continued, and assuming 4% indexing in 2003 through 2008 ($230,042 vs. $222,559). Applying the 75% return indexing in 2003-2008, would increase the 1987 Plan balance by about $39,000 to $261,889. However, the 2003 Plan benefit reflecting the special minimum based on the 12/31/02 accrued benefit raises the lump sum to $287,158 which exceeds the higher 1987 ongoing plan lump sum by about $25,000 ($287,158 vs. $261,889).

18. The results for ID 2119 are similar to those for Ms. Wages, although the lump sum under the 1987 continuing Plan, reflecting the 75% fund return indexing in 2003 through 2008, is somewhat higher than the 2003 Plan reflecting the 12/31/02 special minimum ($89,129 vs. $85,864).

19. ID 2281 would have an account balance with 4% indexing from 2003-2008 under the 1987 ongoing Plan that is slightly higher than the corresponding amount under the 2003 Plan ($51,664 vs. $51,331). ID 2281 is not helped by the special 12/31/02 minimum under the 2003 Plan because the accrued benefit as of 12/31/02 was based on only 11 years of service. However, the 60/10 special minimum in the 2003 Plan would raise ID 2281's lump sum to $64,027, which exceeds the account balance under the 1987 continuing Plan on either basis.

20. ID 2228 is an example of a short service employee – 4 years as of

December 31, 2002. ID 2228 would have been modestly better off had the 1987 Plan continued, somewhat more so if indexing were applied under the 75% of fund return approach.

21. From the above, we see that in some instances the benefits under the 2003 Plan document likely would be higher than under the 1987 Plan assuming it had continued as written, whereas in other instances the opposite would be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: October 12, 2011.

_____
Lawrence Sher