IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PHYLLIS JOHNSON, *et al.*, on behalf of
themselves and all others similarly situated

        Plaintiffs,

  v.

MERITER HEALTH SERVICES
EMPLOYEE RETIREMENT PLAN and
MERITER HEALTH SERVICES, INC.,

      Defendants.

OPINION AND ORDER

10-cv-426-wmc

---

  This class action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, was filed on behalf of former or current employees of defendant Meriter Health Services, Inc., who were participating in defendant Meriter Health Services Employee Retirement Plan, as well as other beneficiaries of the Plan. Plaintiffs allege that defendants violated ERISA over a twenty-three year period in multiple respects. The court previously certified a class -- really eleven subclasses -- pursuant to Federal Rule of Civil Procedure 23(b)(2). Before the court are cross motions for summary judgment. (Dkt. ##300, 302.)

  Plaintiffs filed this lawsuit in July 2010, challenging administration of an employee pension plan dating back to 1987, with the most crucial developments to plaintiffs' claims occurring in 2002 and 2003. Not surprisingly based on this timeline, defendants' statute of limitations defense is the pivotal issue presented by the parties' motions for summary judgment. For the reasons that follow, the court will deny plaintiffs' motion in its entirety and grant in part defendants' motion. Defendants'

motion is denied with respect to plaintiffs' breach of fiduciary duty claim premised on alleged failures to act for the exclusive purpose of plan participants by concealing defendants' failure to pay lump sum distributions as required under IRC § 417(e) from the Plan's inception on October 1, 1987, to December 31, 2002.  In all other respects, the court will grant defendants' motion based on their statute of limitations defense.

UNDISPUTED FACTS[1]

### A.   The Parties

At all times relevant to this action, defendant Meriter Health Services Employee Retirement Plan was an "employee benefit plan" and, more specifically, a "defined benefit plan" within the meaning of ERISA §§ 3(2)(A) and 3(35), 29 U.S.C. §§ 1002(2)(A) and 1002(35).  Similarly, defendant Meriter Health Services, Inc., was the sponsor of the Plan and the "employer" defined in the Plan.  Meriter was formed in 1987 as the result of a merger between Methodist and Madison General.  The Meriter Plan, in turn, was the result of a merger of the Madison General defined benefit plans and Methodist defined contribution plan.  The Plan was designed by Meriter's actuarial consultants Towers Perrin and labeled as a "pension equivalent reserve credit" plan or "PERC".  Defendants do not dispute that Meriter acted as a fiduciary to the Plan in

---

[1] Given the volume of proposed findings of facts submitted by the parties -- the replies in support of each of their responsive proposed findings exceed 100 pages -- it is not practical (or frankly very helpful) to set forth all of the material, undisputed findings of facts in a narrative format.  As such, the court provides a brief overview upfront and describes the record where relevant in the opinion below.

2

certain respects but disputes the proposition that Meriter was a "general fiduciary." (Pls.'
Reply to Pls.' PFOFs (dkt. #377) ¶¶16a, 16b.)

Plaintiffs are former and current employees of Meriter and participants in the Plan
or other beneficiaries of the Plan. The court previously certified eleven subclasses
pursuant to Federal Rule of Civil Procedure 23(b)(2). (Dkt. ##186, 245) Subclass A is
comprised of all persons who received a lump sum distribution from October 1, 1987, to
December 31, 2002. Subclass B is comprised of persons who received their lump sum
distribution between 1987 and 2002 having not yet attained age 65. Subclass C consists
of all persons who terminated their employment with Meriter prior to January 1, 2002,
and whose benefits did not commence prior to January 1, 2003. Subclass D consists of
participants who commenced receipt of their benefit in an annuity form between October
1987 and December 31, 2002, and who were between the ages of 55 and 65 when the
benefit commenced. Subclass E1 is comprised of all persons who accrued benefits both
before and after January 1, 2003, terminated their employment during 2002, and who
received a lump sum distribution after January 1, 2003, but before July 30, 2004.
Subclass E2 is the same as E1, except the members received a lump sum after July 30,
2004, but before August 17, 2006. Subclass F is the same as E1, but its members
received lump sum distributions after August 17, 2006. Subclass G consists of individual
who accrued benefits both before and after January 1, 2003, who commenced annuity
payments on or after January 1, 2003, and who were between the ages of 55 and 65 on
the date their benefit payments commenced. Subclass H is comprised of persons who
accrued benefits both before and after January 1, 2003, who have terminated

3

employment with Meriter, but who have not yet received a distribution from the Plan. Subclass I consists of persons who accrued benefits both before and after January 1, 2003, who are currently employed with Meriter, and who have not yet received a distribution from the Plan.  Finally, Subclass J consists of persons who entered the Plan on or after January 1, 2003.

### B.    The Plans

On October 1, 1987, Meriter created the Plan.  Between 1987 and December 31, 2002, the Plan was governed by three different Plan documents.  The court will refer to the first of the three pre-2003 Plan documents as the "1988 Plan."  (Declaration of Steven D. Cohen ("Cohen Decl.") (dkt. #304), Ex. 17 (dkt. #309).)  The 1988 Plan was signed by then-Meriter President William E. Johnson on September 30, 1988, and has an effective date of October 1, 1987.  The second Plan document is the "1993 Plan." (Cohen Decl., Ex. 18 (dkt. #310).)  The 1993 Plan was signed on October 18, 1993, by Meriter's then-Director of HR William L. Morgan and has an effective date of October 1, 1987.  The third, pre-2003 Plan document is the "February 2002 Plan."  (Cohen Decl., Ex. 22 (dkt. #312-2).)   This document was signed on February 26, 2002, also by Morgan, and also with an effective date of October 1, 1987.

Under these Plan documents, Meriter had the discretionary authority and responsibility for appointing the Plan's administrator and named fiduciaries.  Since October 1, 1987, the Plan Administrator has been the "Pension Committee" also known as the Executive Compensation & Pension Committee (or "ECPC").

The pre-amendment Plan documents all expressed participants' benefits in terms of an indexed annuity consisting of yearly accruals increased each year by an "indexing rate." The yearly accrual equaled 0.75% of a participant's annual salary; for those participants with at least ten years of service, the yearly accrual equaled 0.935%. The Plan adopted a constant factor of 8.0 to convert this annuity into a lump sum distribution. Defendants communicated the annual accrual benefit to participants as an annual "pay credit" or "contribution credit" of 6% of wages for employees with less than 10 years of service and 7.5% for those with 10 or more years of service. These annuity accruals multiplied by the factor of 8.0 were then communicated annually to participants as their accrued benefit.

In 2002, a Meriter management group called the "Pension Design Committee" was convened to conduct a multi-month study of Meriter's retirement benefits program. After reviewing various options, the Pension Committee of the Board of Directors recommended certain changes to the full board in August 2002. On August 28, 2002, the Board of Directors adopted a resolution, accepting the recommendation of the Pension Committee, directing amendment of the retirement plans, and requiring that the plans be kept on file once fully executed and approved by the IRS. (Defs.' PFOFs (dkt. #316) ¶ 54.) The adopted changes were reflected in an operating plan document prepared by Meriter's attorney. (Declaration of Thomas A. Hoffner ("Hoffner Decl."), Ex. T ("2003 Operating Plan") (dkt. #314-20).) That document, however, was unsigned and had handwritten on the cover: "5/2003 DRAFT." Material to plaintiffs' challenges, the operating plan document: (1) set an annual interest rate at the greater of 4% or equal

5

to the annual yield on 10-year Treasury Constant Maturities; and (2) removed the 8.0 conversion factor in calculating a participant's annual pay credit.

Through its counsel, Meriter notified the Department of Labor and the IRS that the Plan had been amended effective January 1, 2003. Plan participants were also required to attend mandatory meetings in late 2002 regarding the amended plan and the roll-out of a 401(k) savings plan. Brochures and a 204(h) notice were also provided to plan participants. The Plan was administered consistent with the operating plan document. Until January 23, 2009, however, defendants still did not formally sign a written instrument that contained the amendments purportedly adopted in 2003.

### C. Plaintiffs' Claims

Section 502 of ERISA, 29 U.S.C. § 1132, provides a civil remedy for participants or beneficiaries for violations of ERISA, either to recover benefits (§ 502(a)(1)(B)) or to obtain appropriate equitable relief (§ 502(a)(3)). Plaintiffs' § 502 claims can be roughly grouped into the following three categories: (1) administration of the Plan pre-amendment; (2) amendment of the Plan, including providing proper notice of that amendment; and (3) post-amendment administration of the Plan.

In the First Amended Complaint, plaintiffs allege the following claims concerning the administration of the Plan before its amendment (the date of which remains in disputed):

- Defendants failed to apply § 4.2 of the Plan in calculating an alternative minimum lump sum calculation using the "actuarial equivalent" factors as defined in § 1.2 and required by IRC § 417(e).

- For participants who received their benefits prior to age 65, defendants failed to provide projected future indexing to age 65 before multiplying the accrued benefit by the factor of 8.0.[2]

Plaintiffs assert the following claims concerning the purported amendment of the Plan effective January 1, 2003:

- Defendants did not amend the plan with an executive written instrument as required by § 10.1 of the Plan until 2009, entitling plaintiffs to benefits under the pre-amendment Plan until 2009.

- Defendant' ERISA § 204(h) notice failed to provide participants with sufficient information to allow them to understand the effect of the plan amendment and that failure was "egregious."  ERISA § 204(h)(6)(A), 29 U.S.C. § 1054(h)(6)(A).

Lastly, plaintiffs assert claims concerning the amendment's effect on participants' benefits:

- Defendants fraudulently or inequitably inserted benefit-freeze provisions in the amended plan, entitling plaintiffs to reformation of the plan pursuant to *Cigna Corp v. Amara*, 131 S. Ct. 1866 (2011).

- Defendants violated ERISA's anti-cutback provision, ERISA § 204(g), by failing to protect the 8.0 conversion factor and the indexing rate of the greater of 4% or 75% of the net returns as accrued benefits.

In addition to claims brought pursuant to ERISA § 502, plaintiffs also allege violations of ERISA § 404, 29 U.S.C. § 1104, which defines certain fiduciary duties, including the duty of acting:  for the "exclusive purpose" of participants and their beneficiaries (§ 404(a)(1)(A)); with the care, skill, prudence and diligence of a "prudent

---

[2] Plaintiffs also allege that defendants violated the Plan with respect to subclass D members by calculating the early retirement annuity without projecting it to the amount payable at normal retirement date.  (Pls.' Opening Br. (dkt. #337) 25.)  While plaintiffs mention the 2%-per-year reduction in Plan § 3.10, this claim appears to turn entirely on whether defendants were required to include projected future indexing to age 65 in determining the benefit of early retirees.  As such, the court considers this claim in conjunction with the projected future indexing claim.

man" (§ 404(a)(1)(B)); and in accordance with the plan documents to the extent those plan documents are consistent with ERISA (§ 404(a)(1)(D))).

### D.    Motions for Summary Judgment

The parties have filed cross motions for summary judgment.  Defendants' motion for partial summary judgment primarily concerns their statute of limitations defense. Specifically, Meriter seeks judgment that the following claims are barred by the applicable statutes of limitations:  (1) all claims of class members who took lump-sum distributions before July 30, 2004 (six years before the filing date of this action); (2) all claims of class members who participated in the plan before July 30, 2004; and (3) all claims premised on plaintiffs' challenge of the 2003 Amendment's legality.  Defendants also move for summary judgment on plaintiffs' claim that the Plan required the greater of 4% or 75% of the Plan's net assets as an interest rate.  Plaintiffs move for summary judgment of a finding of liability on all claims.  The court will consider the parties' cross motions together with respect to each of plaintiffs' claims.


OPINION

### I.  Pre-Amendment Plan Claims Under § 502

### A.    Preliminary Matters

The bulk of the parties' briefs concern pre-amendment Plan claims pursuant to ERISA § 502.  Before addressing the substance of those claims, the court must first address two preliminary matters.  First, the parties dispute the nature of plaintiffs' claims, both as plead and as pursued at summary judgment, particularly as they apply to

defendants' statute of limitations defense.  While the Amended Complaint alleges that "[b]y 2001, Defendants clearly recognized that the Plan *as written and administered* was illegal," (Am. Compl. (dkt. #39) ¶ 85 (emphasis added)), other portions of the complaint primarily focus on defendants' failure to administer the pre-amendment Plan as required by the Plan's own provisions, (*see id.* ¶ 52 (alleging defendants "in practice impermissibly failed to treat the right to future indexing through normal retirement age ... as part of the participant's unconditional nonforfeitable accrued benefit"); *id.* at ¶ 72 ("Defendants failed to recognize this fact in practice and pay the full Accrued Benefit payable at Normal Retirement Date (*i.e.,* including the future Indexing) times the factor of 8.0.")). Regardless of this court's, and equally importantly the Seventh Circuit's characterization of plaintiffs' original claims, the amended complaint put defendants on notice of the scope of plaintiffs' renewed benefit-contract claims.  Perhaps defendants are right in asserting that plaintiffs have now scuttled any claim that the pre-amendment Plan itself violated ERISA in an attempt to side-step defendants' statute of limitations defense, but plaintiffs were free to bring such amended claims provided they are properly plead and plaintiffs do not attempt to shift strategy again by resurrecting claims premised on the pre-amendment Plan being illegal as written.  As a whole, the operative pleading put defendants on notice of claims premised on plaintiffs' failure to follow certain provisions of the Plan in calculating benefits prior to its amendment.[3]

---

[3] Defendants also point out somewhat in passing that a plan participant is required to exhaust her administrative remedies when seeking enforcement of the terms of an ERISA plan, (Defs.' Reply (dkt. #371) 9 (citing *Durand v. Hanover Ins. Group, Inc.*, 560 F.3d 436, 439 (6th Cir. 2009)), while acknowledging in a footnote a case from the Northern District of Indiana characterizing the Seventh Circuit as simply "strongly

Second, the parties dispute the nature of the pre-amendment plan: whether the plan was an indexed-annuity formula plan (plaintiffs' position) or whether it was a cash balance defined benefit plan (defendants' position).  As described above, the plain language of the plan defines the accrued benefit in terms of an indexed annuity. Defendants explain that this annuity language was used so that the IRS would recognize and understand it, while defendants communicated to Plan participants in classic "cash balance" language, consistent with the practices of other early cash balance plans. Defendants' explanation seems plausible, but is largely inconsequential.  Unless the terms are ambiguous, the express terms of the Plan govern the court's interpretation.  *See Cent. States Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Mich., Inc.*, 674 F.3d 630, 634 (7th Cir. 2012) (explaining that courts apply federal common law of interpreting contract in ERISA cases and "will not look beyond [the terms'] four corners in interpreting its meaning" if the terms are unambiguous).  All of that said, even though the express terms describe an indexed annuity formula, defendants' description of the Plan as a cash balance plan to participants is not in and of itself problematic.  Concerns only develop if defendants failed to follow the Plan and thus violated ERISA.  Accordingly, the court will focus on plaintiffs' specific claims concerning defendants' failure to administer the Plan as required by its express provisions, and opts not to be weighed down by the parties' characterizations of the Plan.

---

recommend[ing]" exhaustion.  (*Id.* at 9 n.3 (citing *In re FedEx Ground Pkg. Sys., Inc.*, 722 F. Supp. 2d 1033, 1034-46 (N.D. Ind. 2010)).  Regardless of the particular contours of any such "requirement," defendants effectively waive it by further stating that "Meriter is not asking the Court to require plaintiffs to exhaust now."  (*Id.* at 10.)

B.      **Governing Statute of Limitations**

Before turning to the specific, pre-amendment Plan claims, the court must also address the law governing statute of limitations for claims brought under ERISA § 502, 29 U.S.C. § 1132.[4]   ERISA does not provide an express statute of limitations for these claims; instead, courts look to the most analogous statute of limitations from state law. *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 815-16 (7th Cir. 2010) (citing *Berger v. AXA Network LLC*, 459 F.3d 804, 808 (7th Cir. 2006)).   The parties agree that Wisconsin has the most significant connection to the dispute, and that Wisconsin's six-year statute of limitations for breach of contract claims, Wis. Stat. § 893.43, should apply to plaintiffs' claims.   (Defs.' Opening Br. (dkt. #322) 27; Pls.' Opening Br. (dkt. #337) 149.)  *See also Thompson v. Retirement Plan for Employees of S.C. Johnson & Son, Inc.*, 651 F.3d 600, 602 (7th Cir. 2011) (applying Wisconsin's six-year breach of contract statute of limitations to ERISA whipsaw claim); *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 726 F.3d 936, 941 (7th Cir. 2013) (same).

The accrual rules for ERISA claims, however, are governed by federal law. *Thompson*, 651 F.3d at 604 (citing *Young*, 615 F.3d at 816).   "The general federal common law rule is that an ERISA claim accrues when the plaintiff knows or should know of conduct that interferes with the plaintiff's ERISA rights." *Thompson*, 651 F.3d at 604 (quoting *Young*, 615 F.3d at 817).   For a claim to recover benefits under § 502(a), accrual occurs "upon a clear and unequivocal repudiation of rights under the pension

---

[4] Defendants also challenge plaintiffs' § 404 claims on statute of limitations grounds, but the court will review the law governing the statute of limitations for those claims in the section on plaintiffs' breach of fiduciary duty claims.

plan which has been made known to the beneficiary." *Thompson*, 651 F.3d at 604 (quoting *Young*, 615 F.3d at 817) (quotation marks omitted); *see also Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 65 (7th Cir. 1996).

In addition to this "discovery rule," there are at least two tolling doctrines that may stop the statute of limitations from running. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). First, equitable estoppel "comes into play if the defendant takes active steps to prevent the plaintiff from suing in time." *Id.* Efforts by a defendant to conceal the injury, however, do not fall within this doctrine; rather, those efforts are considered under the discovery rule for accrual purposes. *Id.* at 451. To demonstrate equitable estoppel, the plaintiff must show that a defendant took steps "above and beyond the wrongdoing upon which the plaintiff's claim is founded [] to prevent the plaintiff from suing in time," for example "by promising not to plead the statute of limitations." *Id.* at 450-51. The second doctrine concerns so-called "equitable tolling," which comes into play where "despite all due diligence [a plaintiff] is unable to obtain vital information bearing on the existence of his claim." *Id.* at 451. In such a case, the plaintiff may have discovered an injury, but lacks essential information to determine whether his injury is because of wrongdoing by the defendant. *Id.*

As previously mentioned, plaintiffs filed the present lawsuit on July 30, 2010. Thus, any § 502 claims which accrued before July 30, 2004, are time-barred, absent a basis for finding equitable estoppel or equitable tolling of the statute of limitations.

### C.   Plan § 4.2 Claim

First, plaintiffs argue that defendants miscalculated lump sum benefits by failing to calculate lump sums under § 4.2 of the Plan and to provide the greater of the amount under § 4.2 or § 4.3 (describing the 8.0 conversion factor).  There is no dispute that from October 1, 1987, through the end of 2001, defendants calculated and paid lump sum distributions based on the factor of 8.0.  (Pls.' Reply to Pls.' PFOFs (dkt. #377) ¶ 157a.) For example, Subclass A's class representative Phyllis Johnson received a lump sum benefit in February 1996 of $66,079.24 at the age of 65.  (Pls.' PFOFs (dkt. #345) ¶¶ 367a, 367b.)  At that time, defendants determined her accrued benefit as a single life only annuity to be $8,259.90.  (*Id.* at ¶ 368b.)  Defendants multiplied that amount by the factor of 8.0 under Plan § 4.3 to arrive at the lump sum payment of $66,079.24. (*Id.*)  The dispute here concerns calculations and payments of lump sums going back to 1987 although the cross motions address claims arising out of actions taken from 2001 through 2003.

### 1.  Background

While plaintiffs pursue this benefits-contract claim at summary judgment, the statutory context informs plaintiffs' theory of liability.  In brief, Internal Revenue Code § 417(e)(3), 26 U.S.C. § 417(e), requires that lump sum distributions "shall not be less than the present value calculated by using the applicable mortality table and the applicable interest rate."  *See also* ERISA § 205(g), 29 U.S.C. § 1055(f)(3)(A) ("[T]he present value shall not be less than the present value calculated by using the applicable mortality table and the applicable interest rate.").  Plaintiffs also rely on a treasury

regulation which provides that a defined benefit plan may have additional lump sum provisions that provide for lump sums that are more generous than the mandatory minimum established through § 417(e)-compliant provisions.  Treas. Reg. § 1.417(e)-1(d)(5).

As for the terms of the contract, plaintiffs rely on § 4.2 describing the benefit payment as the "actuarial equivalent" and § 1.2 defining the "actuarial equivalent."

> 1.2   "Actuarial Equivalent," except where specifically provided otherwise, shall mean a benefit of equivalent value computed using an interest rate of 5% and the UP-1984 Mortality Table. The foregoing notwithstanding, in no event shall the interest rate be greater than the interest rate that would be used by the Pension Benefit Guaranty Corporation for a trusteed single-employer plan to value a benefit upon termination of an insufficient trusteed single-employer plan.
>
> . . .
>
> 4.2   Optional Forms of Pension.   The optional forms of benefit payment available shall be the Actuarial Equivalent of the pension benefit otherwise payable to the Participant under Sections 3.9, 3.10, 3.11, 5.1 or 5.1, whichever is applicable, subject to the limitations of Section 3.16.

(1993 Plan (dkt. #310) ¶¶ 1.2, 4.2.)

Section 4.3 describes the lump sum or single sum equivalent distribution provides as follows:

> 4.3   The optional forms of pension benefit payable to Participants hereunder shall be:
>
> Single Sum Equivalent.   This form provides for payment of the Participant's Accrued Benefit in a single sum.  The Single Sum Equivalent shall be equal to the Participant's Accrued Benefit prior to any adjustment for early or postponed commencement multiplied by eight (8).  . . .

14

(*Id.* at ¶ 4.3.)

In 2001, defendants recognized that their calculations of lump sum distributions may run afoul of the requirements in IRC § 417(e).  Based on this, defendants began calculating and paying lump sum distributions consistent with their reading of § 417(e) sometime in late 2001 or early 2002.  (Pls.' PFOFs (dkt. #335) ¶ 179.)  In February 2002, defendants also amended § 4.3 of the Plan to adopt a provision in conformance with the requirements of § 417(e):

> 4.3   The optional forms of pension benefit payable to the Participants hereunder shall be:
>
> Single Sum Equivalent.  This form provides for payment of the Participant's Accrued Benefit in a single sum.  The Single Sum Equivalent shall be the Participant's Accrued Benefit payable at Normal Retirement Date multiplied by an Actuarial Equivalent Factor.  For purpose of this paragraph, the Actuarial Equivalent Factor is the greater of 8.0 or a deferred to age 65 life annuity based on the Applicable Interest Rate, the Applicable Mortality Table and the Participant's age at determination.

At the same time, defendants also adopted definitions of "Applicable Interest Rate" and "Applicable Mortality Table."  (2002 Plan (dkt. #312-2) §§ 1.57, 1.58.)   These definitions reflect the so-called "GATT factors" generated by the 30-year Treasury bond rate and applicable mortality table (published by the IRS).[5]

---

[5] Congress amended IRC § 417(e) in 1994 to include the GATT factors.  Treasury Regulation § 1.417(e)-1(d)(8), however, provides that GATT factors would not apply unless and until a plan had been amended to adopt them.

15

### 2. Nature of Claim

Plaintiffs maintain that § 4.2 and § 1.2 of the Plan meet the requirements of calculating lump sum distributions under Internal Revenue Code § 417(e), 26 U.S.C. § 417(e), and ERISA § 205(g), 29 U.S.C. § 1055(g). (*See* Pls.' PFOFs (dkt. #345) ¶ 101b (describing these provisions of the Plan as "safety net actuarial equivalent provisions that prevented the Plan from violating 417(e) in calculating lump sum distributions of the accrued benefit"). While the 8.0 factor calculation ensured that defendants only had to pay the account balance as the lump sum distribution, calculating the lump sum distribution consistent with § 417(e) may have resulted in an amount in excess of the hypothetical account balance. According to the calculations performed by plaintiffs' expert, in every year from 1987 to 2002, the minimum lump sum payment generally exceeded the calculation relying on the 8.0 factor. (Expert Report of Lawrence Deutsch ("Deutsch Report") (dkt. #305) p.50.) Based on the treasury regulation, Deutsch opines that defendants were required to calculate lump sums under both methods and a plan participant should have received the greater of the two amounts. (*Id.* at pp.15-16.)

In response, defendants seek refuge in plaintiffs' admission that the pre-amendment Plan was legal as written (*e.g.*, in compliance with ERISA) and argue that § 4.3 provides the sole mechanism for calculating lump sums. Though quoted in full above, that provision provides in relevant part that: "The Single Sum Equivalent *shall be* equal to the Participant's Accrued Benefit prior to any adjustment for early or postponed commencement multiplied by eight (8)." (1988 Plan (dkt. #309) § 4.3 (emphasis added). In so arguing, however, defendants would evade the issue of whether the Plan

16

(based on defendants' own interpretation) violated the IRC by failing to pay the minimum required by § 417(e).

Defendants appear to have the upper hand with respect to textual interpretation. Section 4.3 provides the specific method for calculating lump sum distributions regardless of the reference to the actuarial equivalent in § 4.2.  *See, e.g., 5308 FAB Ltd. v. Team Indus. Inc.*, No. 10-C-183, 2012 WL 1079886, at *23 (E.D. Wis. Mar. 30, 2012) ("[T]he Court relies upon the Wisconsin law principle of contract interpretation that in the event of a conflict among contract provisions, the more specific provision controls."). Even if it were a closer call, the Pension Committee was expressly granted discretionary authority to interpret the Plan document and resolve any ambiguities.   Moreover, defendants' sole reliance on § 4.3 to calculate lump sum distributions is not unreasonable given the express language in that provision.  (1988 Plan (dkt. #309) § 8.7.)  *See also Conkright v. Frommert*, 559 U.S. 506, 512 (2010) (explaining that when a plan document grant a plan administrator the authority "to construe disputed or doubtful terms," that "interpretation will not be disturbed if 'reasonable'" (quoting *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 115 (1989))).

### 3.  Accrual Date

The court need not resolve this issue definitively, however, since these claims are barred by the statute of limitations.  Defendants argue that the claims of class members who received lump-sum distributions prior to July 30, 2004, (members of subclasses A, B, E1 and a portion of C) are time-barred because "they were told at the time they elected a lump-sum distribution that their account balances would be their full benefit from the

Plan, and they received that lump sum," placing them "on notice, without more, that Meriter had unequivocally repudiated any claim by them to future or different benefits under the Plan." (Defs.' Opening Br. (dkt. #322) 29.)

In support of that argument, defendants largely rely on *Thompson v. Retirement Plan for Employees of S.C. Johnson & Son, Inc.*, 651 F.3d 600, 606 (7th Cir. 2011), in which the Seventh Circuit held that receipt of lump-sum distributions "served as an unequivocal repudiation of any entitlement to benefits beyond the account balance." In so holding, the court rejected an argument -- similar to the one made here -- that the plaintiffs "could not have understood their injury without seeing the full Plan document." *Id.* The court reasoned that (1) "the Plan defendants did not improperly conceal the wash calculation in the Plan document"; and (2) that even if the Plan had, the plaintiffs "did not need reference to the Plan to understand their injury; they needed to reference the ERISA statute and the law interpreting it." *Id.* at 606 & 606 n.8.

Plaintiffs attempt to distinguish *Thompson*, arguing that unlike the claims in that case and in *Ruppert v. Alliant Energy Cash Balance Pension Plan*, they are not claiming that the pre-amendment Plan violated ERISA; rather, plaintiffs seek to enforce certain provisions of the Plan. Therefore, plaintiffs argue, knowledge of ERISA's statutory and regulatory scheme would not provide a source of knowledge of injury.[6] Plaintiffs do not,

---

[6] As defendant points out in their reply brief, the *Thompson* plaintiffs -- represented by the same counsel as plaintiffs here -- argued to the Seventh Circuit that the benefits paid were inconsistent with the actual terms of the plan document. (Defs.' Reply (dkt. #371) 13.) The Seventh Circuit rejected this argument, finding that the lump sum distribution coupled with ERISA's regulatory and statutory scheme triggered accrual of the claim. *Thompson*, 651 F.3d at 606 n.8 ("The present plaintiffs did not need to reference the Plan

however, provide a plausible distinction between imputing knowledge of ERISA and IRS code provisions. Instead, in support, plaintiffs primarily rely on *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808 (7th Cir. 2010).

In that case, the plaintiff alleged that the plan failed to calculate her lump-sum distribution as required by the plan document. Specifically, the defendant in *Young* allegedly ignored the challenged feature of the plan's term (a "second transition factor"), "communicated that only a single transition factor would be used to calculate opening cash balances," and "consistently paid benefits using this formula." 615 F.3d at 817. The *Young* court held that the plaintiff did not receive a clear repudiation of her rights until the plan's review committee resolved her administrative appeal. *Id.* at 816.

In rejecting the defendant's position that accrual occurred at the time Young received her lump-sum benefit, the court reasoned as follows: "at that time, however, the parties' dispute over the correct interpretation of the Plan had not developed. And nothing suggests that the $286,095 payment that Young received should have been a red flag that she was underpaid." *Id.*; *see also Thompson*, 651 F.3d at 607 (distinguishing *Young*, in part, on the basis that "the lump-sum distribution did not place Young on notice that the Plan was ignoring one factor in a complex formula in the plan document").

Unlike in *Young,* however, ERISA required payment of lump sums consistent with a legal requirement. And like in *Thompson* and *Ruppert*, there is a reference point external

---

to understand their injury; they needed to reference the ERISA statute and law interpreting it.").

to the Plan that could provide knowledge -- actual or constructive -- of plaintiffs' claim.[7] Plaintiffs persist that a plan participant would only know about the 8.0 factor in § 4.3, and in turn, how lump sum distributions were calculated, if a participant referred to the Plan document.  There are at least two problems with this argument.

*First*, plaintiffs' focus on participants' lack of knowledge of the Plan's 8.0 factor -- apparently a unique element of this particular plan -- is a red herring.  While plaintiffs have demonstrated that the 8.0 factor was generally unknown to plan participants, one would not need to know of the 8.0 factor to calculate the lump sum consistent with IRC § 417(e).  In order words, just as the Seventh Circuit found the *Thompson* plaintiffs could have calculated a lump sum payment requirement under ERISA, a plan participant here could have calculated her benefit as required under § 417(e).  In either case, a simple comparison of that calculation against a participant's actual lump sum payment would reflect an underpayment, even though she may be unable to discern how the Plan administrator calculated the actual payment.  (*See* Deposition of Gordon Enderle ("Enderle Depo.") (dkt. #286) 389.)

Plaintiffs maintain that the Plan's consultants contradicted his conclusion by testifying that "absent affirmative disclosure of the Plan's use of the factor of 8.0 . . . , they could not have and would not have thought there had been any underpayment."

---

[7] Plaintiffs focus on whether the "average participant" would have known that even the possibility of a claim existed.  (Pls.' Opening Br. (dkt. #337) 27; Pls.' Opp'n (dkt. #354) 13-14.)  Actual knowledge, however, is not required to trigger accrual, only constructive knowledge is -- that a participant could and should have known of the injury.  That said, the very concept of constructive knowledge seems a bit farcical in the context of ERISA.  As acknowledged by the Seventh Circuit, while ERISA's regulations and laws "may be obscure, . . . that will not be held against the defendants."  *Thompson*, 651 at 606 n.8.

(Pls.' PFOFs (dkt. #345) ¶ 168a.)   Read in context, however, the actual deposition testimony merely indicates that the consultants could not have determined how the lump sum distribution was calculated without knowing of the factor of 8.0, which is quite different from a plan participant not knowing she had been underpaid.  (Enderle Depo. (dkt. #286) 383.)  While plaintiffs understandably focus on the 8.0 factor in an attempt to align the facts of this case with *Young* and avoid the statute of limitations defense, the undisputed facts show plaintiffs need not have referred to the Plan to know that they had been underpaid.  Therefore, plaintiffs' § 417(e) claim is much more like the claim in *Thompson*.[8]

*Second*, in determining whether the statute of limitations barred plaintiffs' claims, the *Thompson* court offered an alternative reason for finding accrual:   "the Plan defendants did not improperly conceal the wash calculation in the Plan document." *Thompson*, 651 F.3d at 606.  The record is undisputed that plaintiffs could have sought the Plan documents at any time, and those documents would have revealed (1) the adoption of § 4.2 and § 1.2 calculation method to comply with § 417(e); and (2) the § 4.3 method utilizing the 8.0 factor.  Moreover, there is no requirement that a pension plan provide plan documents to participants unless a request is made.  29 U.S.C. § 1024 (b)(2), (b)(4); 29 U.S.C. § 1132(c).

Even if the court were to find that lump sum distributions did not trigger accrual, there still must be some other triggering event.  *See Thompson*, 651 F.3d at 607 (distinguishing *Young* on the basis that the plaintiff there exhausted her internal remedy

---

[8]As previously discussed, this is so even if plaintiffs label their claim as a benefits-contract claim.

thereby furnishing an alternative accrual date and rejecting plaintiffs' invitation to let them "slip by with no accrual date").  There is no dispute defendants here learned in 2001 that they may have failed to calculate lump sum distributions as required by IRC § 417(e).  By 2003, the possibility of underpayment was flagged in publicly-accessible forms submitted to the IRS.  Moreover, plaintiffs were alerted -- at least sufficiently to find constructive knowledge -- of a possible issue.  Specifically, around that time, an audit statement which was filed as part of the Plan's IRS 5500 filing with the IRS, Department of Labor and the PBGC, and available for public inspection explained: "During 2002, the Plan sponsor became aware that additional amounts may be due to some former participants of the Plan that were paid out in prior years."  (Cohen Decl., Ex. 225 (dkt. #325-14) 13.)

Putting aside the issue of whether plaintiffs knew or should have known by 2003 of a possible claim concerning payment of lump sum distributions made before 2002, plaintiffs contend that (1) defendants "repudiated any repudiation" by opening the door as to whether they would issue corrective payments; and (2) did not close that door until 2008 when they made a "final decision" not to issue corrective payments." (Pls.' Opp'n (dkt. #354) 43.)  However, the undisputed facts do not support either contention.  By September 2002, defendants had concluded corrective payments were not required:

> After an in-depth review and discussion of the issue, the Committee came to a conclusion that distributions to former employees were made in the manner intended by Meriter and as communicated to plan participants.  *There is no reason to recalculate payments to past employees who elected to receive lump sum payments.*  If at a future date, Congress passes clarifying legislation, or further guidance is issued by the Internal Revenue Service related to calculation of payments of past

> benefits, and/or court decisions are issued that provide new
> guidance, we will reassess our position on this issue.

(Cohen Decl., Ex. Ex. 205 (dkt. #325-8) (emphasis added); *see also* Pls.' PFOFs (dkt. #345) ¶¶ 360, 361(a), 361(b) (describing annual Form 5500s submitted for year 2002 through 2008, in which defendants similarly stated a willingness to reevaluate the need for corrective payments if further guidance suggests corrective payments are warranted).) While defendants stated that they would reassess if Congress or the IRS issued further guidance, these statements did not "leave the door open" to the possibility of corrective payments in any meaningful way.  Rather, defendants simply confirmed the obvious: they would reevaluate if prompted by some external force, whether it be the Congress, IRS or courts.

Even if defendants had made a promise to reconsider corrective payments based on further contingencies, and then somehow broke that promise by later definitively finding no such contingencies, this would not be a sufficient basis to find a later accrual date.  The Seventh Circuit in *Ruppert* rejected a similar argument, finding that while a later amendment was a "fresh violation," it was not a fresh injury for purposes of determining when a claim accrued.  726 F.3d at 941.  The amendment "did not revive claims . . . extinguished by the statute of limitations because [those claims] accrued when the claimants received their lump sum payouts more than six years before the suit was filed."  *Id.* at 941-42.  As such, the court finds that plaintiffs' claims accrued when the lump sum distributions were paid or, in any event, no later than 2003 when defendants made publicly-accessible statements about possible underpayment of lump sum distributions.

On the other hand, defendants would move up the accrual date by arguing that various communications to Plan participants (e.g., SPDs, brochures and individual accounts statements) beginning in 1987 consistently and clearly provide that the account balance equals the lump sum distribution. (Defs.' PFOFs (dkt. #316) ¶¶ 31-41.) Indeed, plaintiffs' own expert concedes that Meriter consistently communicated that the account balance equaled the lump sum distribution. (*Id.* at ¶ 16 (citing Deutsch Report (dkt. #305) pp.48-49).) From this, defendants argue that all claims of participants who were participating in the Meriter Plan (regardless of whether they had received a lump sum distribution yet) as of July 29, 2004, are barred by the statute of limitations.

Perhaps these various communications offer more information than available in the communications at issue in *Ruppert* and *Thompson* -- where the courts rejected similar arguments that the claims accrued based on communications pre-dating lump sum distributions -- the defendants' own actions here call into question whether they repudiated any claim to a lump sum distribution greater than a participant's account balance. After recognizing that their practice of paying the account balance as the lump sum distribution may run afoul of § 417(e) in early 2002 -- before the February 26, 2002, amendment -- defendants began to pay lump sums greater than the account balance. Under these circumstances, the court rejects defendants' argument that communications pre-dating lump sum distributions constituted a clear repudiation of plaintiffs' present claims or triggered the statute of limitations.

### 4.  Equitable Considerations

In addition to targeting the accrual date, plaintiffs also seek to toll the statute of limitations through the doctrines of equitable estoppel and equitable tolling.   Neither doctrine, however, applies because both presuppose earlier knowledge of the injury.  *First*, with respect to equitable estoppel, plaintiffs contend that defendants "effectively promised" their auditors that they would not plead the statute of limitations by promising to make corrective payments.  (Pls.' Opening Br. (dkt. #337) 162.)   As described above, the record simply does not support this characterization, even viewed in a light most favorable to plaintiffs.   Defendants simply promised to make corrective payments if the IRS or Congress issued further guidance on the requirement.  There was no outright promise to correct past payments.

Even if plaintiffs had met their burden of establishing an issue of fact as to defendants' supposed promise to make corrective payments, that promise was *not* to waive any applicable statute of limitations as a matter of fact or equity.  Stated another way, there is no evidence that defendants took affirmative steps to lull plaintiffs and thereby warrant equitable estoppel -- as distinct from efforts to conceal the injury, which would simply alter the discovery of the injury and would not serve as a basis to toll the statute of limitations.  *See Cada*, 920 F.2d at 450-51.

*Second*, equitable tolling does not apply, because there is no evidence that plaintiffs had discovered an injury but lacked vital information to know whether the injury was caused by defendants' wrongdoing.  *See id.* at 451.   The court concludes that a participant's claim premised on defendants' failure to pay the actuarial equivalent as

25

defined in § 4.2 and § 1.2 of the Plan accrued at the time a plaintiff received his or her lump sum distribution as a matter of law and equity.  As such, any distributions plaintiffs received before July 30, 2004, are barred.[9]  To the extent this result may seem unfair, at least in light of defendants' silence at summary judgment as to whether their failure to pay lump sum distributions consistent with § 4.17(e) violated ERISA, plaintiffs also assert claims for breach of fiduciary duty based on defendants' concealing information about this failure and, as explained below, those claims provide an opening for possible relief to class members who received lump sum distributions prior to July 30, 2004.

## D.   Future Indexing through Age 65

Plaintiffs also assert a claim that defendants violated the terms of the pre-amendment Plan by failing to provide projected indexing through the normal retirement age of 65 for those plan participants who opted to receive benefits before age 65, either in the form of a lump sum distribution (subclass B) or annuity (subclass D).[10]  More specifically, plaintiffs contend that defendants violated the Plan by failing to make a projection of the future indexing the participant would have received had he or she waited until age 65 to receive benefits before multiplying that accrued benefit by the

---

[9] The February 26, 2002, amendment had a general effective date of January 1, 1997. Based on this, plaintiffs argue that beginning on January 1, 1997, defendants should have calculated lump sum distributions using the GATT factors and awarded lump sum distributions under that method to the extent that they exceeded the amounts calculated using the 8.0 factor.  Putting aside whether the amendment retroactively applied to January 1, 1997, this claim is similarly barred by the statute of limitations.

[10] In the 1988 Plan, the normal retirement age was either age 65 or, for employees who joined the Plan after attaining age 60, the 5th anniversary of their Plan participation.

factor of 8.0 pursuant to § 4.3.[11]   Plaintiffs emphasize that this claim is a benefits-contract claim, but like plaintiffs' Plan § 4.2 or § 417(e) claim, there appears to be a statutory requirement of future indexing to age 65 (coupled with discounting to the present value) in calculating an accrued benefit.  *See Ruppert*, 726 F.3d 936, 938 (7th Cir. 2014) (explaining that if an employee "decides to take his retirement benefit as a lump sum [early], ERISA provides that the lump sum will not be his current cash balance but the present value of the lump sum retirement benefit that he would be entitled to receive if he deferred receipt until he reached retirement age." (citing 29 U.S.C. § 1054(c)(3)).[12]

### 1. Relevant Plan Provisions

Section 1.1 of the pre-amendment Plan defines "accrued benefit" as follows:

> "Accrued Benefit," *as of any date of reference*, shall mean an annual amount equal to the sum of (a) the Prior Plan Benefit (if any) plus (b) the Transition Benefit (if any) plus (c) the sum of all Yearly Accruals where (a), (b) and (c) are expressed in the Normal Form commencing at Normal Retirement Date and are adjusted *to such date of reference* in accordance with the procedures outlined in Section 3.14.

(1988 Plan (dkt. #309) § 1.1 (emphasis added).)  The Normal Form is defined in § 1.32 with reference to § 3.12, which, in turn, describes a monthly annuity equal to one-twelfth of the accrued benefit.  (*Id.* at §§ 1.32, 3.12.)  Section 3.14 is discussed in greater detail

---

[11] For subclass D, plaintiffs also allege that the failure to provide future indexing led to defendants improperly applying the 2% early retirement reduction in Plan § 3.10.

[12] Defendants' expert Lawrence Sher explains that the factor of 8.0 anticipates future indexing because the factor remains constant, whereas the IRC § 417(e) discount rate factors do not because the factors get smaller at each earlier age.  (Defs.' Resp. to Pls.' PFOFs (dkt. #358) ¶ 205.)  Even if the 8.0 factor inadequately protected benefits of participants taking their distributions before age 65, this problem is subsumed within plaintiffs' challenge under Plan § 4.2 or § 417(e).

below, but in brief, provides an indexing or interest rate of 4% per year, absent an increase adopted by the Pension Committee.

The 2002 Plan amended § 4.3 to provide for indexing to age 65: "The Single Sum Equivalent shall be the Participant's Accrued Benefit payable at Normal Retirement Date multiplied by an Actuarial Equivalent Factor." (2002 Plan (dkt. #312-2) ¶ 4.3.) Even before this amendment, however, defendants concede that "as of January 1, 2002, the Plan was changed prospectively to include future indexing through normal retirement age," though future indexing was only included in calculating lump sum distributions under the § 417(e) method and not when calculated using the factor of 8.0. (Defs.' Resp. to Pls. PFOFs (dkt. #358) ¶ 200a.)

### 2. Analysis

In sole support of their claim of future indexing, plaintiffs rely on their expert's testimony about what the Plan requires. While the court struck any legal opinion in Deutsch's report, the court will nonetheless consider his interpretation of § 1.1 as plaintiffs'. Deutsch recognizes "two distinct dates" in § 1.1 of the Plan: (1) the date of reference and (2) the date of normal retirement age. He still maintains, however, that the date of reference must be the normal retirement date because the Plan only defines benefits actually payable under the Plan with reference to the normal retirement date. (Deutsch Report (dkt. #305) p.21.) Obviously, a plain reading of § 1.1 undermines this interpretation because it defines an accrued benefit as "of any date of reference," expressly not limited to the normal retirement date of age 65. Therefore, defendants'

28

decision not to include future indexing to age 65 appears reasonable based solely on the requirements of the Plan, at least absent a provision requiring such action.

In their reply brief, plaintiffs point to language in § 4.3 quoted in full above, which provides that "[t]he Single Sum Equivalent shall be equal to the Participant's Accrued Benefit *prior to* any adjustment for early or postponed commencement multiplied by eight (8)." (1988 Plan (dkt. #309) § 4.3 (emphasis added).)  The use of "prior to" need not mean that the Plan requires indexing to age 65; rather § 3.10 and § 3.11 provide for pension benefits in the case of early retirement (between age 55 and 65) and late requirement (after age 65) and require adjustments in both instances.  As such, the use of "prior to" in § 4.3 means multiplying the accrued benefit by an 8 before applying the provisions of § 3.10 and § 3.11.  Regardless, § 4.3 refers to the definition of accrued benefit in § 1.1 and that provision does not require future indexing to age 65.

Plaintiffs alternatively argue that § 1.1 must be read to require future indexing because the accrued benefit was not conditioned on future employment and is therefore "nonforfeitable."  (Pls.' Opening Br. (dkt. #337) 81 (citing *Williams v. Rohm & Haas Pension Plan*, 497 F.3d 710, 714 (7th Cir. 2007)).)  This argument presupposes that the Plan document provided for future indexing to age 65, like the plan in *Williams* provided for a cost of living increase allowance.  In other words, plaintiffs' argument puts the cart before the horse -- there is nothing about the language of § 1.1 alone or in other provisions of the Plan that requires future indexing to age 65.  The fact that the accrued

benefit was not conditioned on future employment does not further plaintiffs' argument that the Plan contains this requirement.[13]

## II. January 1, 2003, Amendment

Plaintiffs also challenge whether defendants: (a) properly amended the Plan as required under § 10.1; and (b) provided notice of the changes in the amended plan consistent with the requirements of ERISA § 204(h), 29 U.S.C. § 1054(h)(6)(A).[14]

### A.    Amendment Requirements

Section 10.1 of the Plan -- both in the pre-amended Plan documents, as well as the May 2003 operating plan reflecting the amended plan -- provides in pertinent part:

> The Employer, without the consent of any Participant, may amend this Plan at any time and from time to time by an instrument in writing executed in its name by an officer or officers duly authorized to execute such instrument and delivered to the Pension Committee.
>
> . . .

---

[13] In their 165 page opening brief, plaintiffs devote one sentence to the argument that the Plan would violate "anti-backloading rules" if it did not provide for future indexing to age 65.  (Pls.' Opening Br. (dkt. #337) 82.)  The court would be justified in rejecting this apparent claim that the Plan itself violates ERISA inadequately developed.  But to the extent plaintiffs were pursuing any such claim, it would be barred for all lump sum distributions before July 30, 2004.   Indeed, even if plaintiffs' claim that the pre-amendment Plan required future indexing had merit, this claim is also barred by the statute of limitations for the same reason as plaintiffs' § 4.2 or § 417(e) claim is barred. Participants receiving their lump sum distributions prior to age 65 need know nothing more to know that their distributions did not include any future, projected indexing.  *See Thompson*, 651 F.3d at 606.

[14] Whether defendants amended the claim as required under the Plan's own terms is not a separate, actionable claim, though it impacts the plaintiffs' claims concerning the administration of the Plan beginning in 2003.

> Any such amendment shall be evidenced by a written instrument and upon delivery to the Pension Committee of such instrument, accompanied by a duly certified copy of the resolution of the Board of Directors of the Employer authorizing such amendment, this Plan shall be deemed to have been amended in the manner and to the extent therein set forth.

(1988 Plan (dkt. #309) § 10.1; 1993 Plan (dkt. #310) § 10.1; 2002 Plan (dkt. #312-2) § 10.1; 2003 Operating Plan (dkt. #314-20) § 10.1.)   In addition, ERISA itself requires that "a plan may be amended only pursuant to its express terms." *Downs v. World Color Press*, 214 F.3d 802, 805 (7th Cir. 2000) (citing 29 U.S.C. § 1102(a)-(b); *Brewer v. Protexall, Inc.*, 50 F.3d 453, 457 (7th Cir. 1995); *see also Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 84 (1995) ("The procedure may be simple or complex, but whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level.") (internal quotation marks omitted).

## B.   Amendment

Despite being directed to do so by formal resolution of the Board of Directors, there is no meaningful dispute that defendants failed to execute a written, amended Plan containing the changes approved by the Board in August 2002 with an effective date of January 1, 2003.   Indeed, the undisputed record demonstrates that defendants did *not* execute an amended Plan until January 23, 2009.   The only "evidence" to the contrary is defendants' equivocal representation that they "have not located a copy of this Board-approved plan document [referring to the May 2003 operating plan] signed by a company executive."   (Defs.' Resp. to Pls.' PFOFs (dkt. #358) ¶ 247c; *see also* Defs.' PFOFs (dkt. #316) ¶¶ 54-56.)   Even with respect to the apparent implication of this

31

representation -- that perhaps such a document *may* exist or once existed -- defendants offer no record support.  For example, defendants offer no affidavit or declaration from *anyone* that the document ever existed.  Indeed, defendants do not even include a declaration of the custodian of plan documents about his or her search efforts.  Such a barebones representation is insufficient to raise a genuine issue of material fact as to whether the written Plan was formally amended in 2003.

Instead, defendants argue that "the Board of Directors['] resolution constituted a written instrument executed on behalf of the Company and which resolved that the Plan be amended in accordance with the recommendations of the [Pension Committee], a set of written recommendations that represented the amendments to take place on January 1, 2003."  (Defs.' Opp'n (dkt. #363) 88.)  In support of this argument, defendants submit three, contemporaneously written documents.  The first document is meeting minutes, dated July 31, 2002, of the Pension Design Committee, in which the committee

> reviewed the recommended plan design of 4.5%, 6% and 7.5%. Maintaining the current 4% guarantee, 5 year cliff vesting, age 21 and 1 year of service requirement and the 1,000 hour eligibility rule.  There would be an addition of a 50% match to the 401K plan up to 3% of the employee contribution with a maximum of a 1.5 % employee match.

(Hoffner Decl., Ex. G (dkt. #314-7).)  The committee also discussed the "Factor of 8 Change."  (*Id.*)

The second document is meeting minutes from the Executive Compensation and Pension Committee ("ECPC") from August 16, 2002.  (Hoffner Decl., Ex. H (dkt. #314-8).)  In that meeting, the committee reviewed two options, and ultimately voted to

32

recommend Option B to the full Board of Directors.   (*Id.*)   The meetings described

Option B as

> restricting the employer contribution from a two-tier plan to
> a three-tier plan based upon credited years of service.   We
> would also change the annuity calculation formula to align
> with IRS guidelines and approved mortality tables.   In
> addition, the plan would have a 401K match component.
> The employee post-tax required contribution would be
> discontinued in this core plan and transferred to a new
> 401(k) plan.   Meriter would match the employee 401(k)
> contribution by 50% ($0.50 on the dollar) up to 3%
> employee contribution.

(*Id.*)   During the meeting, the committee also discussed the impact of the Plan changes

on "older employees (age 60 and up)" and agreed to "grandfather them into the old

annuity calculation." (*Id.*)

As reflected by minutes from a meeting of the full Board held on August 28, 2002,

the Board also considered and voted on ECPC's plan redesign recommendation (along

with several other topics).   (Hoffner Decl., Ex. I (dkt. #314-9).)   Those minutes indicate

that Mr. Pollock, a member of the ECPC, "explained the issues that require Meriter to

redesign its pension plan and described the main features of the proposed design, as well

as the alternatives considered." (*Id.* at p.5.)   After some discussion, the Board of

Directors passed the following resolution:

> BE IT HEREBY RESOLVED by the Board of Directors of
> Meriter Health Services, Inc. that this Corporation accepts
> the recommendation of the Executive Compensation and
> Pension Committee regarding revisions to the Meriter Health
> Services Employee Retirement Plan and the Meriter Health
> Services Employees' Long-Range Savings Plan (the
> "Retirements Plans"); and

> FURTHER RESOLVED that the officers of this Corporation
> be and hereby are authorized and directed to amend and
> restate the Retirement Plans as necessary and appropriate to
> implement the recommendations of the Executive
> Compensation and Pension Committee; and
>
> FURTHER RESOLVED that the amended and restated
> Retirement Plans be filed with the Internal Revenue Service
> for determination letters as to their qualified status under the
> provisions of the Internal Revenue Code; and
>
> FURTHER RESOLVED that the copies of the amended and
> restated Retirement Plans, when fully executed and approved
> by the Internal Revenue Service, shall be kept on file in the
> office of the Corporation.

(*Id.*)   The meeting minutes were signed by Regina Millner, Chair of the Board of Directors.  (*Id.* at p.6.)

Defendants urge the court to consider the recommendations of the ECPC and recorded vote of the Board alongside the resolution as sufficient to satisfy the requirements of § 10.1, since it purports to incorporate the recommendations and amendments.  (Defs.' Opp'n (dkt. #363) 88 n.36.)  However, the minutes from the August 16, 2002, ECPC meeting similarly fail to describe the proposed amendment in sufficient detail to satisfy § 10.1.

The July 2002 minutes from the Pension Design Committee fair better; but in those minutes, there was no action taken by that committee and no link between the terms of the amendment described in those minutes and the "Option B" presented to the full Board for approval.  Further, § 10.1 contemplates a written instrument of an amendment as distinct from the Board's resolution approving the amendment.  The

34

court, therefore, finds that the August 28, 2002, board resolution fails to satisfy the requirements of § 10.1 in amending the plan.

Alternatively, defendants argue that the amendment was ratified based on their subsequent actions.  (Defs.' Opp'n (dkt. #363) 89.)  For support, defendants cite to *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995), in which the Supreme Court held that the amendment procedure in a welfare plan satisfied the requirements of ERISA § 402(b)(3), vacated a court of appeal's order holding otherwise, and remanded for consideration of whether the amendment procedure was followed.  In remanding, the Supreme Court specifically also instructed the court of appeals to consider if the amendment of the plan -- termination of post-retirement health care benefits -- was ratified through subsequent actions:  "If the new plan provision is found not to have been properly authorized when issued, the question would then arise whether any subsequent actions . . . served to ratify the provisions ex post."  *Id.* at 85.

*Schoonejongen* and the other case cited by defendants, *Halliburtan Co. Benefits Committee v. Graves*, 463 F.3d 360 (5th Cir. 2006), *decision clarified in denial of rehearing by* 479 F.3d 360 (5th Cir. 2007), both involve ratification of amendments impacting welfare plans, as compared to the pension plan at issue here.  The Supreme Court in *Schoonejongen* stressed the difference between a welfare plan and a pension plan, specifically noting that employers are "generally free under ERISA, for any reason at any time, to adopt, modify or terminate welfare plans," in part because ERISA does not establish the same protections for welfare plans as for pension plans.  *Id.* at 78.  As plaintiffs point out, cases concerning ratification of an amendment of a welfare plan

35

through subsequent actions arguably have limited weight in the context of an amendment of a pension plan.

Still, it is undisputed that the defendants here:  (1) intended to amend the plan; (2) timely advised Plan participants, the Department of Labor and the IRS of the amendment;  and  (3)  subsequently administered the Plan consistent with the amendment.  While the court is reluctant to endorse a theory of ratification which would effectively swallow ERISA's requirement that a plan may be amended only through its terms, ratification seems an appropriate remedy even under ERISA where defendants apparently failed to execute the final document through sheer oversight after being formally "authorized and directed" to so do by Board resolution; where the defendants contemporaneously notified all impacted parties, including Plan participants, that they had done so and subsequently consistently acted accordingly; and where there is no argument that plaintiffs were prejudiced by the failure to execute the document.

In the alternative, defendants seek reformation from the court, finding the May 2003, unsigned operating plan executed for purposes of satisfying § 10.1 and ERISA. The court previously denied defendants' motion for leave to amend their answer to add a counterclaim for such relief, but held open the possibility that the court could still grant reformation as an equitable remedy.  (8/22/13 Order (dkt. #273) 4.)  In *Young v Verizon's Bell Atlantic Cash Balance Plan*, 615 F.3d 808, 820 (7th Cir. 2010), the court found reformation of a pension plan to correct a scrivener's error appropriate, even where the "mistake . . . involve[s] language that is not intrinsically ambiguous but still misstates participants' benefits."  In so holding, the court "acknowledged . . . equitable reformation

36

of an ERISA plan creates some tension with the 'written instrument' requirement of 29 U.S.C. § 1102(a)(1), also known as the 'plan documents rule.'" *Id.*   Here, defendants' failure to sign the May 2003 plan document would seem the type of mistake warranting equitable relief from this court.

In any event, in finding both ratification and reformation, the May 2003 operating plan satisfied § 10.1 and ERISA's written plan requirement.  Even if it did not, the fact that the amendment of a plan be accomplished consistent with its express terms is an ERISA requirement, as well as the fact that defendants did not improperly conceal any failure to follow this technical requirement, means that plaintiffs' claim premised on defendants' failure to properly amend the Plan in 2003 accrued at that time and is now time-barred.  *See* discussion, *supra*, Section I; *see also* 29 U.S.C. § 1024 (b)(2), (b)(4) (requiring the plan administrator to make copies of the plan available upon written request); *Thompson*, 651 F.3d at 606 (finding claim time-barred where ERISA's statutory and regulatory scheme provided knowledge of injury and defendants did not "improperly conceal" the basis of the claim in Plan documents").[15]   Accordingly, the court will grant judgment to defendants on any claim premised on defendants' technical failure to amend the plan effective January 1, 2003.

---

[15] As explained below, the court treating the plan as amended effective January 1, 2003, also moots any claim of cutback in violation of ERISA § 204(g), based on plaintiffs' theory that benefits accrued under the pre-amendment Plan from January 1, 2003, through January 22, 2009, then were cutback by the January 23, 2009, amendment.

## C.    ERISA § 204(h) Notice

In a related claim to the 2003 amendment, plaintiffs challenge the adequacy of the notice issued to participants in late 2002.  Specifically, plaintiffs contend that the notice failed to provide sufficient information to allow participants to understand the effect of the amendment and that this failure was "egregious."

Section 204(h) of ERISA provides in pertinent part:

> (h) Notice of significant reduction in benefit accruals
>
> **(1)** An applicable pension plan may not be amended so as to provide for a significant reduction in the rate of future benefit accrual unless the plan administrator provides the notice described in paragraph (2) to each applicable individual (and to each employee organization representing applicable individuals) and to each employer who has an obligation to contribute to the plan.
>
> **(2)** The notice required by paragraph (1) shall be written in a manner calculated to be understood by the average plan participant and shall provide sufficient information (as determined in accordance with regulations prescribed by the Secretary of the treasury) to allow applicable individuals to understand the effect of the plan amendment. . . .

29 U.S.C. § 1054(h).[16]

Moreover, an "intentional failure" to comply with the notice requirement or a "failure to provide most of the individuals with most of the information they are entitled to receive under this subsection" is deemed an "egregious" failure by ERISA §

---

[16] Subsection (h)(9) provide that "a plan amendment which eliminates or reduces any early retirement benefit or retirement-type subsidy (within the meaning of subsection (g)(2)(A)) shall be treated as having the effect of reducing the rate of future benefit accrual."

204(h)(6)(B).  29 U.S.C. § 1054(h)(6)(B).[17]  If a failure is egregious, plaintiffs § 204(h) provides that "the provisions of the applicable pension plan shall be applied as if such plan amendment entitled all applicable individuals to the greater of: (i) the benefits to which they would have been entitled without regard to such amendment, or (ii) the benefits under the plan with regard to such amendment."  ERISA § 204(h)(6)(A), 29 U.S.C. § 1054(h)(6)(A).

Section 204(h) was amended as part of the Economic Growth Act and Tax Return Reconciliation Act of 2001 ("EGTRRA").  That amendment contained a safe harbor until regulations were adopted.  During the interim period, "a plan shall be treated as meeting the requirements of such sections if it makes a good faith effort to comply with such requirements."  EGTRRRA § 659(c)(2).  The regulations that were subsequently adopted similarly provided for plan amendments taking effect before September 2, 2003 (the effective date of the regulations), the requirements of "section 204(h), as amended by EGTRRA, are treated as satisfied if the plan administrator makes a reasonable, good faith effort to comply with those requirements."  68 Fed. Reg. 17, 277, Q & A(18) (Apr. 9, 2003) (codified 26 C.F.R. pts. 1, 54, and 602).

Defendants issued the applicable § 204(h) notice in October 2002, thus falling within the "safe harbor" period.  The three-page notice described an amendment to the Plan effective January 1, 2003, which may change "the rate at which your accrued benefit grows in the future."  (Hoffner Decl., Ex. (dkt. #314-10) p.2.)  The notice also describes

---

[17] An "intentional failure" also includes instances where a plan administrator discovers an unintentional failure and fails to promptly correct it.  ERISA § 204(h)(6)(B), 29 U.S.C. § 1054(h)(g)(B).

(1) changes to the annual employer credits (4.5% of earning for employees with less than 10 years of service, 6.0% for employees with between 10 and 20 years of service, and 7.5% for individuals with 20 or more years of service) and (2) changes in the annual interest credits to be established based on interest rates and mortality tables prescribed by the Internal Revenue Service.  (*Id.*)  The notice also acknowledges that "future annuity accruals for some participants under the new version of the Plan will be reduced, meaning that the future value of Company-paid annuity benefits will be less than it would have been had the provisions of the prior version of the Plan remained in effect." (*Id.*)  On the second page, the notice reiterates that "[a]s a result of the use of interest rates and mortality tables prescribed by the IRS in the new Plan, the monthly annuity benefit payable to you may not increase for several years, even though your account balance will grow as a result of annual employer credits and interest credits."  (*Id.* at p.3.) Lastly, participants were informed that the effect of this change "will vary from participant to participant, based on each participant's age, service and pay level," and the notice encourages participants to review examples attached to the notice.  (*Id.*; Cohen Decl., Ex. 171 (dkt. #321-5).)

Despite these disclosures, plaintiffs maintain the notice failed to provide most of the information the participant needed to understand the effect of the amendment, including concealing or failing to disclose the fact that:

- the Plan was being converted from an annuity-based formula to an account-based formula;

- a certain period of lump sum and annuity wear-away in most cases lasting several years;

40

- reductions in the rate of future benefit accruals.

(Pls.' Opening Br. (dkt. #337) 99.)   While the plain language of the notice appears to undermine plaintiffs' challenges, especially giving defendants the benefit of the good faith safe harbor provision, the court need not resolve the arguable merits of this claim, however, because any claim based on the inadequacy of the § 204(h) notice is barred by the statute of limitations.

Defendants posit that the appropriate statute of limitations for § 204(h) claims is found in Wisconsin's six-year statute of limitations for breach of contract claims, Wis. Stat. § 893.43.   (Defs.' Opening Br. (dkt. #322) 31-32 n.15.)   As far as the court has been able to discern, the Seventh Circuit has not yet considered the statute of limitations for such a claim, though another district court in this circuit has applied the contract statute of limitations to § 204(h) claims.   *See Hakim v. Accenture U.S. Pension Plan*, 656 F. Supp. 2d 801, 818 (applying Illinois's 6-year statute of limitations for contract claims to § 204(h) claims).   In any event, plaintiffs do not challenge the applicability of a six-year statute of limitations in their opposition brief, and the court finds its application to be reasonable.   Moreover, § 204(h) claims accrue when "the employee knew or should have known that the amendment has brought about a clear repudiation of certain rights that the employee believed he or she had under the plan."   *Romero v. Allstate Corp.*, 404 F.3d 212, 223 (3d Cir. 2005); *see also Hirt v. Equitable Retirement Plan for Employees, Managers &amp; Agents*, 285 Fed.Appx. 802, 804, 2008 WL 2675828, at *1 (2d Cir. July 9, 2008) (holding that a § 204(h) claim "accrues upon a clear repudiation by the plan that is known, or should be known, to the plaintiff").

Plaintiffs argue that participants did not have actual or constructive knowledge of defendants' repudiation because they could not understand what they were giving up. This argument fails for a variety of reasons.  As an initial matter, the notice itself describes an amendment which would change both the annual employer credits and the interest rate.  The notice also stated future annuity accruals would be *reduced* for some participants and that the future value of the annuity benefits will be less than under the prior version of the Plan and encouraged them to review specific attached examples illustrating the effect of the change depending on a participant's "age, service and pay level."  Even if these statements were lacking, plaintiffs were certainly on notice of defendants' repudiation of benefits under the prior plan.  Moreover, as set forth in the court's prior determination, defendants' publicly-accessible statements in a 2003 audit and in Form 5500s beginning in 2002 placed plaintiffs on notice of a possible error in calculating plaintiffs' benefits.  All of this knowledge (whether actual or constructive) was sufficient to trigger accrual of any claims premised on the inadequacy of the § 204(h) notice, providing participants with six years -- until late 2008 -- to bring a challenge under § 204(h).[18]

### III.  Post-Amendment Claims

Plaintiffs also raise challenges concerning defendants' administration of the Plan after January 1, 2003.

---

[18] In finding the notice sufficient to apprise participants that the 2003 amendment may adversely impact their claim to future benefits for purposes statute of limitations, the court does not mean to suggest that it was adequate to apprise them of the need for corrective payments for past accrued benefits and wear away.

### A.     Wear-Away

Plaintiffs spend a significant portion of their brief describing "wear-away" associated with defendants' post-2003 administration of the Plan, contending that "[i]n transitioning to a cash balance formula, Defendants created an opening account balance which produced an accrued benefit payable as an annuity at retirement that was lower than the benefit to which participants were already legally entitled."  (Pls.' Opening Br. (dkt. #337) 102.)  This is because defendants calculated the account balances based on the pre-January 2002 method of calculating lump sums without including (1) an alternative lump sum distribution calculation pursuant to § 417(e) and (2) indexing through normal retirement age.  Plaintiffs' expert estimates that the transition created a 33% deficit.

As far as the court can discern, plaintiffs have not alleged a stand-alone, wear-away claim.  Rather, plaintiffs claim that wear-away or freezing of benefits were the result of defendants' (1) failure to amend the Plan in 2003, which meant benefits should have accrued under the pre-amendment Plan until early 2009; (2) egregious failure to provide sufficient information for participants to understand the effect of so-called wear-away as required by § 204(h); and (3) breach of fiduciary duty claims.  The court's conclusions above in Section II of this opinion moot any recovery premised on the first two claims.  The court will take up plaintiffs' claim that defendants breached their fiduciary duties in failing to disclose wear-away in the section III below.

To the extent plaintiffs intended to allege an independent claim for wear-away, it would also be time-barred because the alleged wear-away or freeze occurred (or at least

commenced) in early 2003 when defendants began administering the Plan based on the May 2003 operating plan.  By that time, defendants had transitioned plaintiffs' benefits to the new plan, and plaintiffs knew or should have known about any wear-away claim based on the § 204(h) notice.  *See Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 410 (6th Cir. 2010) ("[T]he accrual of a cause of action turns on when subclass members knew of Caterpillar's change in benefits, not when they felt its effects.")).

Plaintiffs cite to this court's opinion in *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 255 F.R.D. 628 (W.D. Wis. 2009), to rebut defendants' argument that a claim accrues when participants know of a change, not when they feel the effect of the change.  In *Ruppert*, however, the court concluded that the claim did not accrue until the calculation had been completed, because it was the calculation that *caused* the injury.  *Id*. at 634.  Similarly, the court finds here that the statute of limitations accrued once the participants' benefits were transitioned to the new plan and defendants calculated the benefits -- reflecting any claimed wear-away -- based on the amended plan.

Alternatively, plaintiffs argue that "even if [defendants] committed an actionable wrong outside the limitations period that participants cannot now sue on, they committed a separate and distinct wrong within the limitations period by actually calculating benefits in violation of the terms of the Plan."  (Pls.' Opp'n (dkt. #354) 46.) This argument, however, was rejected by the Seventh Circuit on appeal.  *Ruppert v. Alliant Energy Cash Balance Pension Plan* 726 F.3d 936, 941 (7th Cir. 2013).  While defendants' continued application of the wear-away provisions of the amended plan might arguably

44

result in "fresh violations," there is no fresh injury for purposes of determining when a claim accrued. *Id.*

### B.   Anti-Cutback Claims

Plaintiffs also allege that the 2009 amendment of the Plan violated ERISA's anti-cutback claims.  Under ERISA § 204(g), 29 U.S.C. § 1054(g), "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title."  *See also* IRC § 411(d)(6), 26 U.S.C. § 411(d)(6) ("A plan shall be treated as not satisfying the requirements of this section if the accrued benefit of a participant is decreased by an amendment of the plan . . . .").  Plaintiffs allege that the amendment violated the anti-cutback provisions by eliminating (1) the greater of 4% or 75% of the return on the plan's net assets indexing rate; and (2) the 8.0 factor.  (Pls.' Opening Br. (dkt. #337) 137.)

These claims, however, hinge on plaintiffs' theory that the plan was not properly amended in 2003, and therefore plaintiffs continued to accrue benefits under the old Plan until cutback by the 2009 amendment.  Absent this theory, there is no "accrued benefit" that was decreased by a later amendment of the Plan.  And again, even if the court were to consider the merits of plaintiffs' indexing rate theory, that claim would be barred by the statute of limitations because plaintiffs knew or should have known in late 2002 that the amendment repudiated any right to indexing based on the performance of the Plan.  Specifically, communications to plan participants, including the § 204(h)

notice, disclosed that the indexing rate going forward under the amended Plan would be the greater of 4% or equal to the annual yield on 10-year Treasury Constant Maturities.

## IV.  Breach of Fiduciary Duty Claims

Finally, plaintiffs allege breach of fiduciary duty claims pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).  This provision of ERISA defines four specific fiduciary duties.  Of those, plaintiffs allege defendants violated the duties to act:  for the "exclusive purpose" of participants and their beneficiaries (§ 404(a)(1)(A)); with the care, skill, prudence and diligence of a "prudent man" (§ 404(a)(1)(B)); and in accordance with the plan documents to the extent those plan documents are consistent with ERISA (§ 404(a)(1)(D))).

### A.      Nature of Plaintiffs' Claims

As an initial matter, defendants challenge whether plaintiffs pled a breach of fiduciary duty claim, insisting instead that they only allege "Meriter failed to properly calculate benefits," and "assert no harm connected with any of the[] alleged 'misrepresentation's or failure to disclose." (Defs.' Opp'n (dkt. #363) 48.)  As the court reads the amended complaint, plaintiffs do allege breach of fiduciary duty claims generally.  (Am. Compl. (dkt. #39) ¶ 208.)  Plaintiffs also allege defendants failed to act for the exclusive purpose of the participants in failing to disclose information about the Plan or their administration of the Plan.  (*Id.* at ¶ 156 (alleging defendants breached fiduciary duties in failing to disclose wear-away; ¶¶ 85, 99 (alleging defendants failed to disclose illegality of Plan's calculation of accrued benefits in 2001)).)

Defendants also argue that plaintiffs' amended complaint did not specifically seek a sur-charge as a remedy for a breach of fiduciary duty claim.  However, plaintiffs did seek equitable relief from this court, and sur-charge is simply an equitable remedy available under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  *See Killian v. Concern Health Plan*, 742 F.3d 651, 672 n.50 (7th Cir. 2013) (*en banc*) (describing equitable relief under ERISA as including "monetary payments through estoppel and "'surcharges'") (citing *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011)).  Moreover, defendants' argument that plaintiffs may not rely on the catchall provision of § 502(a)(3) as a remedy for their breach of fiduciary claim directly contradicts the Supreme Court's core holding in *Amara*, affirming district court's award under § 502(a)(3) of "reformation of the terms of the plan, in order to remedy the false or misleading information CIGNA provided."  *Cigna Corp.*, 131 S. Ct. at 1879-80.

Defendants' objections aside, plaintiffs posit the following basic theories at summary judgment in support of their breach of fiduciary claims, all of which are premised on defendants' alleged actions in response to the § 417(e) issue:  (1) questioned whether to provide corrective lump sum payments in 2001 and left that question open until at least 2008; (2) conducted claims review without telling participants that their "claim" for corrected payments was denied; (3) promised plan auditors and the Department of Labor that they would make corrective payments; and (4) fraudulently concealed from participants the existence of their claims.   Plaintiffs also claim that defendants breached their fiduciary duties by both failing to disclose and in concealing the alleged wear-away provision in the amended plan.

47

## B.     Statute of Limitations

Defendants move for summary judgment on plaintiffs' breach of fiduciary duty claims, arguing that plaintiffs had actual knowledge of the alleged breach by January 1, 2003, and therefore the claim needed to be filed within three years, by January 1, 2006. (Defs.' Opening Br. (dkt. #322) 39.)

Unlike the other provisions discussed above, the statute of limitations for a breach of fiduciary duty claim under ERISA § 413, 29 U.S.C. § 1113, is the earlier of:

> **(1)** six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> **(2)** three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

Here, defendants' alleged acts constituting a breach of their fiduciary duties occurred in 2001 or 2002, and certainly by 2003.  Six years after would be no later than 2009.  As for when plaintiffs had *actual* knowledge of defendants' breach or violation, that date is difficult, if not impossible, to determine on summary judgment.  Since ERISA § 413 provides that the statute of limitations runs out on the *earlier* of these dates, however, the limitations period would normally expire no later than 2009 under subsection (1).

Still, as plaintiffs point out, "the statute does allow an exception under the limitations period in instances of fraud or concealment." *Laskin v. Siegel*, 728 F.3d 731,

735 (7th Cir. 2013). "Under those circumstances, the statute of limitations period allows an action to be commenced six years after the plaintiff actually learned of the breach." *Id.* The Seventh Circuit recognized two types of "fraud" for purpose of determining the statute of limitations for ERISA breach of fiduciary claims: "(1) overt acts that misrepresent the significance of facts of which the beneficiary is aware; and (2) underlying ERISA violations that are self-concealing." *Id.* "[A] finding of concealment requires evidence that a defendant took affirmative steps to hide the violation itself." *Id.*

For reasons already explained above, the court has already rejected plaintiffs' characterization of the record as permitting a finding that defendants (1) mislead plaintiffs by leaving open the possibility of corrective payments until 2008, (2) conducted a claims review without informing participants in writing of the denial, or (3) promised in any meaningful way to make future payments. With respect to plaintiffs' breach of fiduciary duty claims premised on defendants' alleged failure to timely disclose the § 417(e) issue, plaintiffs have, however, put forth sufficient evidence to overcome defendants' statute of limitations defense with respect to their claim that defendants (1) knew that the Plan had failed to pay lump sum distributions as required by IRC § 417(e) and ERISA § 205(g) in late 2001, and (2) took affirmative steps to hide the violation.

For example, in early 2002 -- after defendants had begun to calculate an alternative lump sum distribution as required by § 417(e) -- defendants issued a lump sum distribution to one pension participant for approximately $1400 more than his account balance. (Pls.' PFOFs (dkt. #345) ¶¶ 244a, 244b.) In explaining the reason, defendants simply stated that the increased amount was from delay in the Board

49

approving an interest rate.  (Cohen Decl., Ex. (dkt. #338-1).)  This letter at least raises an inference defendants were attempting to conceal the fact that they had shifted the method for calculating lump sum distributions to avoid raising questions about past calculations.  This inference finds additional support in notes from meetings of the Pension Committee in 2002 suggesting members were concerned about the statute of limitations of such claims and had also raised concerns about whether issuing corrective payments would trigger legal challenges.  (Cohen Decl., Ex. 108 (dkt. #336-2); *id.*, Ex. 100 (dkt. #334-16).)  Lastly, the fact that defendants rolled out an amended Plan in the wake of warnings by their auditors also raises questions about whether defendants hoped to hide past mismanagement of plaintiffs' benefits as part of a redesign effort.  In total, plaintiffs have put forth sufficient evidence to demonstrate defendant took affirmative steps to conceal the § 417(e) violation and, in turn, breached their fiduciary duties of acting for the exclusive purpose of plan participants and their beneficiaries.

With respect to the wear-away claim, plaintiffs simply argue that defendants failed to adequately disclose this provision of the amended plan.  (Pls.' Opening Br. (dkt. #337) 141-12.)  To extend the statute of limitations, however, plaintiffs must point to evidence demonstrating that defendants either "misrepresent[ed] the significance of facts the beneficiary is aware of (fraud) or [hid] facts so that the beneficiary does not becomes aware of them (concealment)."  29 U.S.C. § 1113.  Because plaintiffs failed to put forth evidence from which a reasonable fact finder could conclude that defendants acted fraudulently or took affirmative steps to conceal this provisions in the 2003 amendment

to the Plan, the court will grant defendants' motion with respect to breach of fiduciary duty claims based on the wear-away provision in the 2003 amendment.

CONCLUSION

In light of this decision, the court trial set to begin on Monday, July 28, 2014, will solely address whether defendants breached their fiduciary duty to act for the exclusive purpose of plan participants and beneficiaries by concealing defendants' failure to pay lump sum distributions as required under IRC § 417(e) from the Plan's inception on October 1, 1987, to December 31, 2002.

ORDER

IT IS ORDERED that:

1)  plaintiffs' motion for partial summary judgment (dkt. #300) is DENIED; and

2)  defendants' motion for partial summary judgment (dkt. #302) is GRANTED IN PART AND DENIED IN PART as described above.

Entered this 3rd day of July, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge